Docket No. 91494–Agenda 7–May 2003.

MICHAEL AVERY 
et al.
, Appellees, v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant.

Opinion filed August 18, 2005.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

Michael Avery and other named plaintiffs brought a class action in the circuit court of Williamson County against defendant, State Farm Mutual Automobile Insurance Company (State Farm). Representing a nearly nationwide class of State Farm policyholders, plaintiffs alleged claims sounding in breach of contract and statutory consumer fraud, in addition to a claim seeking declaratory and injunctive relief.

The circuit court certified the class. The breach of contract claim was tried before a jury, and the remaining claims received a simultaneous bench trial. The jury returned a verdict in favor of plaintiffs on the breach of contract claim, and the circuit court entered judgment in favor of plaintiffs on the consumer fraud claim. With regard to the third count, the circuit court granted declaratory relief but declined to grant injunctive relief. The damages awarded to plaintiffs totaled $1,186,180,000.

The appellate court affirmed the judgment, with one exception. The appellate court reversed a portion of the damages, lowering the total award to $1,056,180,000. 321 Ill. App. 3d 269. We allowed State Farm’s petition for leave to appeal. 177 Ill. 2d R. 315(a).

Plaintiffs’ suit centers on certain automobile repair part categories which have been identified in the record and to which we refer throughout our discussion. “Crash parts” refers to automobile components that are used to replace parts damaged in a crash, rather than parts that have failed mechanically. They are primarily sheet metal and plastic parts that are attached to the outer shell of the car. Crash parts consist of two categories. The first category is comprised of new parts made by or on behalf of the automobile’s original manufacturer. These parts are commonly referred to as “Original Equipment Manufacturer” parts, or “OEM” crash parts. The second class includes aftermarket parts made by companies not affiliated with original equipment manufacturers. These parts are referred to as “non-OEM” crash parts.
(footnote: 1)
 A succinct general overview of plaintiffs’ theory of the case may be found in “Plaintiff’s Memorandum in Support of Application of Illinois Law to the Claims of Class Members Under Illinois Choice of Law Doctrine”:

“In this case, plaintiffs have placed at issue the propriety of State Farm’s uniform practice of specifying the use of non-OEM crash parts to repair its policyholders’ car[s] in every instance in which such cheaper parts are available. *** Plaintiffs contend that this policy breaches State Farm’s standard contract because it is not designed to restore policyholders’ cars to their pre-loss condition by using parts of like kind and quality. Plaintiffs further contend that this practice violates Illinois’ consumer law because the practice itself and its economic ramifications constitute a violation of Illinois consumer statutes, which prohibit[] misrepresentations as to the ‘standard, quality, or grade’ of the goods and services provided under State Farm’s policies. [Citation.] At trial, the Court and jury must resolve the classwide question of whether State Farm, by requiring the uniform use of non-OEM crash parts, and through the course of conduct it designed to conceal the true import of this practice from its policyholders, breached its contractual obligations and committed consumer fraud.”

This opinion is divided into two principal sections: “Breach of Contract” and “Consumer Fraud.”
 In a third section, we deal with plaintiffs’ claims for declaratory and injunctive relief. These sections are further subdivided, as required by the various arguments and issues, as follows:

I. Breach of Contract

A. 
Propriety of the Nationwide Contract Class

B. 
Whether the Verdict May Be Affirmed with Respect to Subclasses

1. The Massachusetts and “Assigned Risk” Policies

2. The “You Agree” Policies

3. The “Like Kind and Quality” Policies

4. Damages

a. 
Specification Damages

b. 
Installation Damages

II. Consumer Fraud Act

A. 
Plaintiffs’ Consumer Fraud Claim

1. Plaintiffs’ Consumer Fraud Claim May Not Be Based on a Breach of a Promise Contained in Their Insurance Policies

2. This Case Is Not About the Specification of Defective Parts

3. The Representations Which Form the Basis of Plaintiffs’ Cause of Action for Consumer Fraud Do Not Include the Statement That Non-OEM Parts Are as Good as OEM Parts

4. Describing a Non-OEM Part as a “Quality Replacement Part” Is Puffing and, Hence, Not Actionable

5. The Guarantee Provided by State Farm Cannot Form a Basis for Plaintiffs’ Consumer Fraud Claim

6. The Crux of Plaintiffs’ Consumer Fraud Claim Is a Failure by State Farm to Disclose the Categorical Inferiority of Non-OEM Parts During the Claims Process

B. 
Propriety of the Nationwide Consumer Fraud Class

1. Scope of the Consumer Fraud Act

2. Whether the Consumer Fraud Act Applies to the Transactions at Issue in This Case

C. 
Propriety of Judgment: Named Plaintiff

1. Burden of Proof

2. The Deceptive Act or Practice

3. Actual Damage

4. Proximate Cause–Actual Deception

D. 
Other Issues

III. Equitable and Declaratory Relief

We begin with plaintiffs’ breach of contract count.

I. Breach of Contract

Plaintiffs’ original class action complaint, which was filed in July 1997, was amended several times. The trial, which took place in 1999, was predicated upon plaintiffs’ third amended class action complaint. Count I (breach of contract) of the third amended complaint alleged that State Farm breached its “uniform insurance contract” with its policyholders. Plaintiffs alleged that, under the terms of this contract, State Farm promised “to restore plaintiffs’ vehicles to their pre-loss condition using parts of like kind and quality.” According to plaintiffs, the term “like kind and quality,” as stated in this promise, meant “like kind and quality to OEM parts.” However, plaintiffs also alleged that the non-OEM parts at issue in this case were categorically inferior to their OEM counterparts. Under plaintiffs’ view, non-OEM parts could 
never
 satisfy State Farm’s “like kind and quality” obligation. Plaintiffs alleged: “As a practical matter, [State Farm’s] obligation could be met 
only 
by requiring the 
exclusive use 
in repairs 
of factory-authorized or OEM parts
.” (Emphases added.)

In urging the certification of their claim as a class action, plaintiffs alleged that State Farm’s contractual agreement with its policyholders was a uniform “Policy,” in the singular, with “the same or common general terms.” State Farm argued, to the contrary, that there was no uniform State Farm automobile insurance policy nationwide, and individual issues therefore would dominate the contract claims, rendering classwide determinations impossible. See 735 ILCS 5/2–801(2) (West 1998). According to State Farm, some of its policies included a promise to pay to repair the vehicle with parts of “like kind and quality,” but other policies did not contain this provision. State Farm added that, in many states, its policies explicitly provided for the specification of non-OEM parts sufficient to restore the vehicle to its “pre-loss condition.” Still other State Farm automobile insurance policies contained neither the “like kind and quality” nor the “pre-loss condition” language. State Farm pointed, for example, to its Massachusetts policies, which promised simply to pay “the actual cash value” of “parts at the time of the collision.” Another group of policies that contained neither the “like kind and quality” nor the “pre-loss condition” language were the majority of State Farm’s “assigned risk” contracts, which were written for the “residual market” of high-risk consumers whom states 
required
 insurers to cover. According to State Farm, most of these assigned risk policies promised simply to pay the “[a]mount necessary to repair or replace the property.”

State Farm also argued that there were substantive conflicts of law between Illinois and other states, and therefore it would be improper to apply Illinois law to the contract claims of class members nationwide. State Farm contended, in addition, that Illinois lacked significant contacts with the claims of class members in other states and the imposition of Illinois law with regard to their claims would violate constitutional rights. See 
Phillips Petroleum Co. v. Shutts
, 472 U.S. 797, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985).

Following a hearing, the circuit court certified plaintiffs’ claims as a 48-state class action. The circuit court rejected State Farm’s arguments, finding that Illinois law could be applied to the claims of the entire class and that this imposition of Illinois law presented no constitutional difficulties. The court also rejected State Farm’s argument that there was no standard form insurance policy. The court took the position that the specific form of the individual policies was immaterial so long as the operative contractual language in each policy was susceptible of uniform interpretation. The court declined to address this issue at the certification stage, maintaining instead that the question of whether the language in State Farm’s various policies could be given a uniform interpretation should be resolved at trial.

In reaching its decision to certify the class, the court concluded that there were questions of fact or law that were common to the class, and these questions predominated over any questions affecting only individual members. 735 ILCS 5/2–801(2) (West 1998). The court pointed to what it termed State Farm’s uniform practice “throughout the United States” of specifying non-OEM parts on policyholders’ repair estimates. According to the court, the members of the plaintiff class had a “common interest” in determining whether this practice constituted a breach of State Farm’s contractual obligation. In the court’s view, this common interest predominated over questions affecting individual class members.

In an “Order Regarding Law to be Applied to Class Members’ Claims,” the circuit court explained its reasoning for applying Illinois law to class members’ claims nationwide. The court stated:

“With respect to the breach of contract claims, the court finds that there are no true conflicts of law raised by the specific claims or facts at issue in this case which require application of the law of any state other than Illinois. Illinois possesses sufficient contacts such that the application of Illinois law to the breach of contract claims in this case is neither arbitrary nor unfair and comports with due process. Application of Illinois law to the breach of contract claims does not implicate the interests of any other jurisdiction and application of its law to these claims. Finally, the application of Illinois breach of contract standards, which are identical to those in other jurisdictions, does not interfere with any state’s legislative or legal choices.”

Based on its finding that class members had a “common interest” in determining whether State Farm’s “uniform” practice of specifying non-OEM parts breached State Farm’s contractual obligation, and that Illinois law could be applied to class members’ claims nationwide, the circuit court certified the following class:

“All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) ‘crash parts’ installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts. Excluded from the class are employees of Defendant State Farm, its officers, its directors, its subsidiaries, or its affiliates.

In addition, the following persons are excluded from the class: (1) persons who resided or garaged their vehicles in Illinois and whose Illinois insurance policies were issued/executed prior to April 16, 1994, and (2) persons who resided in California and whose policies were issued/executed prior to September 26, 1996.”

Following entry of the circuit court’s order certifying the class, State Farm sought from this court a writ of 
mandamus 
directing the circuit court to reverse the order. State Farm suggested in the alternative that this court reverse the circuit court’s certification order pursuant to our supervisory authority. State Farm also moved for transfer, consolidation, and a stay of proceedings. This court entered an order in which we took “no action” on State Farm’s various requests because there were insufficient votes either to allow or to deny.

In the circuit court, State Farm subsequently moved for summary judgment on the class claims and for decertification of the class. The circuit court denied these motions. State Farm also moved for summary judgment against each of the named plaintiffs. This motion was denied as well.

Prior to trial, the parties tendered a number of motions 
in limine
. One of plaintiffs’ motions sought to bar State Farm from presenting evidence to the jury that the regulation of insurance varied from state to state, and another of plaintiffs’ motions sought to prohibit any disclosure of the states where the class members’ policies were filed. Still another of plaintiffs’ motions sought to preclude the introduction of evidence regarding differences in State Farm’s contractual obligations to class members. In opposing these motions, State Farm argued, as it had in opposing class certification, that there were significant variances in its contractual obligations to the members of the class, and these variances resulted, at least in part, from differing insurance regulations in the various states. State Farm asserted:

“[N]othing is more basic in the trial of a contract claim than *** that[] the rights and duties of the parties to a contract are defined by that specific contract. But plaintiffs ask to exclude that very starting point[,] [t]he contract of the individual class members, a contract which varies *** depending on troublesome differences in State Farm’s obligations toward members of the class. The contractual rights of the members of the class, Your Honor, do vary, and those variances are not only relevant but fundamental.”

The circuit court granted several of plaintiffs’ motions 
in limine
, including those barring State Farm from (1) disclosing the states where the class members’ policies were filed, (2) introducing evidence regarding variances in the states’ insurance regulations, and (3) introducing evidence regarding differences in State Farm’s contractual obligations to members of the class.

The trial began on August 16, 1999. As previously indicated, the breach of contract claim was tried before the jury, and the remaining claims were tried before the court after the jury had left for the day. At the start of the trial, and over the objection of State Farm, the circuit court gave preliminary jury instructions. In these instructions, the court told the jury that State Farm’s contractual obligation was “exactly the same, whether State Farm promised to pay for crash parts of like kind and quality or promised to pay for crash parts which restore a vehicle to its pre-loss condition.” The court added that, under State Farm’s policies, the company was allowed to specify either OEM parts or non-OEM parts, “so long as the crash parts are of like kind and quality which restore the damaged vehicle to its pre-loss condition.” According to the circuit court, crash parts were of like kind and quality “only if they restore[d] a vehicle to its pre-loss condition,” which the court defined as “the condition of the vehicle immediately prior to the time it is damaged.”

It is unnecessary to recount in detail the evidence presented at trial. We note that the trial lasted several days, and involved hundreds of exhibits and testimony by dozens of witnesses. Much of the testimony dealt with whether non-OEM parts were categorically inferior to OEM parts. Each side presented the testimony of experts and bodyshop witnesses in support of their respective positions. At this point, we summarize only the testimony of the named plaintiffs, the testimony of plaintiffs’ damages expert, and that of a State Farm claims consultant. Other facts relevant to our analysis will be introduced as they become pertinent.

Five named plaintiffs testified at trial. Michael Avery, of Louisiana, testified by video deposition. The remaining four gave their testimony in person: Mark Covington, a resident of Mississippi; Sam DeFrank, who lived in Illinois; Carly Vickers, a resident of Pennsylvania; and Todd Shadle, who was living in Massachusetts when his accident occurred.

Two of the witnesses, Avery and Shadle, did not have non-OEM parts installed on their vehicles. Both testified that before their respective accidents, their cars were in very good condition, and they would not consider non-OEM parts. Accordingly, both had OEM parts installed on their vehicles, rather than the non-OEM parts specified in the estimate, and both paid the difference in cost. For Shadle, the difference was about $45, and for Avery it was about $155.

Covington, DeFrank and Vickers did have non-OEM parts installed on their vehicles. All three expressed dissatisfaction with the parts. Vickers testified that, following the collision that gave rise to her suit, her car was involved in a subsequent, more serious accident and was declared a total loss. Vickers admitted that State Farm paid her “book value” for the car. She added that, so far as she knew, State Farm did not value her car any less because of the non-OEM parts that had been used in its repair. DeFrank testified that, several months after his truck was repaired, he sold the vehicle to his brother-in-law for an amount that was slightly below “Blue Book” value. However, DeFrank asserted that, even though the truck had been repaired with non-OEM parts, he did not discount the sale price based on this fact. DeFrank characterized the sale of the truck to his brother-in-law as an “arm’s length transaction.”

Plaintiffs’ damages expert, Dr. Iqbal Mathur, testified that there were two types of damages being sought for breach of contract. The first was what Mathur termed “direct,” or “specification,” damages. According to Mathur, these damages were incurred when State Farm specified a non-OEM part on the repair estimate. Under this theory, everyone in the class was eligible to receive specification damages. On cross-examination, Mathur acknowledged that a plaintiff would be entitled to receive specification damages even if his car were restored to its preloss condition. Mathur also conceded that specification damages would apply even if the car were repaired with an OEM part or with a non-OEM part that was of the same quality as an OEM part.

The second type of contract damages, which Mathur described as “consequential,” or “installation,” damages, was determined by calculating the cost of 
replacing
 non-OEM parts with OEM parts on a class member’s vehicle. Only those class members who actually had non-OEM parts installed on their vehicles were eligible to receive installation damages.

On cross-examination, Mathur acknowledged that, with regard to installation damages, it was necessary to determine whether a non-OEM part was installed on a class member’s vehicle. However, Mathur conceded that he had no way of making this determination. Mathur also acknowledged that he had “no opinion” as to how many class members had non-OEM parts installed on their vehicles but later received fair market value for them. Mathur admitted that his calculations as to installation damages might be incorrect by as much as $1 billion.

Among the witnesses appearing for defendant was Don Porter, a State Farm property consultant in auto general claims. Porter’s testimony was directed primarily to State Farm’s “basic philosophy” of handling auto damage claims, rather than any specific contractual obligation. In describing this philosophy, Porter testified repeatedly that State Farm’s goal was to pay to restore a policyholder’s car to its preloss condition. According to Porter, State Farm has “always had a commitment to restoring the vehicle to its pre-loss condition.” Porter also testified that the parts specified “must be as good as the part that was on the car prior to the loss.” Porter never mentioned the Massachusetts or assigned risk policies, and never stated that all the State Farm policy forms at issue in this case were uniform.

Following the close of evidence, the circuit court, in conferring with the parties, reiterated the view that State Farm’s contractual obligation was the same for each member of the class. In describing this uniform obligation, the circuit court pointed to Porter’s testimony. According to the court, Porter testified that State Farm’s promise “always was that when the car was repaired, the parts would be of like kind and quality which restores [the vehicle] to its pre-loss condition.” The court ruled that this uniform interpretation of the contractual obligation would apply to all of State Farm’s policies, including the “assigned risk” policies and the Massachusetts policies (neither of which contained the “like kind and quality” or the “pre-loss condition” language).

During the conference on jury instructions, State Farm objected to the use of the term “contract” in the instructions.
(footnote: 2) State Farm argued: “Reference to a singular contract is factually inaccurate. There were numerous contracts.” Counsel for State Farm informed the circuit court that, with regard to the court’s interpretation of the contractual obligation as uniform, State Farm wanted to preserve its “objections as to variations in contract terms based on either differing policy language or differing state regulations.” Counsel stated:

“We understand that’s not going to be a part of this trial. So we merely want to preserve that for appellate purposes.”

The circuit court noted the objection, and subsequently instructed the jury. The instructions regarding State Farm’s contractual obligation essentially repeated what the court had given in its preliminary instructions. The essence of these contractual obligation instructions was that State Farm’s contractual obligation was the same for every class member.

The verdict form given by the circuit court was general and classwide. It stated, in pertinent part: “Do you find that defendant State Farm failed to perform its obligations under the contract and breached its contract with the plaintiff class?” The circuit court denied State Farm’s request to give, in addition, individual verdict forms for each named plaintiff.

The jury found that “defendant State Farm failed to perform its obligations under the contract and breached its contract with the plaintiff class.” Contract damages awarded to the plaintiff class totaled $456,180,000, which consisted of $243,740,000 in specification damages and $212,440,000 in installation damages. The circuit court entered judgment on the jury’s verdict in favor of plaintiffs on the contract claim. The court also entered judgment in plaintiffs’ favor on the consumer fraud claim, finding that State Farm had, by its practices, violated the Consumer Fraud Act. The court awarded plaintiffs an additional $130 million in “disgorgement” damages and $600 million in punitive damages, resulting in a total award of $1,186,180,000 on all claims.

On appeal, State Farm argued that, with regard to plaintiffs’ breach of contract claim, individual questions predominated over any purported common questions, and the claim for breach of contract therefore should not have been certified as a class action. 735 ILCS 5/2–801(2) (West 1998). In its brief to the appellate court, State Farm contended that, contrary to the conclusion of the circuit court, the operative contractual language in State Farm’s policies was 
not 
susceptible of uniform interpretation. While acknowledging that most of its auto insurance contracts contained the “like kind and quality” or the “pre-loss condition” language, State Farm insisted that “a significant number of policies did not.” State Farm pointed, for example, to its policies in Massachusetts, as well as its assigned risk policies in Alaska, Illinois, Indiana, and Minnesota, which State Farm averred “did not use either the ‘like kind and quality’ or ‘pre-loss condition’ language.” In its brief to the appellate court, State Farm asserted:

“Neither of these formulations [the Massachusetts policy provision or the ‘assigned risk’ policy provision] expressly imposes 
any 
standard of part quality. In fact, the assigned risk policies deliberately 
delete 
the ‘like kind and quality’ and ‘pre-loss condition’ language that appears in other State Farm policies.” (Emphases in original.)

Focusing on the circuit court’s interpretation of its contractual obligation as uniform, State Farm told the appellate court:

“Rather than trying to deal with the variations in policy language and the governing [state] laws, the circuit court chose to ignore them completely. The court instructed the jury that there was only one policy form, even though there are a number of different forms. Then the court made up its own interpretation of that policy form, without citing any law to support it. Finally, in order to enforce the artificial uniformity it had created, the court barred State Farm from telling the jury about any different contract language or differing state laws governing the specification of non-OEM parts.

The circuit court’s decision to force this case into the mold of a class action by fabricating a single contract and a single interpretation is an error of law of constitutional dimension that requires reversal by this Court.”

The appellate court affirmed the certification of plaintiffs’ breach of contract claim as a class action. The appellate court concluded, as had the circuit court, that State Farm’s contractual promise was the same for each member of the class. The appellate court stated:

“The record demonstrates that plaintiffs presented evidence to show that State Farm made the same promise (
i.e.
, to pay for parts ‘of like kind and quality’ to restore ‘pre-loss condition’) to its policyholders throughout the country. 
State Farm’s own witness, Don Porter, a claims consultant, acknowledged that State Farm had a uniform nationwide obligation to policyholders. This promise was to specify parts of like kind and quality 
to OEM parts 
so as to restore preloss condition.” (Emphasis added.) 321 Ill. App. 3d at 280.

The appellate court also affirmed the circuit court’s finding that Illinois law could be applied to the contract claims of all the class members nationwide and that this imposition of Illinois law presented no constitutional difficulties.

With regard to the merits, the appellate court upheld the circuit court’s judgment that State Farm breached its contractual obligation to the plaintiff class. The appellate court stated:

“Plaintiffs claimed that the non-OEM parts specified by State Farm were categorically inferior and failed to restore the vehicles to their ‘pre-loss condition.’ The claim was supported with expert testimony, from which it could be reasonably inferred, if accepted as true, that the lot of non-OEM parts specified by State Farm was inferior in terms of appearance, fit, quality, function, durability, and performance.” 321 Ill. App. 3d at 280.

The appellate court also upheld most of the damages awarded for breach of contract. In affirming the award of specification damages, the appellate court explicitly concluded that these damages applied even where (1) an inferior non-OEM part was specified on the estimate, but the body shop provided an OEM part at no additional cost to the class member, and (2) non-OEM parts were used in the vehicle’s repair, but the class member subsequently sold the vehicle for fair market value with no diminution in value because of the use of non-OEM parts. 321 Ill. App. 3d at 287-88. The appellate court also upheld the award of installation damages, rejecting State Farm’s criticism that these damages were speculative. 321 Ill. App. 3d at 288-90.

However, the appellate court concluded that the $130 million in disgorgement damages constituted an impermissible double recovery, and the appellate court therefore reversed this award. As a result, plaintiffs’ total award was reduced to $1,056,180,000.

State Farm appeals from those portions of the judgment of the appellate court affirming the judgment of the circuit court.
(footnote: 3) We granted State Farm’s petition for leave to appeal. 177 Ill. 2d R. 315(a).

A. 
Propriety of the Nationwide Contract Class

Before this court, State Farm argues, as it did before the circuit and appellate courts, that the class should not have been certified. State Farm contends that individual questions predominate over any questions common to the class and that Illinois law should not have been applied to the contract claims of class members nationwide. With regard to the merits, State Farm argues that plaintiffs failed to establish a breach of State Farm’s contractual obligation and plaintiffs failed to establish that they were entitled to damages. We turn first to State Farm’s contention that the class should not have been certified.

Class certification is governed by section 2–801 of the Code of Civil Procedure (735 ILCS 5/2–801 (West 1998)), which is patterned after Rule 23 of the Federal Rules of Civil Procedure. See 
Getto v. City of Chicago
, 86 Ill. 2d 39, 47 (1981); K. Forde, 
Illinois’s New Class Action Statute
, 59 Chi. B. Rec. 120, 122-24 (1977). Given the relationship between these two provisions, federal decisions interpreting Rule 23 are persuasive authority with regard to questions of class certification in Illinois. See, 
e.g.
, 
Schlessinger v. Olsen
, 86 Ill. 2d 314, 320 (1981) (citing Fed. R. Civ. P. 23 case in analyzing class certification issue); see K. Forde, 
Illinois’s New Class Action Statute
, 59 Chi. B. Rec. 120, 122-24 (1977); 
Southwestern Refining Co. v. Bernal
, 22 S.W.3d 425, 433 (Tex. 2000). Under section 2–801, a class may be certified only if the proponent establishes the four prerequisites set forth in the statute: (1) numerosity (“[t]he class is so numerous that joinder of all members is impracticable”); (2) commonality (“[t]here are questions of fact or law common to the class, which common questions predominate over any questions affecting only individual members”); (3) adequacy of representation (“[t]he representative parties will fairly and adequately protect the interest of the class”); and (4) appropriateness (“[t]he class action is an appropriate method for the fair and efficient adjudication of the controversy”). 735 ILCS 5/2–801 (West 1998).

Decisions regarding class certification are within the sound discretion of the trial court and should be overturned only where the court clearly abused its discretion or applied impermissible legal criteria. 
McCabe v. Burgess
, 75 Ill. 2d 457, 464 (1979); 
Eshaghi v. Hanley Dawson Cadillac Co.
, 214 Ill. App. 3d 995, 1001 (1991). However, “[a] trial court’s discretion in deciding whether to certify a class action is not unlimited and is bounded by and must be exercised within the framework of the civil procedure rule governing class actions.” 4 A. Conte & H. Newberg, Newberg on Class Actions §13:62, at 475 (4th ed. 2002); see also 
Broussard v. Meineke Discount Muffler Shops, Inc.
, 155 F.3d 331, 344 (4th Cir. 1998) (noting that, while a trial court has broad discretion in deciding whether to certify a class, this discretion must be exercised within the framework of Fed. R. Civ. P. 23).

In the case at bar, State Farm argues that it was an abuse of discretion to certify the class. State Farm’s argument focuses on the commonality and predominance requirement of section 2–801. According to State Farm, it was error for the lower courts to conclude that common questions predominated over questions affecting only individual class members.

With regard to the class that was certified for plaintiffs’ contract claim, the common question identified by the circuit court in its certification order was whether State Farm’s practice of specifying non-OEM parts on repair estimates constituted a breach of State Farm’s contractual obligations. According to the circuit court, this question of “contractual interpretation” predominated over other issues. In reaching this conclusion, the circuit court acknowledged State Farm’s argument that its insurance contracts took varying forms and there was thus no standard form contract to be interpreted. However, in the court’s view, the specific form of the individual insurance policies was immaterial so long as “the operative contractual language contained in each policy [was] susceptible [of] uniform interpretation.” The court concluded that this question of whether the various policies’ language could be given uniform interpretation should be decided at trial, rather than at the class certification stage.

Notwithstanding this assertion by the court, the issue of uniform contractual interpretation was never decided on the merits. As previously noted, prior to trial the circuit court granted plaintiffs’ motions 
in limine 
barring the introduction of evidence regarding differences in State Farm’s contractual obligations and prohibiting any mention of the states where the class members’ policies were filed. As a result of these rulings, the jury was prevented from hearing evidence regarding any variations in State Farm’s contractual obligations to the class members. Moreover, by the time the trial began, the circuit court itself had decided the issue of whether the contractual language in State Farm’s various policies was susceptible of uniform interpretation. In its preliminary instructions to the jury, the court stated: “The contractual obligation of State Farm under its policies or insurance contracts is 
exactly the same
, whether State Farm promised to pay for crash parts of like kind and quality or promised to pay for crash parts which restore a vehicle to its pre-loss condition.” (Emphasis added.) Following the close of evidence in the jury trial, the circuit court expressed this uniform contractual interpretation in even broader terms, ruling that it applied to all of State Farm’s policies, including the assigned risk policies and the Massachusetts policies (neither of which contained the “like kind and quality” or the “pre-loss condition” language).

In our view, the circuit court was incorrect in concluding, in the first instance, that the question of uniform contractual interpretation should be decided at trial rather than at the class certification stage. Apparently the circuit court came to this realization as well (although belatedly), as is evinced by the court’s deciding the uniform interpretation issue prior to trial. The reason why this question should have been resolved during the certification stage is that, had the court answered the question in the negative rather than the affirmative, the class could not have been certified. In order to satisfy the second requirement of section 2–801 (a common question of fact or law predominates over other questions affecting only individual class members), it must be shown that “successful adjudication of the purported class representatives’ individual claims will establish a right of recovery in other class members.” 
Goetz v. Village of Hoffman Estates
, 62 Ill. App. 3d 233, 236 (1978); accord 
Society of St. Francis v. Dulman
, 98 Ill. App. 3d 16, 18 (1981); 
Hagerty v. General Motors Corp.
, 59 Ill. 2d 52, 59 (1974); see also 
Mace v. Van Ru Credit Corp.
, 109 F.3d 338, 341 (7th Cir. 1997) (noting that the typicality and commonality requirements of Fed. R. Civ. P. 23 “ensure that only those plaintiffs or defendants who can advance the same factual and legal arguments may be grouped together as a class”). In the case at bar, if the circuit court had concluded that the operative contractual language in State Farm’s various policies was 
not
 susceptible of uniform interpretation, this would have raised the possibility that there was a breach of contract with some class members but not with others. See 
Broussard
, 155 F.3d at 340. In such a situation, the successful adjudication of the claims of some class members would not necessarily establish a right to recovery in others. If there were significant differences in the operative contractual language of the various policies, the commonality and predominance requirement of section 2–801 could not be met, and the class could not be certified. Accordingly, the circuit court erred in declining to decide the question of uniform contractual interpretation at the class certification stage. As noted, the circuit court apparently realized this error and decided the uniform interpretation issue prior to trial.

The question before us is whether the circuit court decided this issue correctly. In other words, was it error for the circuit court to conclude that the operative language in State Farm’s various policies could be given a uniform interpretation such that the successful adjudication of the contract claims of some class members would establish a right to recovery in other class members? The determination of this issue requires an examination of the relevant contracts. The starting point of any contract analysis is the language of the contract itself. 
Church v. General Motors Corp.
, 74 F.3d 795, 799 (7th Cir. 1996); 
Dugan v. Smerwick Sewerage Co.
, 142 F.3d 398, 403 (7th Cir. 1998). As a general rule, the construction, interpretation, or legal effect of a contract is a matter to be determined by the court as a question of law. 12A Ill. L. & Prac. 
Contracts
 §264, at 107 (1983); see 
Chicago Daily News, Inc. v. Kohler
, 360 Ill. 351, 363 (1935); 
Sindelar v. Liberty Mutual Insurance Co.
, 161 F.2d 712, 713 (7th Cir. 1947). Our review of this issue is therefore 
de novo
. See 
Hessler v. Crystal Lake Chrysler-Plymouth, Inc.
, 338 Ill. App. 3d 1010, 1017 (2003).

We begin with the two main policy forms at issue in this case. The first includes the “like kind and quality” language and provides, in pertinent part:

“We have the right to settle a 
loss 
with 
you 
or the owner of the property in one of the following ways:

***

2. pay to repair or replace the property or part with like kind and quality. If the repair or replacement results in better than like kind and quality, 
you
 must pay for the amount of the betterment ***.” (Emphases in original.)

The second policy form contains the “pre-loss condition” provision, as well as language expressly providing that State Farm’s contractual obligation could be met by specifying non-OEM parts. This policy form states, in pertinent part:

“The cost of repair or replacement is based upon one of the following:

* * *

3. an estimate written based upon the prevailing competitive price. *** We will include in the estimate parts sufficient to restore the vehicle to its pre-loss condition. 
You 
agree with us that such parts may include either parts furnished by the vehicle’s manufacturer or parts from other sources including non-original equipment manufacturers.” (Emphasis in original.)

In our view, these two policy forms are 
not 
the same. As noted, the second one contains, in addition to the “pre-loss condition” promise, an explicit agreement between State Farm and the policyholder regarding the use of non-OEM parts: “
You 
agree with us that such parts may include either parts furnished by the vehicle’s manufacturer or parts from other sources including non-original equipment manufacturers.” (Emphasis in original.) In its brief to this court, State Farm points in particular to this language, explaining that it “expressly provided that State Farm could meet [the preloss condition] obligation by specifying non-OEM parts.” In contrast, the first policy form set forth above, which contains the “like kind and quality” promise, makes no mention of OEM or non-OEM parts, nor does it expressly allow for the specification of non-OEM parts. If, as plaintiffs claim, the specification of non-OEM parts constitutes a breach of State Farm’s contractual obligation, plaintiffs who were insured under policies containing the “like kind and quality” promise would be in a different position regarding this non-OEM-parts claim than would plaintiffs with policies containing the “you agree” language. Class members with a “like kind and quality” policy would have a stronger case for breach of contract than would those whose policies expressly 
allowed 
the practice that is alleged to constitute the breach. It follows that the successful adjudication of the claims of class members with the “like kind and quality” language would not necessarily establish a right of recovery in those with the “you agree” language. See 
Hagerty
, 59 Ill. 2d at 59; 
Goetz
, 62 Ill. App. 3d at 236; 
Dulman
, 98 Ill. App. 3d at 18; 
Mace
, 109 F.3d at 341. There is thus a material difference between the policies containing the “you agree” provision and those that do not contain this language.
(footnote: 4)
 This difference between the “like kind and quality” policies, on the one hand, and the “pre-loss condition” policies containing the “you agree” provision, on the other, is not the only instance in this case of material differences in policy language. The putative class also includes State Farm insureds with policies that contain 
neither 
the “like kind and quality” 
nor
 the “pre-loss condition” promise. State Farm’s Massachusetts policies, for example, simply promise to pay “the actual cash value” of “parts at the time of the collision.” The same is true of most of State Farm’s “assigned risk” policies, which are used in the “residual market” of high-risk consumers that insurers are required to cover. Just as with the Massachusetts policies, the majority of the “assigned risk” policies contain neither the “like kind and quality” nor the “pre-loss condition” language. Instead, the “assigned risk” policies promise to pay an “[a]mount necessary to repair or replace the property.”

As State Farm points out, neither of these formulations–the Massachusetts policy provision or the “assigned risk” policy provision–expressly imposes 
any
 standard of part quality. It follows that plaintiff class members who were insured under either of these policies would be in a different position than their “like kind and quality” and “pre-loss condition” counterparts regarding the claim that the specification of non-OEM parts constituted a breach of their insurance contract. The successful adjudication of the claim of a “like kind and quality” policyholder, for example, would not necessarily establish a right to recovery in a class member with either a Massachusetts or an “assigned risk” policy. See 
Goetz
, 62 Ill. App. 3d at 236; 
Dulman
, 98 Ill. App. 3d at 18.

Notwithstanding the foregoing, the circuit court, following the close of evidence in the jury trial, reiterated its pretrial conclusion that State Farm’s contractual obligation was the same for each member of the class. The circuit court determined that all of State Farm’s policies, including the Massachusetts policies and the “assigned risk” policies, conveyed the same contractual promise. The court stated:

“After having heard all the testimony, and I wrote down in particular when it was done, Mr. Porter’s testimony that State Farm’s agreement, promise, however you choose to characterize it, always was that when the car was repaired, the parts would be of like kind and quality which restores [it] to its pre-loss condition.”

The appellate court also referred specifically to Porter’s testimony in concluding that State Farm’s contractual obligation was uniform: “State Farm’s own witness, Don Porter, a claims consultant, acknowledged that State Farm had a uniform nationwide obligation to policyholders.” 321 Ill. App. 3d at 280. Plaintiffs take this same position, pointing to Porter’s testimony and contending that State Farm’s contractual obligations to its policyholders were uniform. We disagree.

First, Porter’s testimony about State Farm’s “commitment to restoring the vehicle to its pre-loss condition” referred to a “basic philosophy” goal of the company, rather than a contractual obligation. Porter never testified that all of the policy forms at issue in this case were uniform. Second, to the extent that his testimony could be read as referring to State Farm’s insurance contracts, the most that can be said about this testimony is that Porter was referring to individual policy 
terms
 rather than all of the relevant policy 
forms
. Viewed in the light most favorable to plaintiffs, Porter’s testimony may be read as supporting the position that the “like kind and quality” and the “pre-loss condition” phrases mean the same thing: State Farm promised to pay to restore the policyholder’s vehicle to its preloss condition using parts as good as the parts that were on the vehicle at the time of the loss. However, there is nothing to indicate that Porter’s testimony encompasses any other policy language.

An example of a policy provision that falls 
outside
 the scope of Porter’s testimony is the “you agree” language, which expressly allows for the specification of non-OEM parts. While Porter made brief mention of the “you agree” language in his testimony, he discussed this language only as an example of the notice that State Farm provided to policyholders regarding its non-OEM-parts practices. Porter did 
not 
state in his testimony that a policy containing language that expressly allows for the specification of non-OEM parts is the contractual equivalent of a policy that 
omits 
this language. His testimony simply contains 
no comment 
with regard to this matter. Accordingly, with respect to State Farm’s allegedly uniform contractual obligation, Porter’s testimony supports 
only 
the view that the “like kind and quality” phrase and the “pre-loss condition” phrase mean the same thing: that State Farm’s obligation was to pay to restore the policyholder’s vehicle to its preloss condition. Porter’s testimony does 
not 
support the position of the lower courts, and of plaintiffs, that the presence of the “you agree” language makes no difference and that policies containing this language convey the same contractual promise as do policies that omit it.

Equally important, Porter’s testimony does not encompass State Farm’s Massachusetts policies or its “assigned risk” policies, neither of which contain the “like kind and quality” or the “pre-loss condition” language. We have carefully examined the more than 200 transcript pages of Porter’s testimony. We find no mention of either the Massachusetts policies or the “assigned risk” policies. The assertion that Porter’s “uniform obligation” testimony encompasses these policies is simply not supported by the evidence. Accordingly, Porter’s testimony does 
not 
support the position of the lower courts, and of plaintiffs, that State Farm policies which 
omit
 the “like kind and quality” and the “pre-loss condition” language state the same contractual promise as policies that include this language.

Moreover, there is no other record evidence that can sustain the conclusion that material policy differences–
i.e.
, the “you agree” language and the “assigned risk” language–make 
no 
difference, and that all of State Farm’s various policy formulations are the same. Plaintiffs do point to evidence in addition to Porter’s testimony, but this other evidence consists essentially of statements that are equivalent to Porter’s assertions or reflect them. There is nothing to support the conclusion that the “you agree” language, for example, or the Massachusetts or “assigned risk” policies are irrelevant and that all of State Farm’s policy variations therefore are susceptible of the same contractual interpretation. Indeed, State Farm has argued from the beginning of this case that such variances 
are 
relevant and that they preclude class certification.

In sum, there is simply no evidentiary support for the lower courts’ conclusion that 
all 
of State Farm’s various policies are uniform. Where a putative class includes members who are insured under policies that are materially different, the commonality and predominance requirement of section 2–801 cannot be met. 735 ILCS 5/2–801(2) (West 1998). See 
Hagerty
, 59 Ill. 2d at 59; 
Goetz
, 62 Ill. App. 3d at 236; 
Dulman
, 98 Ill. App. 3d at 18; 
Mace
, 109 F.3d at 341. Accordingly, it was an abuse of discretion for the circuit court to certify plaintiffs’ breach of contract claim as a class action. See 
Broussard
, 155 F.3d at 340 (“[P]laintiffs simply cannot advance a single collective breach of contract action on the basis of multiple different contracts”). We therefore reverse the certification of the nationwide contract class.

B. 
Whether the Verdict May Be Affirmed with Respect to Subclasses

Having determined that the certification of the nationwide contract class should be reversed, we note that there remains a question whether the jury’s breach of contract verdict may be affirmed with regard to any subclass comprised of policyholders who were insured under any of the relevant individual policy forms. For the reasons set forth below, we answer this question in the negative.

We note initially that there are serious questions as to whether the breach of contract verdict may be upheld for 
any
 group of class members. Under the verdict form given by the circuit court, the jury found that “defendant State Farm failed to perform its obligations under 
the contract 
and breached 
its contract 
with the plaintiff class.” (Emphases added.) This verdict form followed naturally from the jury instructions, which stated that there was a single contract at issue with a uniform contractual obligation.

However, we have concluded, as a matter of law, that this was error. There was no single contract. Rather, there were multiple policy forms which differed materially. On its face, therefore, the verdict is improper. It included no finding, for example, that State Farm breached the policy form containing the “you agree” language, which 
allowed 
the practice that plaintiffs claim constituted the breach. Indeed, there could not have been such a finding. The jury was never instructed as to the “you agree” provision. Nor was there any finding in the verdict that State Farm breached its contractual obligation in the Massachusetts policies or the “assigned risk” policies. Once again, the jury was not instructed as to these policies. The verdict simply stated, incorrectly, that State Farm breached a 
single contract 
with the plaintiff class.

Accordingly, the breach of contract verdict cannot be upheld with respect to any subclass of policyholders insured under any of the individual policy forms at issue. However, we do not decide this case on this ground alone. Instead, we also look at the individual relevant policy forms and consider whether plaintiffs established a breach of any of them. We also consider whether plaintiffs established damages. For the reasons set forth below, we answer these questions in the negative.

1. The Massachusetts and “Assigned Risk” Policies

With regard to the Massachusetts policies and the “assigned risk” policies, we conclude that there was no breach. Neither of these policy forms contained the “like kind and quality” or the “pre-loss condition” language. The Massachusetts policies promised to pay “the actual cash value” of “parts at the time of the collision,” and the “assigned risk” policies promised to pay an “[a]mount necessary to repair or replace the property.” As State Farm has noted, neither of these formulations–the Massachusetts policy provision or the “assigned risk” policy provision–expressly imposed any standard of part quality. The specification of non-OEM parts would not constitute a breach of these contracts. So long as, with regard to the Massachusetts policies, State Farm paid “the actual cash value” of “parts at the time of the collision,” and so long as, with regard to the “assigned risk” policies, State Farm paid an “[a]mount necessary to repair or replace the property,” the contractual obligation would be met. It would not matter whether the parts specified were non-OEM, OEM, or some other type. Thus, the jury’s breach of contract verdict may not be affirmed with respect to a subclass consisting of policy holders insured under these provisions.

2. The “You Agree” Policies

We turn next to the policies containing the “pre-loss condition” and the “you agree” language. As noted, these provisions state:

“The cost of repair or replacement is based upon one of the following:

* * *

3. an estimate written based upon the prevailing competitive price. *** We will include in the estimate parts sufficient to restore the vehicle to its pre-loss condition. 
You 
agree with us that such parts may include either parts furnished by the vehicle’s manufacturer or parts from other sources including non-original equipment manufacturers.” (Emphasis in original.)

We cannot affirm the jury’s verdict with respect to a subclass of policyholders who were insured under these provisions. First, 
pursuant to the “you agree”language, the insured expressly agrees that “such parts,” 
i.e.
, parts sufficient to restore a vehicle to its preloss condition, “may include *** parts from *** non-original equipment manufacturers.” In other words, the insured agrees that the “pre-loss condition” promise may be met by specifying non-OEM parts. In their brief to this court, plaintiffs do not explain, in any way, how a contract containing the “you agree” language, which 
expressly permits 
the specification of non-OEM parts, may be breached by 
the specification of non-OEM parts
. Plaintiffs have established, in support of their claim, that non-OEM parts were specified by State Farm in class members’ estimates. However, in view of the “you agree” language, this specification of non-OEM parts, by itself, cannot constitute a breach of the “pre-loss condition” promise.

Second, in order to establish a breach of the “pre-loss condition” promise, plaintiffs would have to show that the parts specified or used by State Farm, whether OEM or non-OEM parts, did not restore the vehicle to its preloss condition. A necessary first step in making this showing would be to examine each class member’s vehicle to determine its preloss condition. At trial, Timothy Ryles and Paul Griglio, two of plaintiffs’ expert witnesses, conceded the necessity for such a determination. The following colloquy took place between State Farm’s counsel and Ryles: 

“Q. Good point, Dr. Ryles. To determine whether a particular car has been restored to its pre-loss condition, you’d have to know what the pre-loss condition of that car was; isn’t that right? 

A. You need to, yes.”

Griglio made a similar concession in this exchange with State Farm’s counsel: 

“Q. Similarly, sir, to know whether or not a car was restored to pre-loss condition, you would need to know what the pre-loss condition of that car was, wouldn’t you?

A. Yes, you would.” 

In the case at bar, the determination of the preloss condition of each subclass member’s vehicle would require the individual examination of hundreds of thousands, if not millions, of vehicles. Undoubtedly, these examinations would overwhelm any question common to the subclass, rendering it impossible for such questions to predominate. As noted, class certification is improper unless “common questions predominate over any questions affecting only individual members.” 735 ILCS 5/2-801(2) (West 1998). For this reason, a claim for breach of the preloss condition promise cannot be maintained as a class action. See 
Augustus v. Progressive Corp.
, 2003 Ohio 296, ¶25; 
Schwendeman v. USAA Casualty Insurance Co.
, 116 Wash. App. 9, 22-23, 65 P.3d 1, 8 (2003); 
Snell v. Geico Corp.
, No. Civ. 202160, slip op. at 6 (Md. Cir. Ct. August 14, 2001). Accordingly, the jury’s breach of contract verdict may not be affirmed for a subclass comprised of policyholders insured under the preloss condition provision.

3. The “Like Kind and Quality” Policies

The remaining policy form is the one containing the “like kind and quality” promise. Before analyzing this provision, we note that the record appears to include the policies of only two of the named plaintiffs, DeFrank and Covington. Both DeFrank’s and Covington’s policies contain the “pre-loss condition” and “you agree” language. In addition, although we were unable to find a copy of Avery’s policy in the record, testimonial evidence indicates that Avery’s policy also contained the “pre-loss condition” and “you agree” language.

With regard to the remaining two named plaintiffs–Shadle and Vickers–the record does not appear to include their policies. On this record, therefore, it is unclear that the contracts of 
any
 of the named plaintiffs contained the “like kind and quality” language. If none of the named plaintiffs’ policies contained the “like kind and quality” language, State Farm could not have breached this provision in any of the named plaintiffs’ policies. Accordingly, plaintiffs’ claim for breach of the “like kind and quality” promise fails for lack of proof. We cannot 
uphold a subclass based on this policy form. “It is well settled that a class cannot be certified unless the named plaintiffs have a cause of action.” 
Spring Mill Townhomes Ass’n v. Osla Financial Services, Inc.
, 124 Ill. App. 3d 774, 779 (1983), citing 
Landesman v. General Motors Corp.
, 72 Ill. 2d 44 (1978); accord, 
e.g.
, 
Perlman v. Time, Inc.
, 133 Ill. App. 3d 348, 354 (1985). Assuming, 
arguendo
, that there 
were
 named plaintiffs with this policy form, we conclude that there was no breach of the “like kind and quality” promise. 
 

The “like kind and quality” promise states:

“We have the right to settle a 
loss 
with 
you 
or the owner of the property in one of the following ways:

***

2. pay to repair or replace the property or part with like kind and quality. If the repair or replacement results in better than like kind and quality, 
you
 must pay for the amount of the betterment ***.” (Emphases in original.)

According to the appellate court (and plaintiffs), “like kind and quality,” as stated in this promise, meant “like kind and quality to OEM parts.” 321 Ill. App. 3d at 280. Plaintiffs’ contention throughout this case has been that the non-OEM parts that were at issue were categorically inferior to their OEM counterparts. It follows that, under this theory, State Farm’s specification of non-OEM parts could 
never
 satisfy the obligation to pay for parts of “like kind and quality.” In their third amended complaint, plaintiffs alleged: “As a practical matter, [State Farm’s] obligation could be met 
only 
by requiring the 
exclusive use 
in repairs 
of factory-authorized or OEM parts
.” (Emphases added.)

In our view, there are several difficulties with this theory that the “like kind and quality” promise is necessarily breached by the specification of non-OEM parts. First, the language of the promise itself contradicts the view that State Farm may meet its contractual obligation 
only
 by specifying 
OEM 
parts. If the purpose of State Farm’s promise “to repair or replace the property or part with 
like kind and quality
” (emphasis added) were to require the specification of OEM parts, then there is no reason why the indirect phrasing “like kind and quality” would have been used. The provision could simply have promised that OEM parts would be specified. Implicit in the phrase “like kind and quality” is the likeness or similarity of 
one thing 
to 
another
. Common sense indicates that an item that is of “like kind and quality” to another is not that very item, but rather is something of “like kind and quality” to it.

Also contradicting the position that “like kind and quality” means OEM parts is the contract language 
accompanying
 the “like kind and quality” promise. In the “like kind and quality” provision as set forth above, the sentence immediately following the “like kind and quality” promise states: “If the repair or replacement results in 
better than like kind and quality
 [emphasis added], 
you 
must pay for the amount of the betterment [emphasis in original] ***.” This policy language, which requires an insured to pay for “repair or replacement [which] results in 
better than like kind and quality
” (emphasis added), presumes a standard of quality that is “better than like kind and quality.” However, under plaintiffs’ reasoning, there is nothing better than “like kind and quality.”

Recall the position taken by plaintiffs. According to plaintiffs, 
all 
the non-OEM parts at issue in this case are categorically inferior to OEM parts. This means, of necessity, that OEM parts represent the highest possible standard of quality. In addition, according to plaintiffs, because non-OEM parts are categorically inferior to OEM parts, the “like kind and quality” promise can only be met by specifying OEM parts. Thus, because OEM parts are the best possible parts, and because the “like kind and quality” promise means OEM parts, plaintiffs also necessarily take the position that the term “like kind and quality” refers to the highest possible standard of quality.

But this reasoning cannot be correct. State Farm’s policy cannot be referring to OEM parts when it uses the term “like kind and quality” because the policy itself says that there is a standard of quality which is 
better
 than “like kind and quality” parts. Plaintiffs are clearly incorrect in equating “like kind and quality” with OEM parts.

As previously indicated, State Farm defines “like kind and quality” differently from plaintiffs (and the appellate court). In State Farm’s view, “like kind and quality” means “sufficient to restore a vehicle to its pre-loss condition.”
(footnote: 5) There is substantial legal support for State Farm’s view.

Courts in other jurisdictions have adopted a similar interpretation of the term “like kind and quality.” In 
Siegle v. Progressive Consumers Insurance Co.
, 819 So. 2d 732 (Fla. 2002), the issue was whether, under “like kind and quality” policy language similar to that in the case at bar, an insurer was obligated not only to complete “a first-rate repair which returns the vehicle to its pre-accident level of performance, appearance, and function,” but also to compensate the insured in money for any diminution in market value that resulted from the repaired vehicle’s status as a wrecked car. 
Siegle
, 819 So. 2d at 733. The court ruled that there was no such dual obligation on the part of the insurer. The court explained that, under the policy language at issue, the insurer had a choice of either reimbursing the insured through a money payment or paying to repair or replace the automobile with other property of like kind and quality. If, as in the case that was before the court, the repair option was chosen, “the insurer’s liability was limited to the monetary amount necessary to repair the car’s function and appearance, 
commensurate with the condition of the auto prior to the loss
.” (Emphasis added.) 
Siegle
, 819 So. 2d at 739. Thus, in the court’s view, a promise to repair damaged property with
 like kind and quality 
meant that the insurer was obligated to restore the vehicle to its 
preloss condition
. See also 
Ray v. Farmers Insurance Exchange
, 200 Cal. App. 3d 1411, 1418, 246 Cal. Rptr. 593, 596 (1988) (“To the extent [that plaintiff’s] automobile was repaired to its 
pre-accident 
safe, mechanical, and cosmetic condition, [defendant’s] obligation under the policy of insurance to repair to ‘like kind and quality’ was discharged” (emphasis added)); 
Berry v. State Farm Mutual Automobile Insurance Co.
, 9 S.W.3d 884, 894-95 (Tex. Ct. App. 2000) (under court’s interpretation of the Texas Insurance Code, whether a part is of “like kind and quality” depends on “the age or condition of the covered vehicle prior to the accident”); 
Schwendeman v. USAA Casualty Insurance Co.
, 116 Wash. App. 9, 22-23, 65 P.3d 1, 8 (2003) (under the insurance policy at issue, “whether a replacement part is of ‘like kind and quality’ to the part it replaces necessarily requires ascertaining the condition of the vehicle before the accident in terms of its age, mileage, and physical condition, and the quality of the replacement part”); 
Snell v. Geico Corp.
, No. Civ. 202160, slip op. at 6 (Md. Cir. Ct. August 14, 2001) (preloss condition of each individual vehicle must be established in order to determine whether insurer’s “like kind and quality” promise was breached).

State Farm maintains that “pre-loss condition” is what defines “like kind and quality,” rather than the other way around. For State Farm it is irrelevant whether non-OEM parts are of like kind and quality to OEM parts. The determinative issue is whether the parts specified are sufficient to restore the vehicle to its preloss condition, 
i.e.
, the condition of the vehicle shortly before the accident. Under this definition of “like kind and quality,” the specification of non-OEM parts would not necessarily breach the “like kind and quality” promise.

We agree with State Farm. The term “like kind and quality,” as used in the relevant policies, meant “sufficient to restore a vehicle to its pre-loss condition.” We therefore conclude that the specification of non-OEM parts would not necessarily constitute a breach of the “like kind and quality” promise. Thus, we cannot affirm the jury’s breach of contract verdict with respect to a subclass consisting of policyholders insured under this provision.

In sum, the jury’s breach of contract verdict may not be upheld for any subclass comprised of policyholders insured under any of the individual relevant policy forms. State Farm’s specification of non-OEM parts did not constitute a breach of the Massachusetts policies or the “assigned risk” policies, neither of which expressly imposed any standard of part quality. Nor did the specification of non-OEM parts constitute a breach of the policies containing the “pre-loss condition” and the “you agree” provisions. Under the “you agree” language, the insured 
agrees
 that the “pre-loss condition” promise may be met by specifying non-OEM parts. Further, the individualized proof needed to establish a breach of the “pre-loss condition” promise would destroy the commonality required of a class action. Finally, plaintiffs’ claim for breach of the “like kind and quality” promise fails for a number of reasons. First, the claim fails for lack of proof. In addition, State Farm’s specification of non-OEM parts did not constitute a breach of the policies containing the “like kind and quality” provision. The term “like kind and quality,” as used in the relevant policies, meant “sufficient to restore a vehicle to its pre-loss condition.” This obligation, which is satisfied so long as the parts are sufficient to restore the vehicle to its preaccident condition, is not necessarily breached by the specification of non-OEM parts. Moreover, as noted above, the individualized proof required to establish a breach of the “pre-loss condition” promise would overwhelm any questions common to the subclass, thus prohibiting certification of the claim as a class action.

4. Damages

There is an additional reason why the breach of contract verdict may not be upheld with regard to any subclass. Plaintiffs have failed to establish damages.

a. 
Specification Damages

Two types of damages were awarded to the plaintiff class for breach of contract: (1) direct, or “specification,” damages, and (2) consequential, or “installation,” damages. The first type of damages, which is based on plaintiffs’ theory that the contract was breached by the 
specification
 of non-OEM parts, was calculated as the cost difference between the OEM parts that plaintiffs claimed 
should 
have been specified and the non-OEM parts that State Farm listed on the repair estimate. According to plaintiffs, this figure constituted the amount that State Farm “saved by specifying cheaper [non-OEM] parts.” Plaintiffs’ damages expert, Dr. Iqbal Mathur, calculated that specification damages for the class as a whole would total $243,700,000. Under plaintiffs’ theory, everyone in the class was eligible to receive specification damages.

In our view, plaintiffs’ theory of “specification damages” has no basis in the law. Under this theory, loss occurs when a non-OEM part is 
specified 
on the estimate rather than when the part is 
installed
 on the vehicle. Plaintiffs’ damages expert, Dr. Mathur, conceded at trial that specification damages apply to any class member whose repair estimate 
specified 
a non-OEM part, regardless of whether a non-OEM part was used in the repair of the vehicle. Thus, a policyholder who had been quoted a non-OEM part on his estimate could receive specification damages even if (1) his vehicle was repaired with an OEM part, or (2) his car was restored to its preloss condition. By this same reasoning, specification damages would apply where a non-OEM part was specified on the estimate and was used in the repair, but the policyholder subsequently sold his vehicle for fair market value. If it is the simple 
specification 
of the non-OEM part in a repair estimate that inflicts the damage, it is irrelevant, under plaintiffs’ theory, what happens afterwards, even if the policyholder ultimately suffers no actual damage.

It should be noted that, given this focus on the 
specification
, rather than the 
installation
, of non-OEM parts, plaintiffs’ specification-damages theory stands in contrast to their third amended complaint, as well as to the definition of the plaintiff class as certified by the circuit court. In their third amended complaint, plaintiffs describe State Farm’s alleged breach of contract in terms of State Farm’s 
use 
of non-OEM parts in 
repairs
 that result, 
inter alia
, in plaintiffs’ 
receipt 
of such parts:

“Defendant State Farm’s common practice of 
using
 inferior, imitation parts in 
repairs
 constitutes a breach of its obligation to all insureds who either 
received
 such parts or were obligated to pay the difference in price between imitation parts and the OEM parts actually 
installed
.” (Emphases added.)

Similarly, the circuit court, in defining the plaintiff class, refers to plaintiffs who had non-OEM parts 
installed 
on their vehicles. In the judgment in favor of plaintiffs on their breach of contract claim, the plaintiff class was defined, in pertinent part, as:

“All persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1987, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM (Original Equipment Manufacturer) ‘crash parts’ 
installed
 on their vehicles or else received monetary compensation determined in relation to the cost of such parts.” (Emphasis added.)

Given the contrast between the focus of the specification-damages theory on the estimate’s 
listing 
of non-OEM parts, on the one hand, and the references in the complaint and the class definition to the 
use 
or 
installation 
of non-OEM parts, on the other, a question arises as to why plaintiffs devised their specification-damages theory in the first instance. The answer lies in plaintiffs’ belated realization that they would be unable to establish damages and still maintain the commonality required of a class action. If, in keeping with the complaint and the class definition, loss did not occur until non-OEM parts were 
installed
, plaintiffs would need to show which class members’ vehicles had actually been repaired with non-OEM parts, as well as which class members still owned vehicles that had been repaired with non-OEM parts. However, State Farm’s records did not contain this information.
(footnote: 6) Accordingly, any determinations as to which plaintiffs were eligible for damages would require the examination of each individual class member’s vehicle and repair. Such an undertaking, however, would mean that questions affecting individual class members would predominate over common questions, destroying the commonality required for a class action. See 735 ILCS 5/2–801(2) (West 1998); 
Magro v. Continental Toyota, Inc.
, 67 Ill. 2d 157, 161 (1977).

Faced with this dilemma, plaintiffs created their specification-damages theory, under which the alleged breach of contract and the resulting damages occurred when non-OEM parts were 
specified
 in repair estimates, rather than when the non-OEM parts were 
installed
. If damage occurred when non-OEM parts were 
specified
, there would be no need for individual inquiry as to whether such parts were actually used in the repair of a particular vehicle, or whether the claimant still owned the vehicle in question. Under plaintiffs’ specification-damages theory, the damage occurred when the non-OEM part was 
listed
 on the estimate, and it did not matter whether the part was actually used in the repair or whether the policyholder still owned the vehicle.

While plaintiffs’ specification damages theory appeared to preserve the commonality necessary for a class action, it achieved this goal at the expense of denoting real damages. Common sense dictates that any injury resulting from non-OEM parts would be inflicted, not by the mere 
specification
 of such parts in an estimate, but by the 
use
 of the parts in the repair of a vehicle. No possible damage could come to a policyholder simply because a non-OEM part was listed on his repair estimate. Only if the part were actually installed, and only if it were shown that this part failed to restore the vehicle to its preloss condition, could it possibly be said that the policyholder suffered damage.

Indeed, plaintiffs’ own damages expert, Dr. Mathur, acknowledged at trial that plaintiffs’ theory of specification damages made no economic sense. During cross-examination, the following colloquy took place between State Farm’s counsel and Dr. Mathur:

“Q. So, from an economic perspective, which is all that you are qualified to testify about, you would have to tell us that your theory of direct damages doesn’t make economic sense; isn’t that true, sir?

A. That is correct.

Q. Thank you. So, according to you, as an economist, and not as a lawyer, using theories that plaintiffs’ lawyers have tried to give you, is a policyholder 
entitled
 to damages merely because State Farm quoted a non-OEM part on their estimate, as long as State Farm did restore the car to its pre-loss condition?

A. No.” (Emphasis added.)

We agree with plaintiffs’ damages expert that plaintiffs’ theory of specification damages makes no sense. In our view, plaintiffs’ notion of specification damages contravenes the basic theory of damages for breach of contract, under which the claimant must establish an actual loss or measurable damages resulting from the breach in order to recover. See, 
e.g.
, 
Economy Fire & Casualty Co. v. GAB Business Services, Inc.
, 155 Ill. App. 3d 197, 201 (1987). We reject, as a matter of law, plaintiffs’ theory of specification damages.

b. 
Installation Damages

The second type of contract damages awarded was installation damages. Unlike “specification” damages, “installation” damages were derived from a theory based on an actual loss. However, as explained below, the evidence offered in support of plaintiffs’ installation damages was so speculative and uncertain that awarding damages based on this evidence constituted an arbitrary deprivation of property in violation of State Farm’s due process rights. See 
State Farm Mutual Automobile Insurance Co. v. Campbell
, 538 U.S. 408, 416, 155 L. Ed. 2d 585, 600, 123 S. Ct. 1513, 1519-20 (2003) (due process clause of the fourteenth amendment prohibits imposition of arbitrary punishments).

Installation damages consisted of the additional costs to be incurred by plaintiffs in removing non-OEM parts from their vehicles and replacing them with OEM parts. Included in these damages was an amount to cover two days of car rental while the non-OEM parts were being replaced. Only those class members who actually had non-OEM parts installed on their vehicles were eligible to receive installation damages. Plaintiffs’ expert, Dr. Mathur, explained that, for a variety of reasons, many plaintiffs who had non-OEM parts specified on their repair estimates did not, in fact, have non-OEM parts installed on their vehicles. These plaintiffs were not eligible for installation damages. Thus, in order to calculate the amount of installation damages for the nationwide class, it was necessary to estimate the number of plaintiffs who were eligible for such damages. Mathur estimated that, of the total number of plaintiffs who were quoted non-OEM parts, the percentage whose vehicles were, in fact, repaired with non-OEM parts ranged from 50% to 92%. In other words, although each class member’s estimate, by definition, specified 
non
-OEM parts, 
OEM
 parts were actually installed on the class members’ cars as often as 50% of the time. Mathur testified that, in his view, the actual figure for repairs using non-OEM parts probably was closer to 92% than 50%. He calculated that, if 50% of class members received non-OEM parts, installation damages for the class as a whole would total $658,450,000. If, on the other hand, the correct figure were 92%, installation damages would total $1.2 billion.

On cross-examination, Mathur acknowledged that, with regard to installation damages, it was necessary to determine whether a non-OEM part had been installed on a class member’s vehicle. However, Mathur conceded that he had no way of making this determination. Mathur also acknowledged that he had “no opinion” as to how many class members had non-OEM parts installed on their vehicles but later received fair market value for them. Mathur admitted that his calculations as to installation damages might be incorrect by as much as $1 billion.

The following exchange took place between counsel for State Farm and Mathur.

“Q. From an economic perspective, there is simply no way for you to identify which members of the class are entitled to damages; isn’t that right?

A. Well, I don’t have the data, and so I really cannot identify who the class members are.

Q. Therefore, there is no way for you to identify who is and who is not entitled to damages; isn’t that right, sir?

A. That is correct.”
(footnote: 7)
 The jury awarded plaintiffs $212,440,000 in installation damages. This was about $1 billion less than Mathur’s high-end estimate.

While it has become acceptable to use statistical inference in determining aggregate damages in a class action suit (
e.g.
, 3 A. Conte & H. Newberg, Newberg on Class Actions §10:2, at 478 (4th ed. 2002)), it also is understood that the possibility of error involved in such an approach may exceed constitutional bounds. See, 
e.g.
, 
Bell v. Farmers Insurance Exchange
, 115 Cal. App. 4th 715, 746-57, 9 Cal. Rptr. 3d 544, 571-80 (2004). In 
Bell
, for example, the court rejected a determination of aggregate damages, noting that “the possible inaccuracy of the estimate of unpaid double-time compensation presents an issue of constitutional dimension.” 
Bell
, 115 Cal. App. 4th at 756, 9 Cal. Rptr. at 579. See also 
In re Chevron U.S.A., Inc.
, 109 F.3d 1016, 1020-21 (5th Cir. 1997) (“a procedure is inherently unfair when the substantive rights of *** the defendant are resolved in a manner that lacks the requisite level of confidence in the reliability of its result”).

In the case at bar, the range between Mathur’s high-end and low-end estimates for installation damages was half a billion dollars. Moreover, as previously indicated, Mathur conceded that his estimates could be incorrect by as much as $1 billion. A due process violation is clearly established where the method for determining damages has the potential to increase a defendant’s aggregate liability by as much as $1 billion over what is warranted. See 
Bell
, 115 Cal. App. 4th at 751-53, 9 Cal. Rptr. at 575-76; 
Hilao v. Estate of Marcos
, 103 F.3d 767, 786 (9th Cir. 1996).

Notwithstanding the foregoing, the appellate court below concluded that there was “little danger that ineligible class members will receive a share of this award [installation damages].” 321 Ill. App. 3d at 290. In support of this view, the appellate court pointed, 
inter alia
, to the size of the jury’s installation damages award, which was “approximately $1 billion less than the expert’s estimate.” 321 Ill. App. 3d at 289. Unlike the appellate court, we find little comfort in the size of the jury’s installation damages award. In our view, it is troubling, rather than reassuring, that Mathur’s half-billion-dollar range for installation damages was found by the jury to be too narrow, by another half-billion dollars. In other words, the jury had so little confidence in even the lowest estimate for installation damages that the jury found it necessary to reduce that figure by $500 million. This suggests that the jury’s award of aggregate installation damages was based, not on Mathur’s expert testimony, but on pure speculation and conjecture.

The potential for inaccuracy in Mathur’s installation-damages estimates is simply too great to support an award of damages. See 
Bell
, 115 Cal. App. 4th at 751-56, 9 Cal. Rptr. 3d at 575-79. While expert testimony in support of damages awards may be couched in terms of probabilities or possibilities, there is a need for a reasonable degree of certainty in such testimony. See 
Brown v. Chicago & North Western Transportation Co.
, 162 Ill. App. 3d 926, 937-38 (1987). Here, given the fact that Mathur conceded that the margin of error in his estimate of the amount of installation damages was a billion dollars, the requisite degree of reasonable certainty is lacking. In our view, there is no valid basis for upholding the award of installation damages for the nationwide class and, thus, no valid basis for awarding such damages with regard to a subclass.

In sum, the jury verdict on the breach of contract claim cannot be affirmed. The jury was incorrectly instructed that the operative language in State Farm’s various policy forms could be given a uniform interpretation. Further, the verdict cannot be affirmed for any subclass comprised of policyholders who were insured under any of the relevant individual policy forms. The reason is that plaintiffs’ claim for breach of contract fails on the merits. State Farm’s specification of non-OEM parts did not constitute a breach of any of the relevant individual policy forms, whether the policies at issue were those containing the “like kind and quality” promise, or those containing the “pre-loss condition” and the “you agree” language, or whether the policies at issue were the Massachusetts or “assigned risk” policies. Moreover, plaintiffs have failed to establish contract damages. With regard to specification damages, there is no basis in the law for this theory. In addition, while the installation damages were derived from a model based on an actual loss, the evidence offered in support of them was too speculative and uncertain to support an award of damages. Accordingly, we reverse the jury’s verdict that State Farm breached its contractual obligations. In view of our disposition of plaintiffs’ contract claim, we need not reach State Farm’s other arguments with regard to breach of contract.

One point raised by the dissent merits response. The dissent states that this court has “ben[t] over backwards” to rule in State Farm’s favor (slip op. at 98 (Freeman, J., concurring in part and dissenting in part)), that we have “vilifi[ed]” and “humiliated” plaintiffs’ counsel (slip op. at 103, 110 (Freeman, J., concurring in part and dissenting in part)) and “demeaned” the courts below (slip op. at 110 (Freeman, J., concurring in part and dissenting in part)), and that the result in this case has not been arrived at by an even-handed application of the law, but because this court has developed “a new hostility” to class actions and wishes to “send[ ] a message” that “different standards” will be applied to cases arising out of the Fifth District of our appellate court (slip op. at 110 (Freeman, J., concurring in part and dissenting in part)).
(footnote: 8) In other words, according to the dissent, this court’s decision to reverse the verdict on plaintiffs’ breach of contract count is the result of bias and extralegal considerations. This is emphatically not true. This appeal has been decided pursuant to the same standards that are applied to every case that is brought before this court. Moreover, we have not fashioned any changes to the legal rules governing class actions, let alone ones that are “hostile” to this procedural device. In deciding plaintiffs’ breach of contract claim we have not acted with bias or favoritism but, instead, have applied the law objectively to the facts of record with no purpose other than to reach a just result. The dissent’s assertions to the contrary are unfounded and inappropriate.

II. Consumer Fraud Act

State Farm raises several arguments regarding the circuit court’s judgment that State Farm violated the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act or Act) (815 ILCS 505/2 (West 1998)). Before addressing these arguments, we examine the factual background of plaintiffs’ consumer fraud count in detail.

This case did not begin as a consumer fraud action. As originally pled, plaintiffs’ class action complaint contained only a single count for breach of contract. Plaintiffs added count II, in which they alleged that State Farm violated the Consumer Fraud Act, in their “Second Amended Class Action Complaint (A).”

Although their class action complaint was subsequently amended, the relevant portion of plaintiffs’ consumer fraud count remained unchanged. In their consumer fraud count, plaintiffs alleged the following:

“Among the unlawful practices that defendant engaged in was the practice of installing non-OEM crash parts in its insureds’ vehicles that were inferior, substandard parts, when State Farm had promised and was obligated to undertake repairs on damaged vehicles using only parts of like kind and quality, so as to restore the vehicles to their pre-loss condition.

*** By way of false or deceptive pretenses, acts, or practices, defendant did not disclose to plaintiffs that they were: a) using inferior, imitation parts that diminished the value of their vehicles; and/or b) paying the cost of cheaper imitation parts when available and refusing to pay for OEM parts, thereby causing class members and/or their repair shops to absorb the cost difference.”

After plaintiffs added their consumer fraud count, State Farm argued that it was simply a duplicate of the breach of contract count and, therefore, should be dismissed. State Farm pointed in particular to the language in plaintiffs’ complaint which asserts that State Farm violated the Consumer Fraud Act by installing inferior parts despite having “promised” to use parts of “like kind and quality.”
(footnote: 9) This language, according to State Farm, was nothing more than a restatement by plaintiffs that State Farm had breached a contractual promise. And, State Farm argued, under decisions such as 
DeLeon v. Beneficial Construction Co.
, 55 F. Supp. 2d 819, 826 (N.D. Ill. 1999), and 
Petri v. Gatlin
, 997 F. Supp. 956, 967-68 (N.D. Ill. 1997), a breach of a contractual promise cannot serve as the basis for a statutory consumer fraud action.

Confronted with the argument that its consumer fraud count was simply a redressed version of its breach of contract count, plaintiffs retreated somewhat from the language in their complaint. During the hearing on State Farm’s motion to decertify the class and motions for summary judgment, plaintiffs clarified to the circuit court that the consumer fraud count was not premised on “the drafting, or the sale or even the interpretation” of a contract. Instead, according to plaintiffs, the consumer fraud count was based on actions, representations and omissions which occurred during the claims process, 
i.e.
, after the policyholder brought his or her car to an adjuster or body shop to receive an estimate and repair. This shift in emphasis was significant. By focusing on statements and actions which occurred during the claims process, rather than promises contained in the contract, plaintiffs were able to persuade the circuit court that the consumer fraud count was truly independent from the breach of contract count. Thus, as the circuit court noted, the jury could “say there’s a breach of contract, but that doesn’t necessarily mean there’s been Consumer Fraud.”

In support of their argument that State Farm made fraudulent representations and omissions during the claims process, plaintiffs relied on four documents. The first document was the estimate given to each of the named plaintiffs after his or her car had been examined by a State Farm claims adjuster. Each of these estimates consisted of a computer-generated printout that listed the parts that were to be put on the plaintiff’s car, along with the prices of the parts. The estimates also give the source or type of each part. Non-OEM parts are listed as “Quality Replacement Parts,” while OEM parts are listed along with the manufacturer’s name. Although the named plaintiffs’ estimates varied because of the individual nature of the repairs, each estimate used the term “quality replacement part.” Thus, for example, on plaintiff Sam DeFrank’s estimate, the “Part Type” for the various parts on the estimate is listed as “Quality Replacement Part,” “GM Part” or “Order From Dealer.” Plaintiffs alleged that each member of the class, like DeFrank, received an estimate that included the term “quality replacement part.” A copy of DeFrank’s estimate is attached to this opinion as Appendix A.

Stamped on DeFrank’s estimate in the upper left-hand corner of the first page are the words, “Read the Attached Information Regarding Quality Replacement Parts Not Made By The Original Equipment Manufacturer.” This statement refers to a document, known as a “half sheet,” which was attached to repair estimates that included non-OEM parts. On the half sheet is a disclosure which states, in part, “THIS ESTIMATE HAS BEEN PREPARED BASED [
sic
] ON THE USE OF AFTERMARKET CRASH PARTS SUPPLIED BY A SOURCE OTHER THAN THE MANUFACTURER OF YOUR MOTOR VEHICLE.” A copy of the half sheet is attached to this opinion as Appendix B.

The second item relied upon by plaintiffs was a brochure produced by State Farm titled “Quality Replacement Parts.” This brochure was allegedly given to each member of the consumer fraud class, usually at the time the insured received his or her estimate. In this brochure, State Farm refers to non-OEM parts as “quality replacement parts” and states that “[o]nly those parts which meet our very high performance criteria are acceptable.” Also included in the brochure is a guarantee which states that if the policyholder is unsatisfied with the “fit and corrosion resistance qualities” of the replacement parts, then State Farm will repair or replace the parts at no cost to the policyholder. A copy of the brochure is attached to this opinion as Appendix C.

Unlike the estimates and the brochure, the third and fourth items identified by plaintiffs–articles in a newsletter and a magazine–were not given to the policyholders during the claims process. Instead, these items were promotional or informational materials produced by State Farm. Plaintiffs used these materials to illustrate State Farm’s marketing and use of the term “quality replacement parts.”

The newsletter which the plaintiffs relied upon is titled “Good Neighbor News” and is dated “Fall 1993.” The newsletter which is of record is in the form of a mailing and has a return address of a State Farm agent based in Michigan. The mailing address on the newsletter states generically, “Policyholder Name; Policyholder Address.” A brief article discussing the high price of OEM parts appears on the third page of the newsletter. In the middle of the article there is this quote: “High prices for parts is a major reason why it costs so much to repair a car that’s been damaged. And that’s why State Farm is a big fan of what we call ‘quality replacement parts.’ These parts are identical to–or better than–the original equipment manufacturers’ parts, but cost a lot less.”

The fourth and final item identified by plaintiffs is an article from the April 1990 issue of a magazine called “Reflector,” a State Farm publication circulated to State Farm agents. The article at issue, titled “Quality Replacement Parts,” gives a general overview of State Farm’s use of non-OEM parts. Underneath the title to the article appears this caption: “One of the bumpers on the cover of this 
Reflector
 was produced by the original equipment manufacturer. The other is a quality replacement part produced by another company. The same is true of the other pairs [of parts shown]. The parts are identical except for one thing–the price.”

As noted, the plaintiffs’ focus on the actions taken by State Farm during the claims process made it possible for plaintiffs to pursue a separate count for consumer fraud. It also made possible a second important objective of plaintiffs–class certification. Because the consumer fraud claim was based on the uniform representations contained in State Farm’s written claims documents and not, for example, on the myriad different oral representations that occurred during the sales of the class members’ policies, plaintiffs were able to convince the circuit court that there was a common question of fact which predominated over the class. In its order certifying the nationwide consumer fraud class (in language taken verbatim from plaintiffs’ filing in support of certification), the circuit court stressed the uniformity of the representations made during the claims process:

“As to the consumer fraud allegations, the facts presented at the certification hearing on State Farm’s methods of disclosing to policyholders its use of non-OEM parts also demonstrates a course of conduct common to all class members. When such parts are used on an estimate, the policyholder is given a State Farm brochure discussing the use of non-OEM parts. Defendant’s Exhibit 24; Certification Hearing at 0124-25. The estimate is then stamped indicating the use of non-OEM parts. Defendant’s Exhibit 27. State Farm has also promoted the use of the term ‘quality replacement parts’ nationwide in an effort to promote its substitution of non-OEM for OEM parts. Plaintiffs’ Exhibits 115 and 116.
(footnote: 10)
 The Court finds that the evidence introduced at the certification hearing demonstrate ‘a series of essentially identical transactions,’ 
Miner
, 87 Ill. 2d at 19, 428 N.E.2d at 484, between State Farm and its insureds, which transactions routinely result in the use of non-OEM parts.”

In its certification order, the circuit court also determined that the Consumer Fraud Act could, as a matter of statutory interpretation, be applied to members of the plaintiff class who did not reside in Illinois. The court further concluded that applying the Consumer Fraud Act to the entire class presented no choice-of-law or constitutional problems. In its subsequent “Order Regarding Law to be Applied to Class Members’ Claims,” the circuit court explained its reasoning:

“With respect to the claims under the Illinois Consumer Fraud Act, the court finds there are no true conflicts of law raised by the specific claims or facts at issue in this case which require application of the law of any state other than Illinois. 
Martin v. Heinhold Commodities
, 
Inc
., 117 Ill. 2d 67, 510 N.E.2d 840 (1987) and 
Gordon v. Boden
, 224 Ill. App. 3d 195, 586 N.E.2d 461 (1st Dist. 1991) have approved the application of the Illinois Consumer Fraud Act to the claims of out-of-state plaintiffs. State Farm was chartered and is headquartered in Illinois. State Farm affirmatively uses and consents to the jurisdiction of Illinois courts. It is alleged that the conduct at issue emanated from activities in Illinois. Given the aggregation of contacts of State Farm with this jurisdiction, and the allegations that the conduct at issue emanated from activities in Illinois, Illinois possesses sufficient contacts so that the application of the Illinois Consumer Fraud Act to all class claims is neither unreasonable nor unfair and comports with due process. Further, application of the Illinois Consumer Fraud Act to all claims will not interfere with any other jurisdictions’ legislative, regulatory or administrative policies ***.”

Based on its finding that a common fact predominated, and that the Consumer Fraud Act could be applied to out-of-state residents, the circuit court certified a nationwide class consisting of

“[a]ll persons in the United States, except those residing in Arkansas and Tennessee, who, between July 28, 1994, and February 24, 1998, (1) were insured by a vehicle casualty insurance policy issued by Defendant State Farm and (2) made a claim for vehicle repairs pursuant to their policy and had non-factory authorized and/or non-OEM *** ‘crash parts’ installed on their vehicles or else received monetary compensation determined in relation to the cost of such parts.”

At trial, the five named plaintiffs testified to the representations made and actions taken by State Farm during each of their claims proceedings. Each plaintiff stated that he or she had received a car- repair estimate, and all but one stated that they had received the “Quality Replacement Parts” brochure. The point in the repair process at which the plaintiffs received the brochure, and whether they read it, varied from plaintiff to plaintiff. Shadle, for example, testified that he received his estimate and “Quality Replacement Parts” brochure when the claims adjuster first looked at his car, but that he did not read the brochure. Avery stated that he received his estimate and brochure in the mail after taking his car to an adjuster, that he read the brochure, and that he was “extremely concerned” about what it said. Vickers first saw her written estimate when she went to pick up her car after it was repaired, although her body shop told her early in the repair process that non-OEM parts were going to be used. She did not say whether she received or read the brochure. Like Vickers, Covington did not see his estimate prior to the repairs being started, although his body shop informed him that non-OEM parts were being used. Covington received and read his brochure after the repairs were finished. DeFrank testified that he received his estimate and brochure from the claims adjuster prior to the repair of his pickup truck. He read the brochure and became “very upset.” Notably, none of the five plaintiffs testified that they saw, read or were aware of the articles in the “Good Neighbor News” newsletter or the “Reflector” magazine.

At the conclusion of trial, the circuit court found that State Farm had violated the Consumer Fraud Act with respect to the five named plaintiffs and the class as a whole. In its judgment order, the circuit court noted that a violation of the Consumer Fraud Act could not be proven simply by showing a breach of a contractual promise:

“The court, after considering all the evidence, finds, as did the jury, that State Farm did breach its contract with the plaintiffs, that the non-OEM ‘crash parts’ specified and used by State Farm were not of ‘like kind and quality’ and did not restore plaintiffs’ vehicles to their pre-loss condition as required by the insurance contract between State Farm and the plaintiffs. These findings do not on their own establish a violation of the Act. The court must now consider whether the evidence also establishes the elements, set forth above, which are required to prove a violation of the Consumer Fraud Act.”

After stating the above, the circuit court set forth what it concluded were the deceptive acts perpetrated by State Farm. The circuit court stated:

“The plaintiffs allege, under Count II and Count III of the Third Amended Class Action Complaint, that State Farm violated the Consumer Fraud Act. The Plaintiffs[’] allegations include, without limitation, that State Farm installed inferior non-OEM ‘crash parts’ on the plaintiffs’ vehicles when it was obligated under its insurance policies with the plaintiffs to use ‘crash parts’ of ‘like kind and quality’ which would restore plaintiffs’ vehicles to their ‘pre-loss condition’ and that State Farm failed to disclose to plaintiffs that it was using and paying for cheaper, inferior non-OEM ‘crash parts’ to repair plaintiffs’ vehicles.

After considering all the testimony and evidence admitted at trial, the court finds that the plaintiffs have proven that State Farm violated the Consumer Fraud Act and that none of the defenses asserted by State Farm bar plaintiffs’ right to recover under the Act or reduce the amount of plaintiffs’ recovery.

State Farm, prior to and during the class period for the Consumer Fraud Act plaintiffs, knew that the non-OEM ‘crash parts’ it was specifying on its policyholders’ repair estimates were not of ‘like kind and quality’ and would not restore their policyholders’ vehicles to ‘pre-loss condition.’ State Farm’s knowledge of the inferiority of the non-OEM ‘crash parts’ is clearly shown [
sic
] the testimony of witnesses, State Farm’s own internal documents, CAPA documents (State Farm was instrumental in the creation of CAPA. CAPA’s stated purpose was to certify quality non-OEM ‘crash parts’ and State Farm officers and management served on CAPA’s board prior to and during the class period for Consumer Fraud Act plaintiffs) of which State Farm had knowledge, and other documents, all of which were admitted into evidence and appear in the trial court record. Rather than telling its policyholders of the known problems with the non-OEM ‘crash parts,’ including possible safety concerns, State Farm chose to adopt and use on its estimates the misleading term ‘Quality Replacement Parts,’ and to tell its policyholders, in various written documents which were admitted into evidence, that the parts were as good, or better than, OEM parts. Further, the written disclosures stamped on or attached to the repair estimates or which were delivered with the repair estimates, did nothing to advise the State Farm policyholder of the inferiority of the parts. Finally, State Farm’s ‘Guarantee’ improperly and unfairly placed the burden of securing a quality repair on the policyholder, not State Farm.

State Farm is a mutual insurance company which operates for the benefit of its policyholders. State Farm occupies a position of trust with its policyholders, who pay the required premiums and are entitled to receive all the benefits State Farm promises to provide in its insurance contract with them. State Farm violated this trust. The court finds that State Farm, in light of its knowledge of the inferiority of non-OEM ‘crash parts,’ misrepresented, concealed, suppressed or omitted material facts concerning the non-OEM ‘crash parts,’ with the intent that its policyholders rely upon on [
sic
] these deceptions, in violation of the Consumer Fraud Act.”

In succinct fashion, the circuit court also held that State Farm’s deceptive acts had proximately caused the named plaintiffs and the class as a whole actual damages and that the actual damages were defined in the same terms as they were under the breach of contract count:

“The court further finds that as a direct and proximate result of State Farm’s violation of the Consumer Fraud Act, the plaintiffs were injured and incurred actual damages; namely the specification/direct damages and installation damages which occurred during the class period for Consumer Fraud Act plaintiffs.”

Because the consumer fraud damages were identical to the breach of contract damages, the circuit court reasoned that an award of actual damages for consumer fraud would constitute a double recovery. The circuit court therefore declined to award plaintiffs “actual economic damages” (815 ILCS 505/10a(a) (West 2002)) under the Consumer Fraud Act. The circuit court did, however, award plaintiffs $130 million in “disgorgement” damages and $600 million in punitive damages.

On appeal, the appellate court affirmed the circuit court’s certification of a nationwide class for consumer fraud. As in the circuit court, the appellate court held that a common question of fact predominated for the class based upon State Farm’s uniform practice of specifying non-OEM parts and providing its insureds with a written estimate and a “Quality Replacement Parts” brochure:

“In regard to the consumer-fraud claim, the record contained evidence that State Farm engaged in an ongoing course of conduct nationwide, in which it specified inferior non-OEM parts whenever those parts were cheaper and available, that State Farm knew those parts were inferior, that State Farm did not inform its policyholders of the problems with those parts, and that State Farm affirmatively misrepresented the condition of those parts by assuring policyholders–on the damage estimates and in brochures–that it specified only ‘quality replacement parts’ and that it guaranteed the parts at no additional cost.” 321 Ill. App. 3d at 280-81.

Like the circuit court, the appellate court also held that the Consumer Fraud Act could be applied to consumers residing out-of-state. Citing 
Martin v. Heinhold Commodities, Inc.
, 117 Ill. 2d 67 (1987), the appellate court determined that non-Illinois consumers are “permitted to pursue an action under the Act against a resident defendant where the deceptive acts and practices [are] perpetrated in Illinois.” 321 Ill. App. 3d at 281. The appellate court then concluded: “The evidence demonstrates that the deceptive claims practices occurred in Illinois. It was in Illinois that the claims practices were devised and procedures for implementation were prepared for dissemination in other states.” 321 Ill. App. 3d at 282. Finally, the appellate court affirmed the circuit court’s finding that there were “no true conflicts” between the Consumer Fraud Act and other states’ consumer fraud laws and that “Illinois has significant contacts to the claims asserted by each class member.” 321 Ill. App. 3d at 282. From this, the appellate court concluded that there was no constitutional barrier to applying the Consumer Fraud Act to the claims of plaintiffs who resided out-of-state. 321 Ill. App. 3d at 282-83.

With respect to the merits of the claim, State Farm repeated its argument to the appellate court that plaintiffs’ consumer fraud claim was nothing more than a restatement of the breach of contract claim. Citing to several decisions from the appellate court in support of this argument, including 
Zankle v. Queen Anne Landscaping
, 311 Ill. App. 3d 308, 312 (2000), State Farm argued that the trial court’s finding of liability under the Consumer Fraud Act should be reversed. The appellate court rejected this contention, finding that “[t]he evidence of State Farm’s deceptive claims practices moves this case beyond a mere contract breach.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

State Farm also argued to the appellate court that it was not liable under the Consumer Fraud Act for the affirmative representations it made to plaintiffs because those representations were merely puffing and, therefore, not actionable. The appellate court rejected this argument, stating:

“In our view, [State Farm’s] representations assigned ‘virtues’ to non-OEM parts that they did not possess. See
 Totz v. Continental Du Page Acura
, 236 Ill. App. 3d 891, 905 (1992);
 Rumford v. Countrywide Funding Corp.
, 287 Ill. App. 3d 330, 336 (1997). They are representations that a reasonable policyholder would have interpreted as fact.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

Finally, State Farm argued to the appellate court that the evidence was insufficient to establish that the actions, representations or omissions which occurred during the claims process proximately caused injury to any of the class members. The appellate court rejected this argument too:

“Plaintiffs presented evidence that the non-OEM parts which State Farm specified were categorically inferior, that State Farm specified non-OEM parts that it knew to be inferior, that State Farm did not inform its policyholders that the non-OEM parts it specified were inferior, and that State Farm knowingly represented on its estimates, in its ‘Quality Replacement Part[s]’ brochures, and through its estimators that these non-OEM parts were of equal quality or better than OEM parts. There is evidence that State Farm’s material misrepresentations led numerous class members to blindly accept the non-OEM parts specified (
i.e.
, without knowledge of the inferior condition of those parts). See 
Perona
, 292 Ill. App. 3d at 68-69;
 Johnston v. Anchor Organization for Health Maintenance
, 250 Ill. App. 3d 393, 397 (1993). There is overwhelming evidence of State Farm’s calculated deception of its policyholders in a deliberate disregard of its express written promises contained in the policies issued. The deceit was deliberate and universally employed for the purpose of obtaining unearned, illegitimate monetary gain. This was an ill-gotten gain, acquired at the expense of persons that trusted and relied upon State Farm for honest, fair treatment. There is an abundance of evidence to support the trial court’s finding that the class members’ injuries were proximately caused by State Farm’s deceptive conduct.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

Based on this reasoning, the appellate court affirmed the judgment of the circuit court holding that State Farm had violated the Consumer Fraud Act. The appellate court also affirmed the circuit court’s $600 million punitive damage award. However, the appellate court reversed the $130 million in disgorgement damages, holding that it constituted an impermissible double recovery. State Farm then appealed.

On appeal, State Farm contests the circuit court’s certification of a nationwide consumer fraud class, as well the circuit court’s judgment in favor of plaintiffs on the merits. We first examine, however, the nature of plaintiffs’ consumer fraud claim.

A. 
Plaintiffs’ Consumer Fraud Claim

Surprisingly, although plaintiffs’ allegation of consumer fraud has been in litigation for several years, and a statutory consumer fraud claim must be pled with specificity (
Connick v. Suzuki Motor Co.
, 174 Ill. 2d 482, 501 (1996)), there is still some confusion–as evinced by plaintiffs’ arguments before this court–as to exactly what conduct of State Farm is at issue under the consumer fraud claim. To clarify what is at issue, it will be helpful to identify that conduct which we can readily conclude does 
not
 support plaintiffs’ consumer fraud claim.

1. Plaintiffs’ Consumer Fraud Claim May Not Be Based on a Breach of a Promise Contained in Their Insurance Policies

Before the circuit court, plaintiffs maintained that their consumer fraud count was not based on “the drafting, or the sale or even the interpretation” of any class member’s insurance policy. Yet in their brief before this court, plaintiffs repeatedly point to State Farm’s contractual promises to define the consumer fraud. Plaintiffs state, for example, that State Farm disregarded “the express written promises in its policies,” that there was “no evidence that Plaintiffs or the class knew, expected or understood that State Farm would specify parts that failed to fulfill its contractual obligations,” and that “[t]he law implies and recognizes the expectation, understanding and belief that State Farm would fulfill its contractual obligation.” Similarly, although both the circuit court and the appellate court stated that plaintiffs’ consumer fraud count was not based on a breach of a contractual promise, each court referenced State Farm’s failure to fulfill its policy obligations in its analysis of plaintiffs’ consumer fraud claim. The appellate court in particular, in upholding the circuit court’s consumer fraud judgment, pointedly relied on State Farm’s “deliberate disregard of its express written promises contained in the policies issued.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). These repeated references to simple breaches of contractual promises in support of the consumer fraud count are in error.

A breach of contractual promise, without more, is not actionable under the Consumer Fraud Act. 
American Airlines, Inc. v. Wolens
, 513 U.S. 219, 233, 130 L. Ed. 2d 715, 728, 115 S. Ct. 817, 826 (1995), quoting 
Golembiewski v. Hallberg Insurance Agency, Inc.
, 262 Ill. App. 3d 1082, 1093 (1994). As our appellate court has explained:

“What plaintiff calls ‘consumer fraud’ or ‘deception’ is simply defendants’ failure to fulfill their contractual obligations. Were our courts to accept plaintiff’s assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action. However, it is settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. See 
Law Offices of William J. Stogsdill v. Cragin Federal Bank for Savings
, 268 Ill. App. 3d 433, 437-38 (1995); 
Golembiewski v. Hallberg Insurance Agency, Inc.
, 262 Ill. App. 3d 1082, 1093 (1994). We believe that a ‘deceptive act or practice’ involves more than the mere fact that a defendant promised something and then failed to do it. That type of ‘misrepresentation’ occurs every time a defendant breaches a contract.” 
Zankle v. Queen Anne Landscaping
, 311 Ill. App. 3d 308, 312 (2000).

Accord, 
e.g.
, 
Kleczek v. Jorgensen
, 328 Ill. App. 3d 1012, 1022 (2002);
 Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.
, 275 Ill. App. 3d 452, 460 (1995); 
Exchange National Bank v. Farm Bureau Life Insurance Co. of Michigan
, 108 Ill. App. 3d 212, 216 (1982); 
DeLeon v. Beneficial Construction Co.
, 55 F. Supp. 2d 819, 826 (N.D. Ill. 1999); 
Petri v. Gatlin
, 997 F. Supp. 956, 967-68 (N.D. Ill. 1997).

Both the circuit court and appellate court recognized this principle but both courts failed to apply it consistently. As a matter of law, plaintiffs’ consumer fraud claim may not be based on the assertion that State Farm breached its promise to restore plaintiffs’ vehicles to their “pre-loss condition” or that State Farm breached its promise to repair plaintiffs’ vehicles using parts of “like kind and quality.”

2. This Case Is Not About the Specification of Defective Parts

Before this court, plaintiffs do not claim to have proven that any of the non-OEM parts specified by State Farm in its repair estimates were defective. This is in keeping with plaintiffs’ position at trial. Plaintiffs deliberately avoided any theory relating to defective parts at trial because such a theory would have significantly increased their burden of proof. Such a theory would also have rendered class certification far less likely, since the common question of fact or law necessary for certification would have been more difficult to establish if plaintiffs had been forced to prove that each individual non-OEM part, or grouping of parts, was defective. Thus, before the circuit court, plaintiffs’ counsel made it very clear that they were 
not
 trying to prove that any of the non-OEM parts at issue were defective, at one point saying: “[A]s we’ve stated this is not a defect case. We are not proving and we are not required to prove that the parts are defective.”

What plaintiffs do claim to have established at trial is a proposition far more general than whether any of the specified non-OEM parts was defective. Plaintiffs claim to have proven that non-OEM parts, as a whole, are not as good as OEM parts. Or, to use plaintiffs’ terminology, that non-OEM parts are “categorically inferior” to OEM parts. But “categorically inferior” is not the same thing as “categorically defective.” This point is important.

In their written opinions, both the circuit court and the appellate court refer to State Farm’s specification of “categorically inferior” parts as if the act of specifying nondefective parts, by itself, is fraudulent. The appellate court, for example, in describing State Farm’s allegedly deceptive acts, notes that “[p]laintiffs presented evidence that the non-OEM parts which State Farm specified were categorically inferior, [and] that State Farm specified non-OEM parts that it knew to be inferior.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). However, it is no more fraudulent–in and of itself–to specify non-OEM parts while knowing that they are not as good as OEM parts than it is to sell Chevrolet automobiles while knowing that they are not as good as Cadillacs. Whether the consumer product is automobiles, toasters or something else, there will always be some brands of that product that are not as good as, or which are “categorically inferior” to, other brands of the same product. The state’s economy would come to a grinding halt if the sale of anything less than the single, best brand of every consumer good were considered fraudulent.

What makes the specification of the
 nondefective
, non-OEM part potentially fraudulent are the statements which are made, or not made, about the product. It is the omissions and representations State Farm made about non-OEM parts–not simply the act of specifying non-OEM parts–that must form the basis of plaintiffs’ consumer fraud action.

3. The Representations Which Form the Basis of Plaintiffs’ Cause of Action for Consumer Fraud Do Not Include the Statement That Non-OEM Parts Are as Good as OEM Parts

The appellate court based its holding that State Farm violated the Consumer Fraud Act, in part, on its findings that “State Farm knowingly represented on its estimates [and] in its ‘Quality Replacement Parts’ brochures” that non-OEM parts “were of equal quality or better than OEM parts.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). These findings, however, are incorrect. Neither the written estimates nor the “Quality Replacement Parts” brochures which the named plaintiffs received from State Farm contain the statement that non-OEM parts are “of equal quality to or better than OEM parts.” See Appendix A and Appendix C.

As previously noted, two of the State Farm documents relied upon by plaintiffs in this case, the “Good Neighbor News” newsletter and the “Reflector” magazine, do contain the statement that non-OEM parts are as good as, or better than, OEM parts. However, there is no evidence that any of the named plaintiffs ever read, saw or were in any way aware of these documents. This is not surprising. The “Good Neighbor News” newsletter which is of record is dated “Fall 1993,” one year before the starting date of the consumer fraud class period and approximately three years before the earliest of the five named plaintiffs’ accidents occurred. The “Reflector” magazine article was circulated to State Farm agents, not policyholders, and was published in 1990, some six years before the earliest of the named plaintiffs’ accidents and four years before the starting date of the class period.

In its order certifying the nationwide consumer fraud class, the circuit court wrote that “State Farm has also promoted the use of the term ‘quality replacement parts’ nationwide in an effort to promote its substitution of non-OEM for OEM parts.” This sentence seems to suggest that the circuit court found the newsletter and magazine articles relevant to all policyholders, regardless of whether they saw them or not, because the articles helped create a nationwide market for non-OEM parts. However, we explicitly rejected this “market theory” of causation in 
Oliveira v. Amoco Oil Co.
, 201 Ill. 2d 134 (2002), and again, more recently, in
 Shannon v. Boise Cascade Corp.
, 208 Ill. 2d 517 (2004). Accordingly, neither the “Good Neighbor News” newsletter nor the “Reflector” magazine has any relevance to this case, and the statement that non-OEM parts are “of equal quality to or better than OEM parts” simply does not support plaintiffs’ consumer fraud claim.

4. Describing a Non-OEM Part as a “Quality Replacement Part” Is Puffing and, Hence, Not Actionable

Plaintiffs object to two phrases describing non-OEM parts which appear in the named plaintiffs’ estimates and in the “Quality Replacement Parts” brochure. The first phrase plaintiffs point to is “quality replacement parts.” This phrase appears in both the named plaintiffs’ estimates, as a line entry under “Part Type” (see, 
e.g.
, Appendix A), and in the brochure received along with the estimate (see Appendix C). The second phrase is “very high performance criteria,” which appears in the brochure in this sentence: “Only those parts which meet our very high performance criteria are acceptable.” See Appendix C. Plaintiffs maintain that both these phrases are deceptive under the Consumer Fraud Act.

State Farm, however, contends that these phrases are merely “puffing” and, hence, cannot form a basis for plaintiffs’ consumer fraud claim. We agree. “Puffing” denotes the exaggerations reasonably to be expected of a seller as to the degree of quality of his or her product, the truth or falsity of which cannot be precisely determined. See, 
e.g.
, 
Speakers of Sport, Inc. v. Proserv, Inc.
, 178 F.3d 862, 866 (7th Cir. 1999) (“Puffing in the usual sense signifies meaningless superlatives that no reasonable person would take seriously, and so it is not actionable as fraud”). Such statements include subjective descriptions relating to quality. See, 
e.g.
, 
Evanston Hospital v. Crane
, 254 Ill. App. 3d 435, 439, 444 (1993) (“high-quality”); 
Breckenridge v. Cambridge Homes, Inc.
, 246 Ill. App. 3d 810, 823 (1993) (“expert workmanship,” “custom quality,” “perfect”);
 Zimmerman v. Northfield Real Estate, Inc.
, 156 Ill. App. 3d 154, 163 (1986) (“magnificent,” “comfortable”); 
Spiegel v. Sharp Electronics Corp.
, 125 Ill. App. 3d 897, 902 (1984) (“picture perfect”); see also 
State v. American TV & Appliance of Madison, Inc.
, 146 Wis. 2d 292, 302, 430 N.W.2d 709, 712 (1988) (“A general statement that one’s products are best is not actionable as a misrepresentation of fact”). Describing a product as “quality” or as having “high performance criteria” are the types of subjective characterizations that Illinois courts have repeatedly held to be mere puffing. Thus, as a matter of law, neither phrase can be considered deceptive under the Consumer Fraud Act.

Plaintiffs nevertheless point out that the circuit court found that the phrase “quality replacement parts” was “misleading.” However, the circuit court did not cite to, or distinguish, any of the decisions cited above which hold that subjective statements of quality are merely puffing. Moreover, the circuit court did not cite any evidence to support its finding that the phrase was “misleading” and never made any determination that the phrase “quality replacement parts” stated a deceptive fact.

The appellate court, unlike the circuit court, did conclude that State Farm made representations “that a reasonable policyholder would have interpreted as fact.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). The appellate court determined that State Farm’s “representations assigned ‘virtues’ to non-OEM parts that they did not possess” and, therefore, the representations violated the Act. 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). However, the appellate court’s conclusion that State Farm’s “representations assigned ‘virtues’ to non-OEM parts that they did not possess” is based on a misstatement of the facts. The appellate court found that State Farm “represented on its estimates” and “in its Quality Replacement Part[s] brochures” that “non-OEM parts were of equal quality or better than OEM parts.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). As noted, this is incorrect. The statement that non-OEM parts are as good as OEM parts does not appear in either the named plaintiffs’ estimates or the “Quality Replacement Parts” brochure.

There is no basis for concluding, as plaintiffs contend, that the phrases “quality replacement parts” and “high performance criteria” are anything other than puffing. Thus, these phrases cannot support plaintiffs’ consumer fraud claim.

5. The Guarantee Provided by State Farm Cannot Form a Basis for Plaintiffs’ Consumer Fraud Claim

The circuit court held that State Farm violated the Consumer Fraud Act by providing a guarantee which states that if the policyholder is unsatisfied with the “fit and corrosion resistance qualities” of a replacement part, then State Farm will repair or replace the part at no cost. The circuit court concluded that this guarantee violated the Act because it “improperly and unfairly placed the burden of securing a quality repair on the policyholder, not State Farm.” Plaintiffs point to this conclusion in support of their contention that State Farm violated the Act.

It is not clear what the circuit court meant when it held that State Farm’s guarantee improperly put a “burden” on policyholders. Every guarantee places a burden on the consumer–the manufacturer or retailer must be notified when there is a problem with the product that is produced or sold and the guarantee must be invoked. For this reason, the circuit court cannot be correct if it meant that the guarantee is fraudulent because it required the policyholders to take action. If this were true, every guarantee, no matter how comprehensive or generous, would be inherently fraudulent.

Plaintiffs argue, however, that the guarantee put an improper burden on policyholders because it was simply too difficult to use. According to plaintiffs, State Farm adjustors would “brush off attempts to use the guarantee,” getting an OEM replacement part once the guarantee was invoked could take “up to three to five days,” and “[e]ven when a body shop showed State Farm that a non-OEM crash part did not fit, State Farm would still sometimes not authorize OEM parts.” However, several witnesses, including some who testified on behalf of plaintiffs, stated that the guarantee was honored in a routine fashion. For example, plaintiffs’ witness Dave Beyers, the manager of a body shop in Williamson County, testified that if he had a problem with a non-OEM fender he would simply “fax up a form” to State Farm and “[p]ut the OEM fender on.”

More important, none of the named plaintiffs in this case testified that they had problems using the guarantee. Indeed, none of the named plaintiffs made any attempt to invoke it. Avery and Shadle refused to have non-OEM parts put on their vehicles, so for them, the guarantee was not at issue. The other named plaintiffs, Covington, DeFrank and Vickers, did not attempt to use the guarantee. DeFrank was specifically asked whether he took “advantage of State Farm’s guarantee that had been provided to [him] at the time the estimate was prepared.” He answered that he had not. Accordingly, there is no basis in the record for concluding that the guarantee was unduly burdensome for the named plaintiffs, let alone for the class members as a whole.

Finally, plaintiffs point out that when a policyholder successfully used the guarantee, the amount paid to replace the non-OEM part was recorded as an indemnity payment and became part of the insured’s claim file. Plaintiffs speculate that the inclusion of this information in the claim file could “possibly rais[e] the insured’s rates.” However, plaintiffs point to no testimony or other evidence of record to support this assertion. Thus, we conclude that the guarantee offered by State Farm cannot form a basis for plaintiffs’ consumer fraud claim.

6. The Crux of Plaintiffs’ Consumer Fraud Claim Is a Failure by State Farm to Disclose the Categorical Inferiority of Non-OEM Parts During the Claims Process

Having eliminated that conduct which clearly cannot support a claim for consumer fraud, what remains is the core allegation stated in plaintiffs’ complaint: “By way of false or deceptive pretenses, acts, or practices, defendant did not disclose to plaintiffs that they were: a) using inferior, imitation parts ***.”

Plaintiffs’ complaint does not allege that State Farm failed to disclose an inferior characteristic of any specific non-OEM part. This is to be expected, since the characteristics of one part were not always present in every other part and did not always apply to every member of the class. For example, while plaintiffs contended at trial that some non-OEM parts were not as safe as OEM parts (a proposition which State Farm vigorously disputed), this contention applied only to some of the non-OEM parts at issue, such as bumpers, which not every member of the class received. Similarly, plaintiffs’ assertion that some non-OEM parts were inferior because they were not properly galvanized applied only to metal parts, not plastic. Thus, the allegedly deceptive act which was common to the entire class and every repair was not the failure to disclose a specific inferior characteristic but, rather, the failure to disclose the supposed categorical inferiority of non-OEM parts. This failure to disclose, according to plaintiffs, constitutes “the concealment, suppression or omission of any material fact” (815 ILCS 505/2 (West 1998)) in violation of the Act.

Further, the failure to disclose occurred during the claims process. Recall that State Farm’s practice of giving its policyholders a written estimate and a brochure–in which the alleged categorical inferiority of non-OEM parts was not disclosed–was precisely the basis on which the circuit court found, in its order certifying the consumer fraud class, that State Farm’s conduct was common to all class members. As the circuit court stated:

“As to the consumer fraud allegations, the facts presented at the certification hearing on State Farm’s methods of disclosing to policyholders its use of non-OEM parts also demonstrates a course of conduct common to all class members. When such parts are used on an estimate, the policyholder is given a State Farm brochure discussing the use of non-OEM parts. Defendant’s Exhibit 24; Certification Hearing at 0124-25. The estimate is then stamped indicating the use of non-OEM parts. Defendant’s Exhibit 27.”

 The appellate court below correctly stated the core allegation of plaintiffs’ consumer fraud claim: “Plaintiffs claimed that by adopting and employing this claims practice, State Farm deceived its policyholders in that it failed to inform them of the inferior quality of specified replacement parts.” 321 Ill. App. 3d at 273. It is this allegation we must keep in mind when considering the remaining challenges raised by State Farm in this appeal.

B. 
Propriety of the Nationwide Consumer Fraud Class

State Farm contends that the circuit court’s certification of a nationwide consumer fraud class was improper. According to State Farm, the circuit court’s application of the Consumer Fraud Act to policyholders across the country was impermissible because the Act, by its own terms, does not apply to consumer transactions involving nonresidents that occur outside Illinois. Moreover, in State Farm’s view, the certification of the nationwide class violated Illinois’ choice-of-law rules, as well as the full faith and credit clause, the due process clause, and the commerce clause of the federal constitution. A determination by this court that the Consumer Fraud Act does not apply, by its own terms, to the out-of-state transactions at issue in this case would render it unnecessary to address State Farm’s choice-of-law and constitutional arguments. Accordingly, we consider the scope of the Consumer Fraud Act first. See, 
e.g.
,
 Beahringer v. Page
, 204 Ill. 2d 363, 370 (2003) (holding that constitutional questions will not be decided if case can be decided on other grounds). Because the scope of the Act is a question of statutory interpretation, our review is 
de novo
. 
Lucas v. Lakin
, 175 Ill. 2d 166, 171 (1997).

1. Scope of the Consumer Fraud Act

Section 2 of the Consumer Fraud Act provides that “deceptive acts or practices *** or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact *** in the conduct of any trade or commerce are hereby declared unlawful ***.” 815 ILCS 505/2 (West 1998). Section 10a(a) of the Act authorizes private causes of action for practices proscribed by section 2. Section 10a(a) states, in pertinent part: “Any person who suffers actual damage as a result of a violation of [the] Act committed by any other person may bring an action against such person.” 815 ILCS 505/10a(a) (West 1998). To prove a private cause of action under section 10a(a) of the Act, a plaintiff must establish: (1) a deceptive act or practice by the defendant, (2) the defendant’s intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception. 
Oliveira
, 201 Ill. 2d at 149.

As noted, State Farm maintains that a nonresident consumer may not pursue a private cause of action under the Act when the disputed consumer transaction occurs out-of-state. Plaintiffs dispute this contention. To support their positions, both plaintiffs and State Farm note that a plaintiff cannot recover under the Act unless the defendant’s disputed conduct involves “trade or commerce.” 815 ILCS 505/2 (West 1998); 
Oliveira
, 201 Ill. 2d at 149. Both parties then point to section 1(f) of the Act, the provision of the Act which defines the terms “trade” and “commerce”:

“(f) The terms ‘trade’ and ‘commerce’ mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State.” 815 ILCS 505/1(f) (West 1998).

Plaintiffs initially state that section 1(f) “expressly notes that it applies to transactions ‘wherever situated.’ ” This is incorrect. The words “wherever situated” do not refer to fraudulent transactions, but to the nouns “any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value.” 815 ILCS 505/1(f) (West 1998). The words “wherever situated” do not expand the scope of the Act to apply to consumer transactions that take place out-of-state.

State Farm, in its argument, points to the language of section 1(f), which states that the trade or commerce must affect “the people of this State.” 815 ILCS 505/1(f) (West 1998). Emphasizing the words “this State,” State Farm contends that the Act is limited to transactions which take place in Illinois. Further, according to State Farm, the Consumer Fraud Act does not provide a cause of action to nonresidents whose claims processes took place outside of Illinois because those transactions had no effect on the people of Illinois. Plaintiffs, in reply, argue that the language of section 1(f) is broadly worded, and emphasize that the trade or commerce need only “indirectly affect” (815 ILCS 505/1(f) (West 1998)) the people of Illinois. From this, plaintiffs maintain that there is no geographic limit to the “trade or commerce” covered by the Act.

The language of section 1(f) has been interpreted by courts in a variety of ways. This divergence of interpretation is most notable in the federal district courts. In one of the earliest opinions to address the statute, 
Seaboard Seed Co. v. Bemis Co.
, 632 F. Supp. 1133, 1140 (N.D. Ill. 1986), the district court concluded that section 1(f) “defines ‘trade’ and ‘commerce’ in a geographically limited manner.” See also 
Bettarini v. Citicorp Services, Inc.
, No. 91 C 8390 (N.D. Ill. 1992) (noting the “geographical scope of the Act” and rejecting a claim under the Act where the defendant’s “complained of conduct impacted on [plaintiff] only at his home base in London”); 
Swartz v. Schaub
, 818 F. Supp. 1214 (N.D. Ill. 1993). Other district courts, however, have expressly disagreed with the notion that the Act is limited geographically. See
 Nichols Motorcycle Supply Inc. v. Dunlop Tire Corp.
, 913 F. Supp. 1088, 1140 (N.D. Ill. 1995) (“This Court believes that the Illinois Consumer Fraud Act, although intended to protect Illinois consumers, does not contain a geographic limitation”); see also 
Continental X-Ray Corp. v. XRE
, No. 93 C 3522 n.1 (N.D. Ill. 1995) (same).

Still other district courts interpreting section 1(f) have concluded that the section limits the scope of the Act based on the residency of the plaintiff. Some of the courts adopting this focus have concluded that the Act is intended only to “protect and benefit Illinois residents.” 
Lincoln National Life Insurance Co. v. Silver
, No. 86 C 7175 (N.D. Ill. 1991), cited in 
Nichols
, 913 F. Supp. at 1139. Other courts, however, have concluded that nonresidents may pursue a cause of action, although these courts typically hold that the transaction at issue must occur in Illinois or that there be an adequate “connection” to Illinois. See, 
e.g.
,
 Tylka v. Gerber Products Co.
, 182 F.R.D. 573, 576-78 (N.D. Ill. 1998) (noting that “[c]ourts in this district are split as to whether the [Consumer Fraud Act] may apply to consumers who are not citizens of Illinois” and holding that the Act could apply where “the transactions giving rise to the action took place in Illinois”); 
MAN Roland, Inc. v. Quantum Color Corp.
, 57 F. Supp. 2d 568, 575 (N.D. Ill. 1999) (rejecting interpretation of the Act which extends “standing only to consumers who are Illinois residents” and holding that the Act could apply where the nonresident consumer purchased a product “in Illinois from an Illinois corporation”); 
Rohlfing v. Manor Care, Inc.
, 172 F.R.D. 330, 339 (N.D. Ill. 1997) (even under those cases allowing nonresidents to pursue a cause of action under the Act, the non-Illinois residents in this case could not do so because their claims had “little or no connection to Illinois”); 
Peters v. Northern Trust Co.
, No. 92 C 1647 (N.D. Ill. 1999) (noting split in the district courts based on residency and holding that plaintiffs’ consumer fraud claim failed because the conduct underlying the claims had “no connection to Illinois”).

Additional interpretations of section 1(f) also exist in the district courts. One court has stated that what is important in determining whether a plaintiff may pursue a cause of action under section 1(f) is not the plaintiff’s “residency, but the State of Illinois’ interest in protecting its consumers” (
Ivanhoe Financial, Inc. v. Mortgage Essentials, Inc.
, No. 03 C 6887 (N.D. Ill. 2004)), while another court has referred to section 1(f) as imposing “ ‘Illinois contact’ requirements” (
Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.
, 749 F. Supp. 869, 878 (N.D. Ill. 1990)). Still other permutations can be found in the district courts; this list is not exhaustive.

Like the federal district courts, our appellate court has also divided over the question of how best to interpret section 1(f). In 
Oliveira v. Amoco Oil Co.
, 311 Ill. App. 3d 886 (2000), 
vacated in part & rev’d on other grounds
, 201 Ill. 2d 134 (2002), the Fourth District of our appellate court declined to hold that the Act applied to out-of-state consumers. 
Oliveira
, 311 Ill. App. 3d at 898, citing 
Scott v. Association for Childbirth at Home, International
, 88 Ill. 2d 279, 288 (1981). The appellate court’s decision in 
Oliveira
 was subsequently cited by a First District decision in 
Prime Leasing, Inc. v. Kendig
, 332 Ill. App. 3d 300 (2002), where the court stated in 
dicta
 that “the Act normally does not apply to out-of-state consumers.” 
Prime Leasing
, 332 Ill. App. 3d at 313.

In the case at bar, the Fifth District concluded, without discussing the statutory language of section 1(f) or any of the federal district court decisions discussing this issue, that non-Illinois consumers are “permitted to pursue an action under the Act against a resident defendant where the deceptive acts and practices [are] perpetrated in Illinois.” 321 Ill. App. 3d at 281. More recently, in
 Bunting v. Progressive Corp.
, 348 Ill. App. 3d 575 (2004), the First District elected to follow the appellate court decision in this case and rejected the defendant’s argument that “the Act is inapplicable because plaintiff is a nonresident.” 
Bunting
, 348 Ill. App. 3d at 586.

It is not clear from the plain language of section 1(f) which, if any, of the many interpretations noted above accurately captures the meaning of that provision. Indeed, the wealth of competing interpretations of section 1(f) is a compelling indication of the statute’s ambiguity. See, 
e.g.
, 
Krohe v. City of Bloomington
, 204 Ill. 2d 392, 395-96 (2003) (“A statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more different ways”). Because the language of section 1(f) is ambiguous, it is appropriate for us to consider other sources, including legislative history, in order to discern the statute’s meaning. See, 
e.g.
, 
People v. Jameson
, 162 Ill. 2d 282, 288 (1994).

Although there is not a great deal of legislative history with respect to section 1(f), we do find relevant a statement from Senator Sours, the Senate sponsor of the bill which created a private cause of action under the Act and which added section 1(f). See Pub. Act 78–904, eff. September 21, 1973. Just before the vote in the Senate was taken, Senator Sours made the following remarks:

“Just to conclude briefly Mr. President and Senators, I’d like to just read a couple of excerpts from this bill and . . . the excerpts are very brief to indicate the broad terms of the bill. I’m reading line 7 on page 2: ‘The terms trade and commerce’ and that really is what we’re talking about. 
We’re talking about trade and commerce that is not included within the interstate concept
. Means the advertising and how much of that we see offering for sale, sale or distribution of any services and any property tangible or and intangible, real, personal or mixed and every other article, commodity or thing of value wherever it’s situated and shall include any trade or commerce, directly or indirectly affecting the people of this State.” (Emphasis added.) 78th Ill. Gen. Assem., Senate Proceedings, June 30, 1973, at 268 (statements of Senator Sours).

In addition to Senator Sours’ statement, we note the long-standing rule of construction in Illinois which holds that a “statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute.”
 Dur-Ite Co. v. Industrial Comm’n
, 394 Ill. 338, 350 (1946);
 Graham v. General U.S. Grant Post No. 2665, V.F.W.
, 43 Ill. 2d 1, 6 (1969); see also
 Sale v. Haitian Centers Council, Inc.
, 509 U.S. 155, 188, 125 L. Ed. 2d 128, 155, 113 S. Ct. 2549, 2567 (1993) (“Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested”); 73 Am. Jur. 2d 
Statutes
 §250 (2001). Given the statement of Senator Sours and the rule against giving statutes extraterritorial effect unless an intent to do so is clearly expressed, we conclude that the General Assembly did not intend the Consumer Fraud Act to apply to fraudulent transactions which take place outside Illinois.

Having concluded that the Act does not have extraterritorial effect, the next step in our analysis is to determine whether the transactions at issue in this case took place outside Illinois. We first observe, however, that it can be difficult to identify the situs of a consumer transaction when, as plaintiffs in this case allege, the transaction is made up of components that occur in more than one state. To solve this problem, courts have often directed their focus to the site of injury or deception–the reason being that, until a deceptive statement has been communicated to a plaintiff and there has been an injury, there is no fraudulent transaction and no cause of action. The Court of Appeals of New York followed this approach in 
Goshen v. Mutual Life Insurance Co.
, 98 N.Y.2d 314, 774 N.E.2d 1190 (2002). In that decision, the New York court considered whether “hatching a scheme” or originating a marketing campaign in New York constituted an actionable deceptive act under a consumer fraud statute which limited the definition of trade or commerce to that which occurred in-state. 
Goshen
, 98 N.Y.2d at 324, 774 N.E.2d at 1195. The court concluded that it did not. The court explained that “[t]he origin of any advertising or promotional conduct is irrelevant if the deception itself–that is, the advertisement or promotional package–did not result in a transaction in which the consumer was harmed.” 
Goshen
, 98 N.Y.2d at 326, 774 N.E.2d at 1196. Because there was no fraudulent transaction until the deception occurred, the location of the deception was the controlling factor. Thus, the court held that “to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York.” 
Goshen
, 98 N.Y.2d at 325, 774 N.E.2d at 1195. See also 
Graham v. General U.S. Grant Post No. 2665, V.F.W.
, 43 Ill. 2d 1, 6 (1969) (no cause of action under Illinois Dram Shop Act where the injury to plaintiff occurred out-of-state).

The position taken by the 
Goshen
 court is not unreasonable. In a misrepresentation case, there is no fraudulent transaction until the misrepresentation has been communicated. But the 
Goshen
 court’s view of the situs of a consumer transaction is a narrow one. The place of injury or deception is only one of the circumstances that make up a fraudulent transaction and focusing solely on that fact can create questionable results. If, for example, the bulk of the circumstances that make up a fraudulent transaction occur within Illinois, and the only thing that occurs out-of-state is the injury or deception, it seems to make little sense to say that the fraudulent transaction has occurred outside Illinois. Stated otherwise, we believe that there is a broader alternative to the position taken by the 
Goshen
 court, namely, that a fraudulent transaction may be said to take place within a state if the circumstances relating to the transaction occur primarily and substantially within that state.

The General Assembly has stated that the Consumer Fraud Act “shall be liberally construed to effect” its purposes. 815 ILCS 505/11a (West 1998). Given this fact, we believe that the General Assembly intended the broader understanding of an in-state transaction noted above. Accordingly, we hold that a plaintiff may pursue a private cause of action under the Consumer Fraud Act if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois. In adopting this holding, we recognize that there is no single formula or bright-line test for determining whether a transaction occurs within this state. Rather, each case must be decided on its own facts. Accordingly, the critical question in this case becomes whether the circumstances relating to plaintiffs’ disputed transactions with State Farm occurred primarily and substantially in Illinois.

2. Whether the Consumer Fraud Act Applies to the Transactions at Issue in This Case

The appellate court below concluded that the Consumer Fraud Act could be applied to the out-of-state plaintiffs in this case. The appellate court explained: “The evidence demonstrates that the deceptive claims practices occurred in Illinois. It was in Illinois that the claims practices were devised and procedures for implementation were prepared for dissemination in other states.” 321 Ill. App. 3d at 282.

We agree with the appellate court that the place where a company policy is created or where a form document is drafted may be a relevant factor to consider in determining the location of a consumer transaction. However, in this case, it does not follow that because a single factor relating to State Farm’s claims practices with its policyholders took place in Illinois, the claims practice itself “occurred in Illinois.” In fact, just the opposite is true. The overwhelming majority of circumstances relating to the disputed transactions in this case–State Farm’s claims practices–occurred outside of Illinois for the out-of-state plaintiffs.

Plaintiff Michael Avery’s transaction with State Farm during the claims process is representative of the situation of the out-of-state plaintiffs. Avery resides in Louisiana, not Illinois. His car was garaged in Louisiana and his accident occurred there as well. Avery’s estimate was written in Louisiana and he received his “Quality Replacement Parts” brochure in Louisiana. The alleged deception in this case–the failure to disclose the inferiority of non-OEM parts –also occurred in Louisiana. The repair of Avery’s car took place in Louisiana. Damage to Avery, if any, occurred in Louisiana. Moreover, there is no evidence that Avery ever met or talked to a State Farm employee who works in Illinois. Avery’s contact with State Farm was through a Louisiana agent, a Louisiana claims representative, and a Louisiana adjustor. In sum, the overwhelming majority of the circumstances which relate to Avery’s and the other out-of-state plaintiffs’ claims proceedings– the disputed transactions in this case–occurred outside Illinois. We conclude, therefore, that the out-of-state plaintiffs in this case have no cognizable cause of action under the Consumer Fraud Act.

In support of the appellate court, plaintiffs rely on 
Martin v. Heinold Commodities, Inc.
, 117 Ill. 2d 67 (1987) (
Martin I
), to which the appellate court cited. In 
Martin I
, a plaintiff class consisting of both Illinois and non-Illinois residents brought suit against an Illinois company that had served as broker for the plaintiffs in commodities transactions. The broker relationship had been established by a contract that allegedly contained deceptive statements. This court allowed certification of the plaintiffs’ claims under the Illinois Consumer Fraud Act, even with respect to the non-Illinois plaintiffs. 
Martin I
, 117 Ill. 2d at 80-83.

Martin I 
is of little help to plaintiffs. In addressing the propriety of the class before it, 
Martin I 
considered only whether the class comported with the due process principles laid out in
 Phillips Petroleum Co. v. Shutts
, 472 U.S. 797, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985). 
Martin I
, 117 Ill. 2d at 82. 
Martin I 
did not address the scope of the Consumer Fraud Act as a matter of statutory interpretation; that issue simply was not presented. See 
Nix v. Smith
, 32 Ill. 2d 465, 470 (1965) (“A judicial opinion is a response to the issues before the court, and these opinions, like others, must be read in light of the issues that were before the court for determination”). Nevertheless, to the extent that 
Martin I 
is relevant here, it is distinguishable.

In 
Martin I
, this court specifically based its decision on the following facts: (1) the contracts containing the deceptive statements were all executed in Illinois; (2) the defendant’s principal place of business was in Illinois; (3) the contract contained express choice-of-law and forum-selection clauses specifying that any litigation would be conducted in Illinois under Illinois law; (4) complaints regarding the defendant’s performance were to be directed to its Chicago office; and (5) payments for the defendant’s services were to be sent to its Chicago office. Given these circumstances, this court concluded that the Act could apply to the whole class. 
Martin I
, 117 Ill. 2d at 82-83.

In contrast to 
Martin I
, there are virtually no circumstances relating to the disputed claims practices at issue in this case which occurred or existed in Illinois for those plaintiffs who are not Illinois residents. The appellate court’s conclusion that a scheme to defraud was “disseminated” from State Farm’s headquarters is insufficient. See, 
e.g.
, 
Rohlfing v. Manor Care, Inc.
, 172 F.R.D. 330, 340 & n.10 (N.D. Ill. 1997) (where the only connection with Illinois is the headquarters of the defendant or the fact that a scheme “emanated” from Illinois, the Consumer Fraud Act “does not apply to the claims of the non-Illinois plaintiffs even under the broad application of the [Act] endorsed by 
Martin
 and other similar cases”).

Based on the foregoing, we conclude that the circuit court erred in certifying a nationwide class that included class members whose claims proceedings took place outside Illinois. Because we have decided the propriety of the certification order on statutory interpretation grounds, we need not consider whether certification of the nationwide class was unconstitutional or violated choice-of-law rules.

The only putative class that can exist in this case under the Consumer Fraud Act is a class consisting of policyholders whose vehicles were assessed and repaired in Illinois. Four of the five named plaintiffs in this case, Avery, Covington, Shadle and Vickers, are not residents of Illinois, the damage to their vehicles did not occur in Illinois, they did not receive their repair estimates in Illinois, and they did not have their cars repaired in Illinois. These individuals have no cause of action under the Act. The only named plaintiff in this case whose vehicle was assessed and repaired in Illinois and, therefore, the only named plaintiff who can serve as a representative plaintiff for the putative Illinois class, is Sam DeFrank. Because a failure of DeFrank’s claim would render discussion of class certification issues moot (see, 
e.g.
,
 Oliveira v. Amoco Oil Co.
, 201 Ill. 2d 134, 156-57 (2002)), we now turn to the propriety of the judgment in favor of DeFrank.

C. 
Propriety of Judgment: Named Plaintiff

To succeed in a private cause of action under the Consumer Fraud Act, a plaintiff must prove “(1) a deceptive act or practice by the defendant, (2) the defendant’s intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception.” 
Oliveira
, 201 Ill. 2d at 149. In general, a trial court’s decision as to whether these elements have been proven in any case is reviewed under the manifest weight of the evidence standard. 
Kirkruff v. Wisegarver
, 297 Ill. App. 3d 826, 839 (1998).

State Farm contends that the named plaintiffs, including DeFrank, failed to prove several of the elements required to establish a private cause of action. State Farm also contends that the circuit court held plaintiffs to the wrong burden of proof. We address this issue first.

1. Burden of Proof

The circuit court below held, as a matter of law, that plaintiffs must prove the elements of a private cause of action under section 10a(a) of the Act by a preponderance of the evidence. The appellate court agreed. 321 Ill. App. 3d at 291. State Farm contends that these holdings are incorrect and that the proper burden of proof in this case is clear and convincing evidence.

In the ordinary civil case, because there are no sound reasons for favoring one party over another, the party with the burden of persuasion must prove his or her case by a preponderance of the evidence. A proposition proved by a preponderance of the evidence is one that has been found to be more probably true than not true. Occasionally, however, policy considerations require a court to impose a higher standard of proof. In such a case, the party with the burden of persuasion must prove his or her case by clear and convincing evidence. 
Bazydlo v. Volant
, 164 Ill. 2d 207, 212-13 (1995); see 
Arrington v. Walter E. Heller International Corp.
, 30 Ill. App. 3d 631, 639-40 (1975). 

In the context of common law fraud, the law presumes that transactions are fair and honest; fraud is not presumed. Accordingly, fraud must be proved by clear and convincing evidence. 
Racine Fuel Co. v. Rawlins
, 377 Ill. 375, 379-80 (1941); see 
Gordon v. Dolin
, 105 Ill. App. 3d 319, 324 (1982) (observing that in a common law fraud action, the plaintiff carries “a heavy responsibility”).

The Consumer Fraud Act does not expressly provide the standard of proof required to succeed in a private cause of action. However, as noted, the Act is to be liberally construed to effect its purpose, which is to provide broader protection to consumers than an action for common law fraud. Accordingly, based on the liberal intent of the legislature behind the Act, and based on the fact that the Act does not expressly require a greater standard of proof, the appellate court has held that the appropriate standard of proof for a statutory fraud claim is preponderance of the evidence. See 
Cuculich v. Thomson Consumer Electronics, Inc.
, 317 Ill. App. 3d 709, 717-18 (2000); 
Malooley v. Alice
, 251 Ill. App. 3d 51, 56 (1993).

In this case, the appellate court agreed with this reasoning and conclusion. 321 Ill. App. 3d at 291. We do likewise and so hold. Cases requiring a clear and convincing standard of proof (see, 
e.g.
, 
General Motors Acceptance Corp. v. Grissom
, 150 Ill. App. 3d 62, 65 (1986); 
Munjal v. Baird & Warner, Inc.
, 138 Ill. App. 3d 172, 183 (1985)) are overruled on this point.

2. The Deceptive Act or Practice

When State Farm specified a non-OEM part in one of its repairs, it disclosed the use of that part in the policyholder’s estimate and “half-sheet.” See Appendix A and Appendix B. As noted previously, the gravamen of plaintiffs’ complaint against State Farm is that this disclosure was inadequate. According to plaintiffs, State Farm should also have disclosed the categorical inferiority of non-OEM parts. Its failure to do so, plaintiffs contend, constituted a deceptive act or practice under the Act.

There are several difficulties with plaintiffs’ argument. Recall that plaintiffs do not contend that all non-OEM parts are defective, only that they are all not as good as OEM parts. State Farm knew this fact, plaintiffs allege, and should have disclosed it to all policyholders. But many businesses undoubtedly sell products with the knowledge that those products are not as good as other brands on the market. Under plaintiffs’ reasoning, it would appear that to avoid liability under the Act, every knowing sale of a brand of product which is not the top brand would have to carry a disclaimer: “Notice, our brand is not, on the whole, as good as our competitor’s.” Thus, adopting plaintiffs’ argument would appear to work a significant expansion of liability under the Act.

Further, and of equal importance, we note that the disclosure provided by State Farm was required by, and complied with, state law.

Section 155.29 of the Insurance Code provides:

“§155.29. (a) Purpose. The purpose of this section is to regulate the use of aftermarket crash parts by requiring disclosure when any use of an aftermarket non-original equipment manufacturer’s crash part is proposed and by requiring that the manufacturers of such aftermarket crash parts be identified.

(b) Definitions. ***

* * *

(c) Identification. Any aftermarket crash part supplied by a non-original equipment manufacturer for use in this State after the effective date of this Act shall have affixed thereto or inscribed thereon the logo or name of its manufacturer. The manufacturer’s logo or name shall be visible after installation whenever practicable.

(d) Disclosure. No insurer shall specify the use of non-OEM aftermarket crash parts in the repair of an insured’s motor vehicle, nor shall any repair facility or installer use non-OEM aftermarket crash parts to repair a vehicle unless the customer is advised of that fact in writing. In all instances where an insurer intends that non-OEM aftermarket crash parts be used in the repair of a motor vehicle, the insurer shall provide the customer with the following information:

(1) a written estimate that clearly identifies each non-OEM aftermarket crash part; and

(2) a disclosure settlement incorporated into or attached to the estimate that reads as follows: ‘This estimate has been prepared based on the use of crash parts supplied by a source other than the manufacturer of your motor vehicle. Warranties applicable to these replacements parts are provided by the manufacturer or distributor of these parts rather than the manufacturer of your vehicle.’ ” 215 ILCS 5/155.29 (West 1998).

State Farm’s compliance with section 155.29 of the Insurance Code raises an important issue. Like most state consumer fraud statutes, the Illinois Consumer Fraud Act exempts from its coverage practices or transactions which are permitted by other laws. Section 10b(1) of the Consumer Fraud Act provides:

“Nothing in this Act shall apply to any of the following:

(1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States.” 815 ILCS 505/10b(1) (West 1998).

Interpreting Illinois decisions which have addressed this provision, the Seventh Circuit has stated:

“Taken together, the [Illinois] cases stand for the proposition that the state [Consumer Fraud Act] will not impose higher disclosure requirements on parties than those that are sufficient to satisfy federal regulations. If the parties are doing something specifically authorized by federal law, section 10b(1) will protect them from liability under the [Act]. On the other hand, the [Consumer Fraud Act] exemption is not available for statements that manage to be in technical compliance with federal regulations, but which are so misleading or deceptive in context that federal law itself might not regard them as adequate.” (Emphasis omitted.) 
Bober v. Glaxo Wellcome PLC
, 246 F.3d 934, 941 (7th Cir. 2001).

The Insurance Code does not require insurance companies to disclose that non-OEM parts are “categorically inferior” to OEM parts. Indeed, contrary to the findings of the circuit court below, it would appear that by allowing and regulating the use of non-OEM parts in Illinois, the General Assembly has made the policy determination that at least some number of non-OEM parts are 
not
 inferior to OEM parts. Otherwise, the General Assembly’s decision to permit their use makes little sense. See 
Snell v. Geico Corp.
, No. Civ. 202160, slip op. at 9 n.2 (Md. Cir. Ct. August 14, 2001) (reasoning that, if state insurance commissioners would not sanction the use of 
inferior 
non-OEM parts, and if, nevertheless, they sanctioned the use of non-OEM parts in some instances, “these insurance commissioners must have determined that non-OEM parts are not 
categorically 
and 
universally 
inferior” (emphases in original)).

In light of section 155.29 of the Insurance Code, and section 10b(1) of the Act, we believe that there is a serious question as to whether State Farm’s failure to disclose to its policyholders that non-OEM parts are not as good as OEM parts can be considered a deceptive act or practice. However, State Farm does not press this issue and we need not explore it further. We express no opinion as to the proper scope of section 10b(1) of the Act or the correctness of the 
Bober
 decision, or whether State Farm committed a deceptive act or practice within the meaning of the Consumer Fraud Act. Instead, we conclude that DeFrank’s claim fails because he suffered no actual damage, as required under the Act, and because he failed to establish proximate causation.

3. Actual Damage

The most striking deficiency in DeFrank’s claim that State Farm violated the Consumer Fraud Act is his lack of actual damage. In order to sustain a private cause of action under the Act, a plaintiff must prove that he or she suffered “actual damage as a result of a violation of [the] Act.” 815 ILCS 505/10a(a) (West 1996); 
Oliveira
, 201 Ill. 2d at 148-49.
(footnote: 11) In this case, DeFrank did not suffer any damage as a result of State Farm’s specification or use of non-OEM parts.

The incident that gave rise to DeFrank’s claim occurred on November 1, 1997, when his 1992 Chevrolet pickup truck was damaged in an accident. DeFrank testified that State Farm’s estimate for repair of his truck included non-OEM parts and that these non-OEM parts were used in the truck’s repair. DeFrank stated that several months later he sold his truck to his brother-in-law for $11,000, slightly below the “blue book” value of $11,400, in what DeFrank himself agreed was an “arm’s length” transaction. DeFrank was asked by plaintiffs’ counsel at trial whether the non-OEM parts on the truck were a factor in the sale. His answer was “No.” On cross-examination, this point was made clear:

“Q. [Counsel for State Farm] And there were no discounts in the price that you sold the truck for to your brother-in-law on account of the fact that there were non-OEM parts on the car; is that right?

A. [DeFrank] Right.

Q. Is that correct?

A. Yes.”

The language of the Consumer Fraud Act is plain. A plaintiff must prove “actual damage” before he or she can recover under the Act. That did not occur here. DeFrank’s own testimony establishes that, when he sold his truck to his brother-in-law, he received the same value for the truck that he would have received if only OEM parts had been used in the repair. It simply made no difference that non-OEM parts were present on the truck. Clearly, DeFrank suffered no “actual damage” as a result of State Farm’s specification or use of non-OEM parts and, therefore, he cannot recover under the Act.
(footnote: 12)
 The appellate court offered no explanation as to how DeFrank, or any other members of the class, suffered “actual damage” within the meaning of the Consumer Fraud Act, while the circuit court offered only a brief statement on the issue. In a single sentence in its judgment order, the circuit court held that plaintiffs’ damages under the consumer fraud count were defined in the same manner as they were under the breach of contract count. Thus, according to the circuit court, actual damages were defined as “specification” and “installation” damages. As with the breach of contract count, “specification” damages occurred at the moment State Farm specified a non-OEM part in a policyholder’s repair estimate. “Installation” damages consisted of the cost of replacing non-OEM parts with OEM parts on those vehicles which had actually had non-OEM parts installed. Neither of these theories establishes that DeFrank suffered any damage under the Consumer Fraud Act.

First, DeFrank no longer owns his truck, which was sold for fair market value. Accordingly, as plaintiffs’ own damages expert, Dr. Mathur, acknowledged at trial, DeFrank is not entitled to installation damages.

Second, reliance on specification damages is entirely inappropriate for DeFrank’s consumer fraud claim. As explained in our discussion of plaintiffs’ breach of contract count, specification damages are not, in fact, real or measurable damages and, hence, in no way constitute “actual damage” within the meaning of the Act. In addition, with respect to DeFrank’s consumer fraud claim, specification damages make no chronological sense. Under plaintiffs’ theory of specification damages, the damage done to DeFrank occurred at the moment State Farm specified non-OEM parts in its repair estimate. However, the alleged misrepresentations made to DeFrank, and the alleged failure to disclose the categorical inferiority of non-OEM parts, occurred 
after
 specification, when DeFrank was handed his estimate and the brochure. Actual damage cannot be the result of omissions and misrepresentations which are made after the damage has already occurred. 
Connick v. Suzuki Motor Co
., 174 Ill. 2d 482, 502 (1996).

Perhaps aware of the temporal problems that arise when actual damage is defined as the mere specification of non-OEM parts, the appellate court offered an additional explanation of damage which, at least implicitly, resolves this problem. The appellate court stated:

“There is evidence that State Farm’s material misrepresentations led numerous class members to blindly accept the non-OEM parts specified (
i.e.
, without knowledge of the inferior condition of those parts).” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).
(footnote: 13)
Notice what the appellate court has done here. With this sentence, it is no longer the case that damage occurred when non-OEM parts were 
specified
. Instead, the damage occurred when non-OEM parts were 
accepted
. This is not the theory of damages which was adopted by the circuit court, nor is it the theory advanced by plaintiffs.

The new theory of damages offered by the appellate court has the virtue of making chronological sense because it places the deception before the damage. Applying this reasoning to DeFrank’s case, DeFrank would first have received an estimate and a brochure, and the omissions in those documents would then have deceived him into “blindly accept[ing] the non-OEM parts specified without knowledge of their categorical inferiority.” However, this theory still does not explain how DeFrank was actually damaged within the meaning of the Consumer Fraud Act. As noted above, even though DeFrank accepted the non-OEM parts that were placed on his truck, he suffered no damage whatsoever as a result of that acceptance. Accordingly, because State Farm’s specification or use of non-OEM parts did not cause DeFrank any actual damage, his consumer fraud claim is without merit.

4. Proximate Cause–Actual Deception

The appellate court’s conclusion that State Farm’s representations “led numerous class members to blindly accept the non-OEM parts specified *** without knowledge of their categorical inferiority” cannot apply in DeFrank’s case for an additional reason–lack of proximate causation.

In a series of three cases, this court has held that in a cause of action for fraudulent misrepresentation brought under the Consumer Fraud Act, a plaintiff must prove that he or she was actually deceived by the misrepresentation in order to establish the element of proximate causation. The three cases are 
Zekman v. Direct American Marketers, Inc.
, 182 Ill. 2d 359 (1998), 
Oliveira v. Amoco Oil Co.
, 201 Ill. 2d 134 (2002), and 
Shannon v. Boise Cascade Corp.
, 208 Ill. 2d 517 (2004).

In the case at bar, State Farm argues that under 
Zekman
 and 
Oliveira
 (
Shannon
 was not yet filed at the time of briefing and argument), DeFrank’s consumer fraud claim must fail because he has not established that he was actually deceived by any omissions or representations made by State Farm. Plaintiffs, in response, argue that 
Zekman
 and 
Oliveira
 are distinguishable from the present case because those cases involved deceptive advertising and alleged fraud on the market, 
i.e.
, misrepresentations made to the public at large, rather than misrepresentations “directed specifically at plaintiffs as policyholders.” According to plaintiffs, a covenant of good faith is implied in every contract and the presence of such a covenant here gave rise “to a relationship quite different than the attenuated nexus between a merchant and prospective consumer in an impersonal deceptive advertising campaign.”

Though not entirely clear, it appears that plaintiffs are arguing in favor of a different definition of causation for those individuals who have contracts with a consumer fraud defendant versus those who do not. To the extent that this is plaintiffs’ argument, we reject it. Further, and more importantly, we reject plaintiffs’ attempt to distinguish 
Zekman
 and 
Oliveria
. The critical point of these cases is not that they involved advertising. Rather, the important legal principle established in 
Zekman
, 
Oliveria
 and 
Shannon
 is that in a case alleging deception under the Act, it is not possible for a plaintiff to establish proximate causation unless the plaintiff can show that he or she was, “in some manner, deceived” by the misrepresentation. 
Oliveria
, 201 Ill. 2d at 155. Proximate causation is an element of all private causes of action under the Act. Thus, DeFrank must establish that he was deceived by State Farm’s representations or omissions in order to prove his claim.

The circuit court did not discuss deception in its judgment order and the court’s entire analysis of proximate causation is contained in its finding that “as a direct and proximate result of State Farm’s violation of the Consumer Fraud Act, the plaintiffs were injured and incurred actual damages.” The appellate court did address deception, although in a summary fashion. The court stated, without further explanation, that “[t]here is overwhelming evidence of State Farm’s calculated deception of its policyholders.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23).

The notion that DeFrank was deceived by the omissions or representations in his estimate and brochure into accepting non-OEM parts is categorically refuted by the record. At trial, DeFrank gave the following testimony:

“Q. [Plaintiffs’ counsel] I may have asked you this. Did you report the collision to State Farm?

A. [DeFrank] Yes.

Q. Did you report it promptly?

A. Yes.

Q. Okay. Tell the jury what happened, Sam, after you called State Farm.

A. They made an appointment with me to take my truck to the claims center which is out by the airport.

Q. Okay.

A. And which I did on that particular day.

Q. Okay. Was it on November the 5th that you did that?

A. Yes, sir.

Q. Okay. Tell the jury what happened on November the 5th when you went out there.

A. Well, I took my truck to the claims center. I pulled it inside. And the fellow there that–he started looking it over. And I said, Oh, yeah. By the way, I said, I want all GM parts on that truck.

Q. Why did you happen to bring that up?

A. Seeing commercials on TV where they say, you know, keep your GM car all GM.

Q. Okay. That was all you knew about it?

A. That was all I knew about it at the time.

Q. What did he tell you?

A. He said, We will talk about that later.

Q. Did that indicate anything–what did you think?

A. I figured something was up.

Q. Okay. Did you talk to a man named–a claim representative or somebody named Richard Hill?

A. Yes, sir.

Q. Okay. When did you do that?

A. When?

Q. Yeah. When did you do that? Was that while the truck–

A. While this other fellow was looking at my truck and, I guess, writing the estimate on that, we went into his office.

Q. Richard Hill?

A. Richard Hill’s office.

Q. Okay. And did what [
sic
] Mr. Hill give you?

A. We talked for a little bit, and then he handed me a little brochure from State Farm.

Q. Okay.

A. That stated their policy.

Q. Okay. Did it tell you that–state their policy about what?

A. If they used non-OEM parts on your vehicle.

Q. That they would use non-OEM?

A. That they stand behind it. Yeah.

Q. What was your reaction to finding out that they were going to use non-OEM parts on your vehicle?

A. I was very upset.

Q. Did you complain?

A. Did I to Mr. Hill at that time? Yes.

Q. And what was Mr. Hill’s response to you?

A. He just promised me that–or basically said that there was really–that’s how they do it, and that they stand behind their non-OEM parts. If I had any trouble they would take care of me.”

DeFrank’s testimony makes it abundantly clear that he was not deceived by anything State Farm said, or did not say, regarding the quality of non-OEM parts. Even before he spoke to the State Farm adjuster, DeFrank believed, in his own mind, that non-OEM parts were not as good as OEM parts. Otherwise, he would not have insisted that GM parts be installed on his truck. Further, DeFrank would not have become, in his words, “very upset” upon learning that non-OEM parts were to be used on his truck unless he believed that non-OEM parts were not as good as OEM parts.

Neither the appellate court nor the circuit court addressed DeFrank’s testimony or explained how, in light of that testimony, it can be said that he “blindly” accepted the non-OEM parts “without knowledge of their categorical inferiority.” 321 Ill. App. 3d 269 (quote contained in a portion of the opinion unpublished under Supreme Court Rule 23). DeFrank plainly was not deceived by State Farm’s estimate or “Quality Replacement Parts” brochure. Because he was not deceived by State Farm, DeFrank failed to establish the proximate causation necessary to recover under the Consumer Fraud Act.

In light of the above, it is clear that DeFrank suffered no actual damage, and that he failed to establish proximate causation. For these reasons, DeFrank failed to prove a private cause of action under the Consumer Fraud Act. Because DeFrank, as the representative plaintiff, has not proven his claim for consumer fraud, there can be no Illinois class for plaintiffs’ consumer fraud count. See, 
e.g.
, 
Oliviera
, 201 Ill. 2d at 156-57;
 Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co.
, 114 Ill. 2d 278, 294-95 (1986). Therefore, we reverse the judgments of the circuit and appellate courts in favor of plaintiffs on the consumer fraud count.

D. 
Other Issues

In light of our disposition of plaintiffs’ consumer fraud claim, we need not reach other issues raised by State Farm in relation to that claim, including the propriety of the circuit court’s punitive damages award.

III. Equitable and Declaratory Relief

In count III of their third amended complaint, plaintiffs sought a declaration of rights and a permanent injunction that would,
 inter alia
, prohibit State Farm from representing “that non-OEM crash parts are of ‘like kind and quality’ to OEM crash parts” or that non-OEM crash parts can “restore a vehicle to its pre-loss condition.” The circuit court granted plaintiffs declaratory relief. The court entered a declaration which stated, in essence, that State Farm’s contractual obligation was the same with respect to each member of the class, regardless of variations in policy language and state regulations. However, the court declined to award plaintiffs injunctive relief, finding that money damages constituted an adequate remedy at law.

In light of our disposition of plaintiffs’ claims for breach of contract and statutory consumer fraud, we affirm the circuit court’s denial of equitable relief. We reverse the circuit court’s granting of declaratory relief.

CONCLUSION

For the foregoing reasons, that portion of the circuit court’s judgment which denied plaintiffs’ request for equitable relief is affirmed. All other portions of the circuit court’s judgment are reversed. Those portions of the appellate court judgment which affirmed the denial of equitable relief and which reversed the circuit court’s award of disgorgement damages are affirmed. All other portions of the appellate court’s judgment are reversed.

Appellate court judgment affirmed in part

and reversed in part;

circuit court judgment affirmed in part

and reversed in part.

JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE FREEMAN, concurring in part and dissenting in part:

I agree with my colleagues with respect to some, but not all, of the issues raised in this appeal. Apart from my disagreement on these legal matters, I am troubled by the tone and tenor of today’s opinion. I, therefore, write separately to explain my views.

I. BREACH OF CONTRACT

The court reverses the jury verdict in favor of the plaintiff class outright, based on several different rationales. I agree with two major points. First, I concur in the judgment that the nationwide class certification cannot stand. While I disagree with the court’s analysis, I believe its conclusion is correct. Further, although the court rightly concludes that the “specification” damages have no basis in law, thus necessitating reversal, I cannot completely join in this portion of the court’s opinion because of some unnecessary 
dicta
.

Notwithstanding the above, I respectfully disagree with the remainder of the court’s conclusions on the breach of contract claim, and dissent therefrom. As I will explain, the court errs in its conclusion that plaintiffs cannot prove a breach of any of the various insurance policies in effect during the class period. Moreover, I do not believe that the jury engaged in improper speculation in awarding installation damages, such as would necessitate this court stepping in and overruling the jury verdict.

A. Nationwide Certification

The court concludes that nationwide certification was erroneous because the various contracts State Farm uses in different states cannot all be interpreted as promising the same thing. Although I agree with the ultimate result reached by my colleagues–I, too, would find that the circuit court erred in certifying the nationwide class–I disagree with the court’s reasoning.

As an initial matter, the court’s analysis with respect to this issue is plagued by inconsistencies. For example, the court criticizes the circuit court’s conclusion that there is a unitary contractual promise, noting that the various contracts contain different language and that there is no evidence to support the conclusion that the language is irrelevant to determining State Farm’s obligations to its insureds. See slip op. at 22-23. The court specifically holds that the “like kind and quality” policy form and the “pre-loss condition” form “are 
not
 the same.” (Emphasis in original.) Slip op. at 19. But later, the court inexplicably accepts 
State Farm’s argument 
that “[t]he term ‘like kind and quality,’ as used in the relevant policies, meant ‘sufficient to restore a vehicle to its pre-loss condition.’ ” Slip op. at 31. In other words, despite what the court said earlier, it ultimately concludes that the promises in the two contracts 
are
 the same. If the promises are the same, then any differences between the forms are irrelevant.

In another example of inconsistency, the court states that the circuit court should have ruled before trial on the issue of whether State Farm’s various contract forms had a unitary promise. Slip op. at 17. However, when it comes to reviewing the lower courts’ rulings, the court holds that “there is simply no 
evidentiary support
 for the lower courts’ conclusion that” there is a unitary promise. (Emphasis added.) Slip op. at 23. The evidentiary support the court considers but finds wanting consists, of course, of information adduced at trial. See slip op. at 21-23. This is clearly inconsistent with the earlier statement that the circuit court ought to have decided the issue before trial began, in light of the fact that the court is–quite properly, in my mind–willing to entertain the possibility that evidence adduced at trial could demonstrate that State Farm had a common obligation to all of its policyholders, regardless of variations in the contracts State Farm drafted.

Moreover, the court’s rejection of the evidence adduced at trial–specifically, the testimony of Don Porter–cannot withstand scrutiny. First, I note that the court characterizes Porter as “a State Farm property consultant in auto general claims.” Slip op. at 10. This description connotes that Porter is the equivalent of a lower level employee. In reality, Porter, a State Farm witness, worked at the State Farm home office in Bloomington as one of only 19 State Farm “property consultants” in the entire nation. At the time of trial, he had been a State Farm employee for 21 years. Porter specifically testified that he was “here to testify to what we do as an organization and what I know that my comrades do when we talk about the use of these parts.”

Porter testified, as the court admits, that State Farm had a uniform nationwide practice: “ ‘restoring the vehicle to its pre-loss condition.’ ” Slip op. at 10. The court, however, determines that it may ignore this testimony because Porter did not specifically refer to each and every form of contract which State Farm used. I do not believe that the court is respecting the standard of review. Had Porter testified that he arranged his bookshelves in alphabetical order by title, we would not refuse to accord this testimony weight because he did not 
specifically
 testify that he placed 
Moby Dick 
before 
Wuthering Heights
. Porter was no neophyte, and he was testifying to the practices of State Farm “as an organization.” His testimony cannot be brushed away on the basis that he might not have been talking about State Farm as a whole.

The court also interprets Porter’s testimony in the light least favorable to the result reached by the circuit court, stating that his general testimony regarding State Farm’s practices related only to State Farm’s “philosophy,” and not its contractual obligations. In other words, the court overrules the circuit court because although State Farm might have had a nationwide “philosophy,” its various policies might have promised less–
i.e.
, State Farm might as a matter of “philosophy” give its policyholders 
more
 than the benefits for which they have paid. Although it might make a nice sound byte for State Farm’s advertisements, this is simply conjecture, not a valid basis for overruling the circuit court. We must defer to the circuit court’s interpretation of testimony unless it is clearly erroneous. That standard clearly has not been reached here. At best, the court is suggesting another 
possible
 interpretation of the testimony at issue and substituting its judgment for the circuit court’s. This is not a reviewing court’s role. Porter, during his testimony, made a general, categorical statement that State Farm had an overarching consistent obligation. As the court admits, Porter knew that State Farm had several differently worded policies; it is not as if he were unaware that State Farm chose to use different language in its policies in different states. Nevertheless, he testified that its obligation was everywhere the same.

The court also makes much of Porter’s numerous self-serving statements that State Farm’s only intent was to restore its insureds’ vehicles to their “pre-loss condition.” (Indeed, Porter repeated this phrase no less than 26 times during the course of his testimony.) But sometimes, another answer slipped through. For instance, when asked whether State Farm treated all insureds “equally with respect to specifying non-OEM crash parts,” Porter testified, “In my experience, we do. 
It doesn’t make any difference the age of the vehicle
, the type of the vehicle.” (Emphasis added.) This cuts against the court’s argument that State Farm’s obligation depends on the preloss condition of every individual vehicle, as a vehicle’s age is a component of its preloss condition. At another point, counsel for State Farm asked Porter to supply his definition of “the term ‘non-OEM part.’ ” He responded:

“Well, a non-OEM part to me is a part that’s made by other than the original manufacturer. And, you know, but it simply to me, is you buy a part from Ford and if the Ford fender was made by Ford, but you can buy that fender that’s–that’s originally produced by Ford by another manufacturing firm that has produced the same type of fender or fenders 
as good as the fender that was the OEM fender
.” (Emphasis added.)

Here Porter clearly testified that non-OEM parts had to be as good as OEM parts.

On cross-examination, Porter was asked about a confidential internal State Farm memorandum, titled General Claims Memorandum (GCM) #430 (I will return to this document later). Porter admitted that this document required that non-OEM parts “must be of OEM quality.” Plaintiffs’ counsel subsequently posed the following question to Porter, and received the following response:

“Q. Yes, sir. Now, is there a guarantee to–anywhere else other than this general claims memo that guarantees that these parts will be made out of the same construction and have the same structural integrity as the OEM parts?

A. You know, sir, I would have to say that, 
yes, it does 
after all 
because
 it says quality replacement part, and 
when we say quality replacement part, we mean those parts that are as good as the parts that were on the vehicle at the time of the loss
.” (Emphases added.)

Porter here made clear that the term “quality replacement part,” which meant “parts that are as good as the parts that were on the vehicle at the time of the loss,” was a guarantee of 
OEM quality.
 Thus, here, Porter equated the guarantee to restore the vehicle to preloss condition with a guarantee of OEM-quality replacement parts. This telling admission wholly undermines the court’s theory that preloss condition destroys commonality, because if preloss condition means OEM quality, then a vehicle cannot be restored to preloss condition with a part which falls short of OEM quality, and thus individual examinations of plaintiffs’ vehicles is not necessary if, as the jury concluded, all non-OEM parts are of lesser quality than OEM parts.
(footnote: 14)
 The jury was entitled to believe Porter’s admissions in plaintiffs’ favor over his constant repetition of a term favoring State Farm, his long-term employer. The court’s proffered reasons for disregarding Porter’s testimony are simply untenable.

The court’s treatment of Porter’s testimony, moreover, is not an isolated event. I am troubled by the court’s consideration–or more appropriately its lack of consideration–of the evidence adduced at trial. This case comes before this court on appeal from a trial which lasted more than seven weeks–50 days elapsed between opening arguments on August 16, 1999, and the jury’s October 4 verdict. Over the course of the trial, 81 witnesses testified, with the circuit court admitting into evidence well over 200 exhibits. Before the case even went to trial, there were over two years of pretrial proceedings between the filing of plaintiffs’ original class action complaint in July 1997 and the August 1999 beginning of trial. The common law record alone runs to more than 30,000 pages of filings. And yet, in an 81-page opinion, the court devotes 
less than two full pages 
to its initial recitation of the facts. It concerns me, as it ought to concern anyone, to see that the actual evidence adduced in this case is given such short shrift.

As I stated at the outset of this separate opinion, however, I do ultimately agree with my colleagues that the nationwide class cannot stand. Initially, I believe that the circuit court abused its discretion in applying Illinois law to the contracts between State Farm and non-Illinois residents. Illinois follows the Restatement (Second) of Conflict of Laws in making choice-of-law decisions. 
Morris B. Chapman & Associates, Ltd. v. Kitzman
, 193 Ill. 2d 560, 568 (2000). The Restatement provides that when the parties have not made an effective choice of law, the factors of possible relevance to choice of law in breach of contract cases are

“(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties,”

which are to be “evaluated according to their relative importance with respect to the particular issue.” Restatement (Second) of Conflict of Laws §188, at 575 (1971). In the context of insurance contracts,

“[T]he rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship *** to the transaction and the parties, in which event the local law of the other state will be applied.” Restatement (Second) of Conflict of Laws §193, at 610 (1971).

Accord 
Westchester Fire Insurance Co. v. G. Heileman Brewing Co.
, 321 Ill. App. 3d 622, 630-31 (2000). With respect to automobile insurance contracts, the “principal location of the insured risk” is that location in which the vehicle is to be garaged during most of the insurance policy’s term. Restatement (Second) of Conflict of Laws §193, Comment 
b
, at 611 (1971).

Of the above factors, the only one which would appear to militate in favor of applying Illinois law to the out-of-state contracts is the fact that State Farm is an Illinois resident. The most important factor, the location of the insured risks–the insureds’ vehicles–would cut against application of Illinois law. The contracts would not have been delivered in Illinois. The insureds would not be domiciled in Illinois. And the last act to give rise to a valid contract–either the insureds’ signatures or the deposit of checks in the mail–most likely would not have occurred in Illinois. Consideration of the relevant factors would appear to militate strongly against applying Illinois law to the entire multistate class in this case.

Moreover, even if the fact of State Farm’s Illinois domicile sufficed to uphold application of Illinois law according to Illinois choice of law principles, doing so would not pass constitutional muster. In 
Phillips Petroleum Co. v. Shutts
, 472 U.S. 797, 86 L. Ed. 2d 628, 105 S. Ct. 2965 (1985), the Supreme Court reviewed a class action brought in Kansas against Phillips Petroleum for recovery of interest on royalties in oil and gas contracts. The contracts at issue were entered into in 10 different states. Even though most of the contracts were entered into outside Kansas, the Kansas Supreme Court upheld its trial court’s decision to apply Kansas law to the entire action.

The Supreme Court reversed. The Court stated that even in a case where multiple choices of law might be 
possible
, the forum court’s choice of law had to comply with constitutional guarantees of due process. 
Shutts
, 472 U.S. at 822-23, 86 L. Ed. 2d at 649, 105 S. Ct. at 2980 (“in many situations a state court may be free to apply one of several choices of law. But the constitutional limitations *** must be respected even in a nationwide class action”). The Court rejected the rule formulated by the Kansas Supreme Court that “ ‘Where a state court determines it has jurisdiction over a nationwide class action and procedural due process guarantees of notice and adequate representation are present, we believe the law of the forum should be applied unless compelling reasons exist for applying a different law.’ ” 
Shutts
, 472 U.S. at 821, 86 L. Ed. 2d at 648, 105 S. Ct. at 2979, quoting 
Shutts v. Phillips Petroleum Co.
, 235 Kan. 195, 221-22, 679 P.2d 1159, 1181 (1984). The Court also noted that a plaintiff’s choice of the forum state’s law–as evinced by having filed the suit there–is of “little relevance.” 
Shutts
, 472 U.S. at 820, 86 L. Ed. 2d at 648, 105 S. Ct. at 2979. Rather, the Court held that to apply its own law, the forum state “must have a ‘significant contact or significant aggregation of contacts’ to the claims asserted by each member of the plaintiff class, contacts ‘creating state interests,’ in order to ensure that the choice of [the forum state’s] law is not arbitrary or unfair.” 
Shutts
, 472 U.S. at 821-22, 86 L. Ed. 2d at 648, 105 S. Ct. at 2979. The Court concluded that, in the case before it, “[g]iven [the forum state’s] lack of ‘interest’ in claims unrelated to that State, and the substantive conflict with jurisdictions such as Texas, we conclude that application of [the forum state’s] law to every claim in this case is sufficiently arbitrary and unfair as to exceed constitutional limits.” 
Shutts
, 472 U.S. at 822, 86 L. Ed. 2d at 648, 105 S. Ct. at 2979.

The same shortcomings that caused the Supreme Court to find a constitutional violation in 
Shutts
 are present in the instant case. As in 
Shutts
, there are significant outcome-determinative differences between the law of Illinois and the laws of other states regarding the breach of contract action. For instance, our circuit and appellate courts determined that State Farm’s promise to have repairs performed with parts “of like kind and quality” meant “of like kind and quality to OEM parts,” a conclusion with which I agree. However, as State Farm observes, courts in other jurisdictions have not so construed the language. See, 
e.g.
, 
Ray v. Farmers Insurance Exchange
, 200 Cal. App. 3d 1411, 1417, 246 Cal. Rptr. 593, 596 (1988) (“ ‘like kind and quality’ *** means ‘substantially the same condition [as] before the accident’ ”), quoting 
Owens v. Pyeatt
, 248 Cal. App. 2d 840, 849, 57 Cal. Rptr. 100, 107 (1967); 
Schwendeman v. USAA Casualty Insurance Co.
, 116 Wash. App. 9, 22-23, 65 P.3d 1, 8 (2003); see also
 Berry v. State Farm Mutual Automobile Insurance Co
., 9 S.W.3d 884, 894-95 (Tex. Civ. App. 2000). Other states have expressly provided by statute or regulation that non-OEM parts may be used in repairs so long as they are the equivalent of the part on the vehicle immediately prior to the accident. See Or. Rev. Stat. §746.287(2) (1999); Mass. Regs. Code tit. 211, §133.04(1) (2004); 806 Ky. Admin. Regs. 12:095 (2003). Application of these jurisdictions’ laws would change the outcome of the instant case.

It is possible for a forum state to have a sufficient interest in the resolution of the claims of out-of-state litigants as to render the application of the forum state’s law neither arbitrary nor fundamentally unfair despite outcome-determinative differences. 
Shutts
, 472 U.S. at 818, 86 L. Ed. 2d at 646, 105 S. Ct. at 2977-78. However, I do not believe that Illinois has such an interest in the instant action. It is true that State Farm is an Illinois corporate citizen, and Illinois does have an interest in regulating its conduct. However, Illinois does not have any particularly compelling interest in protecting the rights of the citizens of other states, especially given that there is no indication that the other states are unable or unwilling to vindicate the rights of their citizens within their own court systems, according to their own laws. Moreover, neither State Farm nor any non-Illinois policyholder would appear to have had any reasonable expectation that Illinois law would govern their contractual dispute. See 
Shutts
, 472 U.S. at 822, 86 L. Ed. 2d at 648-49, 105 S. Ct. at 2979-80 (fairness calculus must take into account the reasonable expectations of parties as to which state’s law would control). Thus, I believe that applying Illinois law to the entire nationwide class which the circuit court certified in this case would run afoul of the due process concerns spelled out in 
Shutts
, and I would reverse the multistate certification for this reason. See 
State ex rel. American Family Mutual Insurance Co. v. Clark
, 106 S.W.3d 483, 486-87 (Mo. 2003).

B. Contract Interpretation

Having determined that the nationwide class cannot stand, the court next examines whether the verdict may be upheld with respect to any subclass. Slip op. at 23. The court concludes that the question must be answered in the negative. The court actually answers this question in two paragraphs, with no analysis nor citation to authority, based on the verdict form. See slip op. at 23-24. This ought, perhaps, to be the end of the opinion. But, the court quickly turns the reader’s eye away from the paucity of its analysis of what is apparently the determinative issue in the case by turning to a lengthy exegesis of the individual policy forms.

Before reviewing the court’s conclusion that, as a matter of law, the plaintiffs failed to prove a breach of any promise State Farm made in any of the various policies State Farm drafted, it is helpful to recall the overarching theme of the plaintiffs’ complaint. At its heart, plaintiffs’ complaint was that State Farm promised policyholders that their vehicles would be repaired with OEM-quality parts, but the non-OEM parts State Farm specified for repairs were simply not as good as OEM parts and that State Farm knew it. State Farm knowingly specified the inferior non-OEM parts, plaintiffs contended, because they were cheaper. These contentions cannot be ignored, when one considers the evidence adduced at trial. Plaintiffs presented to the jury numerous internal State Farm memoranda that detailed problems with non-OEM parts, some of which criticized non-OEM parts as a class. One such memorandum went so far as to state specifically, in contrasting galvanized OEM parts with nongalvanized non-OEM parts, that “we may well say it is like kind and quality, but the bottom line is that it is not the same.” Plaintiffs also presented expert testimony to the effect that non-OEM parts were categorically inferior to OEM parts and thus were 
never
 of like kind and quality. State Farm does not challenge these experts’ 
bona fides
 on review, and thus their conclusions must be accepted. I believe it is important to note that a reviewing court neither can substitute its judgment for that of the trier of fact nor can it set aside a verdict simply because the trier of fact could have drawn different conclusions from conflicting testimony. 
Doser v. Savage Manufacturing & Sales, Inc.
, 142 Ill. 2d 176 (1990). Although State Farm presented its own expert witnesses, a “battle of the experts” is a situation in which reviewing courts are especially loathe to second-guess the findings made by the trier of fact. See 
In re Glenville
, 139 Ill. 2d 242 (1990).

The court avoids discussing the evidence presented by plaintiffs by holding that State Farm never promised any policyholders that repairs would utilize parts of equal quality to OEM parts. Thus, according to my colleagues, it 
does not matter 
whether State Farm was knowingly repairing its policyholders’ vehicles with inferior parts, because State Farm never promised to use noninferior parts. I suggest that the court has perhaps insufficiently considered the policy implications of overturning a billion dollar verdict on the basis that an insurer’s knowing usage of inferior parts is “good enough.” I am not stating that non-OEM parts are by definition inferior; my point is that plaintiffs alleged, and by its verdict the jury found, that as of now non-OEM parts are not up to the standards of OEM parts–a factual conclusion the court avoids addressing. The quality of non-OEM parts could change in the future, but the court does not dispute that the crash parts State Farm was actually specifying for repairs were inferior to their OEM counterparts.

In addition to being bad policy, the court’s conclusion is also based on a flawed analysis of the relevant contractual provisions. In this regard I note a piece of evidence which the court has remarkably determined to be irrelevant. In 1986, State Farm’s vice president of claims penned a confidential internal memorandum, known as “General Claims Memorandum #430” (hereinafter GCM #430). Therein, he discussed the quality of the parts to be used in repairs. He–that is, State Farm’s vice president of claims–specifically distinguished between what was required of “aftermarket” parts and what was required of “salvage” parts. As an aid to understanding the memorandum, I note that it is uncontroverted that “aftermarket” is a synonym for “non-OEM,” and it is also uncontroverted that “salvage” parts are, as the name implies, a lower grade than non-OEM parts. In comparing the two grades of parts, State Farm’s vice president of claims had this to say:

“
Aftermarket parts must be of OEM quality
; that quality must be guaranteed by the supplier;

Salvage parts must be 
of equal, or better, quality 
compared to the parts being replaced
.” (Emphases in original.)

Thus State Farm specifically required that non-OEM parts be of equal quality to OEM parts, only holding “salvage” parts to the lesser standard of equivalence to the parts being replaced.

One might think that this would be the end of the matter. A reasonable reader might expect that a reviewing court would affirm the lower court’s conclusion that non-OEM parts had to be of equal quality to OEM parts, given a memorandum by State Farm’s vice president of claims which precisely so stated. The court, however, does not consider whether GCM #430 ought to be treated as a binding admission by State Farm, because the court, in a footnote, concludes that GCM #430 is irrelevant. See slip op. at 29 n.5. Instead, the court performs its own investigation into the policies at issue, ignoring the fact that State Farm has already said that its non-OEM (aftermarket) parts “must be of OEM quality,” as opposed to salvage parts, a lower grade, which are merely required to be of equal quality “to the parts being replaced.”

Even if the court were correct to so blatantly ignore the evidence, its analysis of the contracts is logically faulty. For instance, in what the court calls “The ‘You Agree’ Policies” (see slip op. at 25 (heading 2)), State Farm promises to restore the insured’s vehicle to its “pre-loss condition.” This particular form of the contract also contains what the court calls the “you agree” language:“
You
 agree with us that such parts may include either parts furnished by the vehicle’s manufacturer or parts from other sources including non-original equipment manufacturers.” (Emphasis in original.) See slip op. at 25.

The court’s defense of this policy form is two-fold, and begins by focusing on the “you agree” language. The court reasons that by agreeing to this language a policyholder has implicitly admitted that there must exist at least some non-OEM parts capable of satisfying State Farm’s promise. The court construes this admission strictly against the policyholder (in startling contrast to the court’s treatment of State Farm’s admission in GCM #430 that non-OEM parts must be of equal quality to OEM parts). See slip op. at 25.

First, one must recall that this is an insurance policy–a classic contract of adhesion. See 
Cramer v. Insurance Exchange Agency
, 174 Ill. 2d 513, 533 (1996) (Freeman, J., specially concurring) (“It is well established that an insurance contract is one of adhesion”); see also 
Williams v. Illinois State Scholarship Comm’n
, 139 Ill. 2d 24, 72 (1990) (adhesion contracts are those in which the parties are in a disparate bargaining position, and one party has no hand in drafting the agreement but, rather, must “take it or leave it” as the other party has drafted). Contractual clauses which are “part of a ‘boilerplate’ agreement” in a contract of adhesion have their “significance greatly reduced because of the inequality in the parties’ bargaining power.” 
Williams
, 139 Ill. 2d at 72. The average person has no ability to bargain over the individual clauses of his or her auto insurance policy. The court ignores this fact, and seriously damages the credibility of its analysis by doing so. The notion that a policyholder has entered into a binding, factual admission simply by purchasing an auto insurance policy would merely be laughable if the court was not seriously suggesting it as a basis for overturning a billion dollar verdict produced by a two-month-long trial in which the evidence supports the conclusion that an insurer knowingly specified inferior crash parts for repairs of its policyholders’ vehicles.

More overridingly, however, even ignoring the injustice of strictly construing a contract of adhesion in favor of the drafter, the court’s analysis is logically flawed. The “you agree” language is 
not 
an admission that there exist non-OEM parts which will restore vehicles to their preloss condition. It is merely an agreement that 
if
 State Farm proposes to perform a repair with a non-OEM part which 
is
 sufficient to restore a vehicle to its preloss condition, the insured cannot object to the part 
simply 
because it is non-OEM. But if non-OEM parts are 
not
 sufficient to restore vehicles to their preloss condition, as plaintiffs have consistently maintained and as the jury by its verdict found, the policyholder cannot be not forced to accept it simply because of the “you agree” language.

The fallacy of the court’s position is better viewed when one examines how it would play out in the context of other policies State Farm could have issued. Suppose, for example, that State Farm knew that all of the major auto manufacturers were considering building plants in a foreign country that I shall designate as Country A. In anticipation of the plants being built and in order to forestall any complaints by policyholders about receiving parts produced in Country A, State Farm amended its policy so as to provide that

“
You
 agree with us that such parts may include parts furnished by the vehicle’s manufacturer, including parts manufactured in Country A.”

The reasoning employed by the court in the instant case would hold that everyone insured under this policy has entered into a binding admission that there are General Motors parts manufactured in Country A which are of sufficient quality to restore their vehicles to preloss condition. This is logically fallacious. Recall that the policy language in my hypothetical was drafted in 
advance
 of the plant in Country A being built, and thus at the time it went into use, there did not exist 
any 
General Motors parts made in Country A. A plain reading of this language is, rather, a concession by the insured that 
if
 a part manufactured in Country A suffices to restore his vehicle to its preloss condition, he may not reject the part simply 
because 
of its origin in Country A.

My colleagues might protest that this hypothetical is far-fetched– and it may be–but no more so than the court’s tortured reading of language in a contract of adhesion against innocent policyholders in order to avoid having to acknowledge the proofs adduced at trial. The underlying point remains that the language upon which the court relies is 
not
 an admission by an insured that there exist non-OEM parts which suffice to restore a vehicle to its preloss condition. It is merely an agreement that 
if
 there are such parts, the insured may not refuse to accept them 
simply
 because they are non-OEM parts.

The second stage of the court’s defense of this policy form focuses on the fact that State Farm’s promise is to restore the insured’s vehicle to its “pre-loss condition.” The court believes that this policy form is unsuited to be the basis of a class action because to determine whether a vehicle has been restored to its preloss condition requires determination of the condition of each individual policyholder’s vehicle before the loss and after repair, and this multitude of individual questions would “overwhelm any question common to the subclass.” Slip op. at 26.

However, as I have already noted, State Farm witness Porter testified that the term “quality replacement part,” which meant “parts that are as good as the parts that were on the vehicle at the time of the loss,” was a guarantee of 
OEM quality.
 This testimony equates the guarantee to restore the vehicle to preloss condition with a guarantee of OEM-quality replacement parts, which undermines the court’s theory that preloss condition destroys commonality. If preloss condition means OEM quality, as Porter’s testimony reveals, then a vehicle cannot be restored to preloss condition with a part which falls 
short
 of OEM quality. Thus if, as the jury concluded, all non-OEM parts are of lesser quality than OEM parts, individual examinations of plaintiffs’ vehicles is 
not
 necessary. State Farm does not argue in its briefs to this court that the circuit court erred in determining that the “pre-loss condition” and “like kind and quality” promises are the same. Indeed, to the contrary, State Farm affirmatively argues that the promises 
are
 the same, an argument the majority accepts. See slip op. at 30-31.

Accordingly, the court has failed to demonstrate any reason that plaintiffs would be barred from recovering under “The ‘You Agree’ Policies.”

The court’s analysis of the “like kind and quality” policies also falls short. Here, the court examines those policies in which State Farm has written that it promises to “pay to repair or replace the property or part with like kind and quality.” The court construes this language in the most favorable way possible for State Farm, concluding ultimately that this is an unambiguous promise to restore the vehicle to its preloss condition–a term which appears nowhere in this form of the contract.

The court acknowledges (see slip op. at 27) plaintiffs’ argument that “like kind and quality” means of “like kind and quality to OEM parts.” This interpretation is well supported by State Farm’s own analysis of the standards required of non-OEM parts, in GCM #430:

“
Aftermarket parts must be of OEM quality
; that quality must be guaranteed by the supplier;

Salvage parts must be 
of equal, or better, quality 
compared to the parts being replaced
.” (Emphases in original.)

I respectfully suggest that this ought to be the end of the matter. Plaintiffs argue that “like kind and quality” means “like kind and quality to OEM parts”; State Farm has admitted in its internal memoranda that this is 
precisely
 the quality standard it requires of non-OEM parts; case closed.

Instead, the court once again ignores the memorandum by State Farm’s vice president of claims and construes the language State Farm drafted in State Farm’s favor, even going so far as to draw inferences advantageous to State Farm. See slip op. at 28-31. In so doing, the court abandons our well-established rule that ambiguities in insurance contracts are to be strictly construed 
against 
the drafter. See 
Travelers Insurance Co. v. Eljer Manufacturing, Inc.
, 197 Ill. 2d 278, 293 (2001); 
American States Insurance Co. v. Koloms
, 177 Ill. 2d 473, 479 (1997); 
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 108-09 (1992).

The phrase “like kind and quality” is clearly ambiguous. The language itself gives no clue as to whether it means of like kind and quality 
to OEM parts 
or 
to the part which existed on the vehicle immediately prior to the crash
. But instead of construing this phrase against State Farm, as mandated by our precedent, the court bends over backwards to find an interpretation that favors State Farm. For instance, the court reasons that if non-OEM parts 
never
 satisfied this promise (as plaintiffs have alleged), there would be no need for this “indirect phrasing.” Slip op. at 28. In other words, the court finds that the very vagueness of State Farm’s contract of adhesion is a point in State Farm’s 
favor
.

Moreover, the court misses the fundamentally obvious point that State Farm and the plaintiffs 
disagreed
 as to whether non-OEM parts were of like kind and quality to OEM parts. State Farm, of course, has maintained all along that non-OEM parts are or can be of like kind and quality to OEM parts. Given this professed belief, there was no reason for State Farm to restrict itself only to using OEM parts. The proofs at trial, however, convinced the jury that this was not the case. Essentially, the court is saying that State Farm must not have promised that any non-OEM parts it used would be of OEM quality 
because the plaintiffs argued and proved that State Farm never fulfilled this promise.
 This defies reason. We do not automatically adopt a defendant’s interpretation of a contract it drafted whenever a plaintiff proves a breach of its interpretation of the contract. To so suggest is absurd.

The court also draws inferences in favor of State Farm from the sentence which follows the “like kind and quality” promise: “If the repair or replacement results in better than like kind and quality, you must pay for the amount of the betterment.” Clearly this statement by State Farm in its contract of adhesion is meant to cover State Farm in the unlikely event that a repair left the policyholder better off. But the court argues on State Farm’s behalf that the very existence of this statement shows that “like kind and quality” cannot mean “like kind and quality to OEM parts,” because if it did, nothing could ever run afoul of the “better than ‘like kind and quality’ ” language. Slip op. at 29. First, this reasoning is faulty in much the same way as the court’s reasoning regarding the “you agree” language: State Farm could just as easily have provided that “If the repair or replacement results in your vehicle being able to fly to the moon, you must pay for the value of this ability.” That State Farm included self-serving language in a contract of adhesion does not constitute an admission by its policyholders regarding the hypothetical possibility against which State Farm has sought to protect itself.

Moreover, the proofs plaintiffs presented at trial concerned the quality of non-OEM parts during the relevant period. Plaintiffs claimed, and the jury concluded, based on documentary evidence and the testimony of experts whose 
bona fides
 State Farm does not challenge on appeal, that non-OEM parts were not the equal of OEM parts. This does not foreclose the possibility that a master craftsman in Zurich might in the future take it upon himself to smith a set of General Motors crash parts out of titanium alloy, to such precise tolerances that the parts were indeed an improvement on OEM parts. More realistically, it is possible that in the future a company could mass produce non-OEM parts which are better than OEM parts. It could happen. But according to the proofs plaintiffs presented at trial, and the verdict the jury returned in plaintiffs’ favor, it has not happened yet. State Farm has protected itself against this eventuality by the sentence upon which the court relies. But there is no basis for the court’s broad inference from this sentence to support its interpretation of the baseline promise State Farm has made in this version of the policy.

Again, the flaw in the court’s reasoning is that it is taking into account plaintiffs’ 
theory
 of the case in evaluating State Farm’s contractual 
promises
. The court’s reasoning runs as follows: if, as plaintiffs contend, no non-OEM parts were of like kind and quality to OEM parts, then there would have been no reason for State Farm to draft the policy in the manner in which plaintiffs suggest they did. The problem with this reasoning is that it was very much in dispute whether non-OEM parts were of like kind and quality to OEM parts. State Farm has consistently maintained and still maintains that they are or can be equivalent, and 
State Farm drafted the policy
.

Moreover, as I have already observed, the court ultimately concludes that “like kind and quality” means something which is nowhere found in the language of this policy: it means, just as State Farm argues, “ ‘sufficient to restore a vehicle to its pre-loss condition.’ ” Slip op. at 30-31. There are a number of difficulties with this conclusion. First, it contravenes the rule that ambiguous language in an insurance contract is to be strictly construed against the insurer. Clearly the court finds the “like kind and quality” language ambiguous, given that the court ultimately finds that it has a meaning contained nowhere in the contract. Given that it is ambiguous, there is no question that it ought to be construed against State Farm. 
Eljer Manufacturing
, 197 Ill. 2d at 293; 
Koloms
, 177 Ill. 2d at 479; 
Outboard Marine
, 154 Ill. 2d at 108-09.

A second problem with the court’s conclusion is that in order to reach it, the court ignores State Farm’s own admissions that non-OEM parts “must be of OEM quality.” The court’s willful blindness to GCM #430 is truly troubling. It is, of course, possible for reasonable minds to differ as to the weight to accord a particular piece of evidence. But to act as though a document on the precise issue at hand, penned by State Farm’s vice president of claims, does not even 
exist
 does a disservice not only to the parties but also to the credibility of this court. The court suggests that GCM #430 is irrelevant because it is not contained within the four corners of the policy and the court has not 
explicitly
 found that the “like kind and quality” language is ambiguous. See slip op. at 29 n.5. This misses the mark. As I have already observed, the meaning the court ultimately ascribes to the phrase–“sufficient to restore a vehicle to its pre-loss condition”–is 
itself
 not found within the four corners of the document. It can only further erode the public’s trust in the judiciary to reverse a verdict of this size, ignoring relevant evidence precisely on point, because the court claims it is 
unambiguous
–clear, beyond any doubt–that State Farm’s promise to “repair or replace the property or part with like kind and quality” means “with a part equally bad to whatever part was on the vehicle just before the accident” and 
cannot possibly 
mean “like kind and quality to OEM parts.” There is no defensible basis for this conclusion and there is a host of evidence to the contrary, including not only Porter’s testimony and the text of GCM #430, but also extensive testimony by State Farm witnesses that repairs with non-OEM parts would never compromise the safety of the vehicle. If State Farm may utilize replacement parts no better than the parts which happened to be on the vehicle preaccident, however old or faulty, as the court concludes, a vehicle could very well have safety issues after repair. If the court is looking outside the document to understand the meaning of the phrase, and there is no question that it is, then the court is 
treating
 the phrase as ambiguous, regardless of whether my colleagues are forthright enough to so admit.

Moreover, GCM #430 itself shows that the court’s analysis of the contract is wrong–not only is the phrase ambiguous, but the court has actually interpreted it incorrectly. GCM #430 
directly
 contradicts the court’s pro-State Farm interpretation of the ambiguous phrase in State Farm’s insurance policy. Not only did the vice president of claims specify that aftermarket parts had to be “of OEM quality,” he also specified that the lesser standard of equality to “the parts being replaced”–
i.e.
, preloss condition–was a standard applicable only to “salvage parts.” How the court can square its interpretation of “like kind and quality” with this evidence is beyond me. Apparently, given the court’s deafening silence on the matter, it is beyond the court as well.

The court errs in construing the ambiguous language “like kind and quality” in favor of State Farm, in terms which appear only in other versions of the policy. Doing so violates the rule that ambiguous terms in insurance policies are strictly construed against the drafter. Indeed, three out of the four members of today’s majority have authored opinions which have explicitly endorsed this long-standing rule of construction of insurance contracts, and the fourth member has recently concurred in an opinion in which the rule was applied. See 
Eljer Manufacturing
, 197 Ill. 2d at 293 (Justice McMorrow, writing for the court, acknowledging that “if the language of the policy is susceptible to more than one meaning, it is considered ambiguous and will be construed strictly against the insurer who drafted the policy and in favor of the insured”); 
Central Illinois Light Co. v. Home Insurance Co.
, 213 Ill. 2d 141, 153 (2004) (Justice Garman, writing for the court, acknowledging that “if the words used in the policy are reasonably susceptible to more than one meaning, they are ambiguous and will be strictly construed against the drafter”); 
Gillen v. State Farm Mutual Automobile Insurance Co.
, 215 Ill. 2d 381, 393 (2005) (Justice Fitzgerald, writing for a unanimous court, acknowledging that “[i]f the policy language is susceptible to more than one reasonable meaning, it is considered ambiguous and will be construed against the insurer”). This construction also contradicts the court’s own statements that “There is nothing to support the conclusion that [linguistic differences] are irrelevant and that all of State Farm’s policy variations therefore are susceptible of the same contractual interpretation” (slip op. at 22-23) and that the “like kind and quality” policy form and the “pre-loss condition” form “are 
not
 the same.” (Emphasis in original.) Slip op. at 19. The court also ignores State Farm’s own interpretation of its obligations in GCM #430, a document by a State Farm vice president which directly contradicts State Farm’s position and the court’s conclusion regarding what is required of non-OEM (aftermarket) parts. The court’s conclusion that in order to be “like kind and quality,” non-OEM parts need merely to be sufficient to put the car in preloss condition erases the distinction 
drawn by State Farm 
in GCM #430 between non-OEM parts and salvage parts.

Because the reasoning regarding the “like kind and quality” form of contract is erroneous, there is no reason that plaintiffs could not recover under this form of the contract as well as the “pre-loss condition” form of contract, as I previously demonstrated.

Unlike my colleagues, I would construe the ambiguous terms in State Farm’s policies against the drafter, in accordance with our unwavering precedent. See, 
e.g.
, 
Eljer Manufacturing
, 197 Ill. 2d at 293; 
Koloms
, 177 Ill. 2d at 479; 
Outboard Marine
, 154 Ill. 2d at 108-09. Noting that State Farm witness Porter testified that State Farm’s obligation was everywhere the same, and that State Farm’s vice president of claims specified that non-OEM parts must be “of OEM quality,” as opposed to the lesser standard of equivalence “to the parts being replaced,” which applied only to salvage parts, I would affirm the conclusion of the circuit court and appellate court that State Farm could only satisfy its obligations to its insureds with non-OEM parts of equivalent quality to OEM parts.

C. Damages

The court goes on to discuss the damages awarded on the breach of contract claim, even though doing so is not necessary to its decision. Having already determined that the verdict form was faulty and there was in any event no breach of any of the underlying policies, the court’s decision to address damages is clearly 
dictum
, even though the court labels its damages discussion an “additional reason” to reverse. As I stated at the outset, I agree with the court that there is no basis for the so-called “specification” damages. No State Farm policyholder was harmed by the isolated act of State Farm 
specifying
 that their vehicle was to be repaired with a non-OEM part. Rather, only those policyholders whose vehicles were 
actually
 repaired with non-OEM parts or who paid the difference to have OEM parts installed can be said to have been harmed.

However, I do not agree with the court’s unwarranted attack on plaintiffs’ counsel for requesting specification damages. First, it is 
wholly
 irrelevant to the legal issues involved in this case “why plaintiffs devised their specification-damages theory in the first instance.” Slip op. at 33. The court’s answer to this question is nothing more than an attack on plaintiffs’ counsel as unintelligent and dishonest, in that order. The court reasons that counsel was, at first, ignorant that plaintiffs would have to establish damages without destroying commonality and, then, mendacious enough to deliberately invent a bogus category of damages in order to hoodwink the circuit court into maintaining this action as a class action when it should not have been. Slip op. at 33-34. This vilification of plaintiffs’ counsel is wholly speculative and injudicious.

The court’s attack has the additional fault of being inaccurate. The court guesses that plaintiffs invented specification damages because without them, plaintiffs would have been “unable to establish damages and still maintain the commonality required of a class action.” Slip op. at 33. And yet, the court does not hold that the other category of damages plaintiffs claimed, installation damages, destroyed commonality. In fact, the court admits that there is nothing wrong with “us[ing] statistical inference in determining aggregate damages in a class action suit” (slip op. at 37), as plaintiffs did with respect to installation damages. The court here implicitly admits that plaintiffs 
could
 have established installation damages without destroying commonality (the court simply holds that plaintiffs presented insufficient 
evidence
 to support their installation damage claim in this case, a conclusion with which I disagree, as I shall discuss). So the “realization” the court attributes to plaintiffs is entirely false. And thus the attack on plaintiffs’ counsel, along with the impugning of their integrity, unwarranted even if it were accurate, is ill-founded as well.

With respect to installation damages, I would hold that plaintiffs did present sufficient evidence to uphold their installation damages claim. This court has stressed that the determination of the amount of damages is a function reserved to the trier of fact and that a reviewing court should not substitute its opinion for the judgment rendered in the trial court. 
Richardson v. Chapman
, 175 Ill. 2d 98, 113 (1997). Moreover, “a court reviewing a jury’s assessment of damages should not interfere unless a proven element of damages was ignored, the verdict resulted from passion or prejudice, or the award bears no reasonable relationship to the loss suffered.” 
Snelson v. Kamm
, 204 Ill. 2d 1, 37 (2003). Therefore, when “the calculations and proportions of the award demonstrate a strong relation to the evidence presented, the jury’s determination 
cannot 
be against the manifest weight of the evidence. See 
Jones v. Chicago Osteopathic Hospital
, 316 Ill. App. 3d 1121, 1138 (2000) (if a jury’s award falls within the flexible range of conclusions reasonably supported by the evidence, it must stand).” (Emphasis added.) 
Snelson
, 204 Ill. 2d at 38-39. These long-standing principles are nowhere acknowledged in today’s opinion.

The court’s damages discussion presents an anomaly in American jurisprudence, in that it would reverse a damage award for being 
too low
. I know of no rule of law which would lead a court of review to conclude, as the court does today, that if the jury had given plaintiffs more than it believed the plaintiffs had proven they deserved, it would affirm, but because the jury was conservative and awarded a low amount, plaintiffs are entitled to no compensation at all.

In my view, the court appears to be punishing the conservatism of the jury’s damage award. Dr. Mathur testified that damages could be as high as $1.2 billion. He also testified that his estimate could be off by as much as $1 billion. The jury obviously took Dr. Mathur at his word. The jury accepted the top estimate Dr. Mathur suggested, but reduced his highest estimate by the largest correction he endorsed. These calculations clearly “demonstrate a strong relation to the evidence presented” (
Snelson
, 204 Ill. 2d at 38), and thus are not against the manifest weight of the evidence. I decline to join the court’s suggestion that jury awards which bear a strong relation to the evidence presented might still be reversed for being too low, and I question the impact the court’s discussion will have on future damage awards in this state. And, again, it is worth recalling that the entire discussion here is 
dictum
, as the court has already determined that the plaintiff class is entitled to no relief on other, independent grounds. The court’s decision to include this analysis cannot be understood as anything but a decision to attack this particular jury verdict on every conceivable front.

D. Disposition

In light of the foregoing, I believe that the appropriate disposition with regard to the breach of contract claim is to remand the cause to the circuit court to determine whether there exists any subclass of the nationwide class with respect to which the verdict may be upheld. In contrast to my colleagues, I believe that the proper reason for reversing the nationwide class is the 
Shutts
 problem: there are outcome-determinative differences between the laws of Illinois and the laws of other states, and Illinois has no compelling interest in applying its law to states whose laws differ. See 
supra
, slip op. at 91 (Freeman, J., concurring in part and dissenting in part). But the fact that there are outcome determinative differences between Illinois and 
some
 other states does not mean that there are outcome-determinative differences between Illinois and 
all
 other states. Thus, on remand, I would direct the circuit court to hold a hearing to determine which (if any) of the states that have been the subject of evidence in these proceedings is sufficiently closely aligned with Illinois law that the use of Illinois law to determine the contractual rights of State Farm’s policyholders in that state would not offend State Farm’s due process rights. Such a result would be well within the circuit court’s inherent power to manage class actions. See 735 ILCS 5/2–802(a), (b) (West 1998). See also 
Purcell & Wardrope, Chartered v. Hertz Corp.
, 279 Ill. App. 3d 16, 20 (1996) (“ ‘A class action may, nevertheless, still be maintained, despite these conflicting or differing State laws, and the court may simply choose to divide the class into subclasses. Moreover, if at some later time in the litigation, the subclassification becomes unmanageable, the court, of course, always has the option to set aside the class certification or a portion of it’ ”), quoting 
Purcell & Wardrope, Chartered v. Hertz Corp.
, 175 Ill. App. 3d 1069, 1075 (1988). Assuming that all the requirements of a class action are satisfied with respect to such a subclass, the verdict could be affirmed with respect to that subclass, with damages equal to the 
pro rata
 portion of the nationwide installation damages attributable to the policyholders in those states.

Notwithstanding the decertification of the entire nationwide class, a considerable volume of evidence has been received in connection with this matter and considerable judicial resources which have been expended thereon. As previously noted, this trial lasted nearly two months and the pretrial proceedings spanned more than two years. It would be contrary to any proper sense of judicial economy to require a retrial as to the contract issues for the rights of any subclass of policyholders to which Illinois law could be applied without impacting the due process rights of State Farm.

Nor is judicial economy the only interest to be served by making all reasonable efforts to uphold the verdict to the extent possible. Class actions are a valued, indeed an integral, part of our judicial system and our society. As Chief Justice Burger, in writing for the United States Supreme Court, recognized,

“The aggregation of individual claims in the context of a classwide suit is an evolutionary response to the existence of injuries unremedied by the regulatory action of government. Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.” 
Deposit Guaranty National Bank of Jackson v. Roper
, 445 U.S. 326, 339, 63 L. Ed. 2d 427, 440, 100 S. Ct. 1166, 1174 (1980).

In other words, the class action makes it possible for wrongs, which might otherwise go unredressed, to be pursued, and righted. The possibility that wrongdoers might be held accountable provides a powerful incentive not to engage in even small-scale wrongdoing, and such an incentive can only benefit society as a whole. If there was a wrong committed here–as the jury found, the trial court agreed, the appellate court confirmed, and I would affirm–State Farm ought to be held accountable therefor to the extent that due process will allow.

II. CONSUMER FRAUD

I concur in the court’s analysis of the consumer fraud issue. However, the court’s analysis includes an instance of objectionable 
dicta
. Also, as with the breach of contract issue, I find the tone and tenor of the court’s analysis to be injudicious. I, therefore, disavow and dissent from those instances of hostile rhetoric and objectionable 
dicta
.

I agree with the court’s analysis of the consumer fraud issue. Due to inconsistencies in the arguments of counsel and analyses in the lower courts, the court correctly discusses what allegations are 
not
 at issue. Slip op. at 53-59. This discussion leads to the core allegation of plaintiff’s consumer fraud claim: that, during the claims process, State Farm failed to disclose the categorical inferiority of non-OEM parts. Slip op. at 59-60.

Turning to the propriety of the nationwide consumer fraud class, the court opinion correctly holds that the Illinois Consumer Fraud Act has no out-of-state effect and I expressly agree with the court’s analysis of this issue. Slip op. at 61-70. Further, the court correctly concludes that, in this case, the Consumer Fraud Act applies only to those policyholders whose vehicles were assessed and repaired in Illinois. Accordingly, the court focuses its application of the Act solely on DeFrank, who is the only named plaintiff who can represent an Illinois class. Slip op. at 70-78.

The court eventually concludes as follows. DeFrank suffered no actual damage as a result of State Farm’s specification of non-OEM parts. Slip op. at 75-78. Also, based on this court’s 
Zekman
 and 
Oliveira
 decisions, and DeFrank’s testimony, DeFrank was not actually deceived by anything State Farm said or did not say regarding the quality of non-OEM parts. Slip op. at 78-81.

Although I concur in the court’s analysis of the consumer fraud issue, I dissent from an instance of objectionable 
dicta
. It is found in section II(C)(2) of the court opinion, captioned “The Deceptive Act or Practice.” Slip op. at 72-75. Prior to reaching the determinative issues with respect to DeFrank, the court opinion purports to identify the deceptive act or practice that pertains to DeFrank. However, the opinion already identified this claim. Slip op. at 58-59. The clear purpose of this section is to discuss the state regulation of aftermarket crash parts as a possible basis for reversal. At the close of this discussion, the court expressly declines to resolve the issue. If the court is unwilling to resolve this issue, then the court should not raise it.

I also take issue with the tenor of the court’s analysis of the consumer fraud claim. Like the section dealing with breach of contract, the court indulges in sarcasm, chiding, and innuendo in furtherance of needless and intemperate attacks on the plaintiffs bar and our own appellate court. Some examples follow:

“Plaintiffs deliberately avoided any theory relating to defective parts at trial because such a theory would have significantly increased their burden of proof. Such a theory would also have rendered class certification far less likely, since the common question of fact or law necessary for certification would have been more difficult to establish if plaintiffs had been forced to prove that each individual non-OEM part, or groupings of parts, were defective.” Slip op. at 54.

This is sheer speculation. Also, the majority suggests that the appellate court intentionally rephrased or recharacterized DeFrank’s actual damages to avoid certain “temporal problems.” Slip op. at 77. Assigning such motives to the appellate court constitutes unfair innuendo. These statements impugn the integrity of the bench and bar. I expressly disavow them.

CONCLUSION

Although I am in agreement with my colleagues on a number of legal points, I disagree with many conclusions reached by them today. I find the tone taken by the court with respect to plaintiffs’ trial counsel and the lower courts to be particularly unwarranted given that their actions were not especially egregious. They did not flout any of the rules of this court nor did they break with precedent in such a way as to deserve condemnation. Thus, the question becomes, from whence does this hostility come? What is not said anywhere in today’s opinion is the fact that this case has been the focus of a great deal of national attention with respect to class actions in general and our Fifth District in particular. In my view, today’s opinion appears to be my colleagues’ point of entry into the ongoing national debate concerning class action litigation. It is my considered opinion, however, that while this debate is being conducted in the legislative arena amongst our elected officials in Congress and the Illinois General Assembly, we in the judiciary ought to tread carefully.

I am as troubled as every citizen ought to be about the possibility of abuse of the class action vehicle. And it would further no end to feign ignorance of the fact that some allegations of abuse have been leveled at the courts of this state, and the Fifth District in our state in particular. However, as the saying goes, the baby should not be thrown out with the bath water. In 1977, this court acknowledged the utility of the class action as a method of litigating complex common questions brought by numerous claimants:

“A class action is a potent procedural vehicle. Under its terms claims by multiple persons can be decided without the necessity of the appearance of each. A vindication of the rights of numerous persons is possible in a single action when for many reasons individual actions would be impracticable. [Citations.] The origins of this invention of equity, according to Professor Chafee [citation], go back almost 300 years. Its purpose has been described as ‘to enable it [equity] to proceed to a decree in suits where the number of those interested in the subject of the litigation is so great that their joinder as parties in conformity to the usual rules of procedure is impracticable.’ [Citation.]” 
Steinberg v. Chicago Medical School
, 69 Ill. 2d 320, 334-35 (1977).

Several years later, the United States Supreme Court echoed our sentiments, noting:

“The class-action device was designed as ‘an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.’ [Citation.] Class relief is ‘peculiarly appropriate’ when the ‘issues involved are common to the class as a whole’ and when they ‘turn on questions of law applicable in the same manner to each member of the class.’ [Citation.] For in such cases, ‘the class-action device saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under [Federal Rule of Civil Practice] 23.’ [Citation.]” 
General Telephone Co. of the Southwest v. Falcon
, 457 U.S. 147, 155, 72 L. Ed. 2d 740, 749, 102 S. Ct. 2364, 2369 (1982).

These observations illustrate why class actions have long held a legitimate and important place in the judiciary. Both this court and the United States Supreme Court have approved of this litigation tool for over 100 years. See K. Forde, 
Illinois’s New Class Action Statute
, 59 Chi. B. Rec. 120 (1977) (explaining historical background of class actions). In their haste, perhaps, to take a stand on the class action question, my colleagues seemingly retreat from these time-honored principles and show a new hostility to a long-recognized form of litigation. I feel it is my duty to remind my colleagues that the same standards of review that are at play in the other four districts of the state apply to the Fifth District. I am concerned that today’s opinion sends a message that we, as a court, will employ different standards for cases coming out of the Fifth District on which national attention has been focused in order to reach a desired result. My feelings in this regard stem from the fact that in overturning the verdict in its entirety, my colleagues in this case have ignored the standard of review, humiliated plaintiffs’ counsel, and demeaned both the trial court and the appellate court. It is my sincere hope that the rhetoric employed in today’s opinion will not serve to further coarsen a debate already littered with incivility and hostility.

JUSTICE KILBRIDE joins in this partial concurrence and partial dissent.

FOOTNOTES
1:     
1
The non-OEM crash parts involved in this case are: (1) fenders; (2) hoods; (3) doors; (4) deck lids; (5) luggage lid panels; (6) quarter panels; (7) rear outer panels; (8) front-end panels; (9) header panels; (10) filler panels; (11) door shells; (12) pickup truck beds, box sides, and tail gates; (13) radiator/grill support panels; (14) grilles; (15) headlamp mounting panels/brackets/housings/lenses/doors; (16) tail-light mounting panels/brackets/housings/lenses; (17) outer body moldings; (18) door body side moldings; (19) front wheel opening moldings; (20) side moldings; (21) front and rear fascias; (22) outer panel mounting brackets, supports, and surrounds; (23) bumpers (excluding chrome bumpers); (24) bumper covers/face bars; and (25) bumper brackets/supports.

2:     
2
State Farm made essentially the same objection, in writing, in its “Memorandum Regarding Jury Instructions.” Referring to plaintiffs’ “substantive proposed contract instructions,” State Farm noted that “[t]hese instructions speak of a single State Farm ‘contract’ with the ‘class.’ ” State Farm argued, however, that “there is no one ‘contract’ with the class.”

3:     
3
We granted leave to the following agencies and organizations to file 
amicus curiae
 briefs in support of State Farm: Alliance of American Insurers, Allstate Insurance Company, the Chamber of Commerce of the United States, Citizens for a Sound Economy Foundation, North Carolina Department of Insurance 
et al
., General Motors Corporation 
et al
., Government Employees Insurance Company 
et al.
, Illinois Chamber of Commerce, Illinois Department of Insurance, Illinois Manufacturers’ Association, National Association of Independent Insurers 
et al
., National Association of Insurance Commissioners, National Conference of Insurance Legislators 
et al
., the Superintendent of the Ohio Department of Insurance, Public Citizen, Inc., 
et al.
, and Washington Legal Foundation. We also granted leave to the following agencies and organizations to file 
amicus curiae
 briefs in support of plaintiffs: Alliance of Automotive Service Providers National Association 
et al.
, Illinois Trial Lawyers Association, Trial Lawyers for Public Justice 
et al
., and United Policyholders. See 155 Ill. 2d R. 345.

4:     
4
Plaintiffs make no mention of the “you agree” language in their brief to this court.

5:
Plaintiffs point to a 1986 version of an internal State Farm document, General Claims Memo #430 (GCM #430), which, according to plaintiffs, contradicts State Farm’s position that “like kind and quality” means “sufficient to restore a vehicle to its pre-loss condition.” However, as State Farm claims consultant Don Porter stated at trial, GCM #430 is not contained within the four corners of any State Farm insurance contract. GCM #430 is therefore extrinsic evidence as to the meaning of the “like kind and quality” contractual promise. Absent a finding that the “like kind and quality” promise is ambiguous, such extrinsic evidence is irrelevant to the meaning of this contractual provision. See 
Grzeszczak v. Illinois Farmers Insurance Co.
, 168 Ill. 2d 216, 223-24 (1995); 
Dempsey v. National Life & Accident Insurance Co.
, 404 Ill. 423, 426 (1949). We make no such finding of ambiguity. 

6:     
6
In affirming the certification of the nationwide class, the appellate court stated: “[T]hrough its own records State Farm is capable of identifying class members who have had non-OEM parts installed on their vehicles.” 321 Ill. App. 3d at 283. However, in its brief to the appellate court, State Farm flatly contradicted this assertion: “State Farm’s records do not show which class members’ vehicles had actually been repaired with non-OEM parts, let alone which class members still owned such vehicles.” The appellate court never explained the discrepancy between its statement and State Farm’s.

7:     
7
John Werner, an assistant director in State Farm’s research division, testified that, while the company’s computer system could tell what kind of part was specified on an estimate, it could 
not
 tell what kind of part, whether OEM or non-OEM, was actually installed on a policyholder’s vehicle.

8:     
8
The dissent agrees that the verdict in favor of plaintiffs on the consumer fraud count must be reversed in its entirety. Slip op. at 107-08 (Freeman, J., concurring in part and dissenting in part). Thus, the dissent’s statement that this court is now employing “different standards” to class action cases arising out of the Fifth District (slip op. at 110 (Freeman, J., concurring in part and dissenting in part)), must apply only to those cases alleging breach of contract.

9:     
9
Plaintiffs made similar statements in various other filings in the circuit court. For example, in “Class Plaintiffs’ Reply to State Farm’s Informational Memorandum of Law on Plaintiffs’ Causes of Action,” plaintiffs wrote the following: “State Farm contends that ‘Plaintiffs have only vaguely alluded to any specific misrepresentation or omission.’ 
See
 Def. Mem. at 13. This contention is ludicrous. Plaintiffs repeatedly have stated that State Farm’s practice of promising in Plaintiffs’ policies to restore Plaintiffs’ vehicles to pre-loss condition by using parts of like kind and quality, but nonetheless using inferior non-OEM crash parts which were not of like kind and quality and which did not restore Plaintiffs’ vehicles to their pre-loss condition violated the CFA [Consumer Fraud Act].” Similarly, in their written opposition to State Farm’s motions for summary judgment on class claims and against the named plaintiffs, plaintiffs identified the fraudulent misrepresentation as “State Farm’s promis[e] in the policy to restore Plaintiffs’ vehicles to pre-loss condition by using parts of like kind and quality.”

10:     
10
Plaintiffs’ exhibits 115 and 116 are two internal State Farm memoranda which discuss the term “quality replacement parts.” There is no allegation that these memoranda were ever seen by any member of the class.

11:     
11
The word “actual” was added to section 10a(a) by Public Act 89–144, effective January 1, 1996. Without expressing any opinion on the significance of this change, we note that DeFrank’s accident occurred in 1997 and, thus, is covered by this language. See 
Greisz v. Household Bank (Illinois)
, 8 F. Supp. 2d 1031, 1043 (N.D. Ill. 1998) (discussing the change in language).

12:     
12
DeFrank was not the only named plaintiff for whom the use of non-OEM parts made no difference. State Farm paid plaintiff Carly Vickers “book value” for her car after it was totaled in an accident. In her trial testimony, Vickers stated that, as far as she knew, State Farm did not value the car any less because of the non-OEM parts which were on it.

13:     
13
The appellate court did not identify what percentage of the class it was referring to when it used the term “numerous.” Nor did the court explain why, if only “numerous class members” were damaged, State Farm was held liable for damages to the entire class. 

14:     
14
On this topic I note that the court has accepted State Farm’s argument that its contractual guarantees to restore vehicles to their “pre-loss condition” and to perform repairs with parts of “like kind and quality” may be defined in terms of each other. See slip op. at 30-31. If the promises are fungible, as the court admits, then clearly plaintiffs could show that State Farm breached its promise to restore their vehicles to preloss condition by showing that State Farm was not using parts of “like kind and quality.”